1

2

3 **UNITED STATES DISTRICT COURT**

4 **EASTERN DISTRICT OF CALIFORNIA**

5

6 ESTATE OF CECIL ELKINS, JR., et al.,            CASE NO. 1:13-CV-1483 AWI SAB

7           Plaintiffs

8           v.                                    **ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

9 CALIFORNIA HIGHWAY PATROL, et
al.,
10                                                (Doc. No. 103)
          Defendants
11

12

13         This case stems from a fatal confrontation between decedent Cecil Elkins, Jr. ("Elkins")

14 and the last remaining defendant, California Highway Patrol ("CHP") Officer Hipolito Pelayo

15 ("Pelayo").  Plaintiffs are the estate and family members of Elkins, and they allege various claims

16 under 42 U.S.C. § 1983 and California state law.  Pelayo now moves for summary judgment on

17 the claims against him.  For the reasons that follow, Pelayo's motion will be granted.

18

19                         __SUMMARY JUDGMENT FRAMEWORK__

20         Summary judgment is proper when it is demonstrated that there exists no genuine issue as

21 to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R.

22 Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-

23 Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary judgment bears

24 the initial burden of informing the court of the basis for its motion and of identifying the portions

25 of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine

26 issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d

27 265 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is

28 "material" if it might affect the outcome of the suit under the governing law.  See Anderson v.

1   Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); United States v. Kapp, 564 F.3d 1103, 1114

2   (9th Cir. 2009). A dispute is "genuine" as to a material fact if there is sufficient evidence for a

3   reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248;

4   Freecycle Sunnyvale v. Freecycle Network, 626 F.3d 509, 514 (9th Cir. 2010).

5         Where the moving party will have the burden of proof on an issue at trial, the movant must

6   affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

7   Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an

8   issue at trial, the movant may prevail by presenting evidence that negates an essential element of

9   the non-moving party's claim or by merely pointing out that there is an absence of evidence to

10   support an essential element of the non-moving party's claim. See James River Ins. Co. v. Herbert

11   Schenk, P.C., 523 F.3d 915, 923 (9th Cir. 2008); Soremekun, 509 F.3d at 984. If a moving party

12   fails to carry its burden of production, then "the non-moving party has no obligation to produce

13   anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan

14   Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If the moving party

15   meets its initial burden, the burden then shifts to the opposing party to establish that a genuine

16   issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio

17   Corp., 475 U.S. 574, 586 (1986); Nissan Fire, 210 F.3d at 1103. The opposing party cannot "'rest

18   upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets

19   forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope

20   Records, 515 F.3d 1019, 1030 (9th Cir. 2008).

21         The opposing party's evidence is to be believed, and all justifiable inferences that may be

22   drawn from the facts placed before the court must be drawn in favor of the opposing party. See

23   Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Narayan v. EGL, Inc., 616 F.3d 895, 899

24   (9th Cir. 2010). While a "justifiable inference" need not be the most likely or the most persuasive

25   inference, a "justifiable inference" must still be rational or reasonable. See Narayan, 616 F.3d at

26   899. Summary judgment may not be granted "where divergent ultimate inferences may

27   reasonably be drawn from the undisputed facts." Fresno Motors, LLC v. Mercedes Benz USA,

28   LLC, 771 F.3d 1119, 1125 (9th Cir. 2015); see also Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158,

1175 (9th Cir. 2003).  Inferences are not drawn out of the air, and it is the opposing party's

obligation to produce a factual predicate from which the inference may be drawn.  See Fitzgerald

v. El Dorado Cnty., 94 F.Supp.3d 1155, 1163 (E.D. Cal. 2015); Sanders v. City of Fresno, 551

F.Supp.2d 1149, 1163 (E.D. Cal. 2008).  ""A genuine issue of material fact does not spring into

being simply because a litigant claims that one exists or promises to produce admissible evidence

at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Bryant v.

Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  The parties have the

obligation to particularly identify material facts, and the court is not required to scour the record in

search of a genuine disputed material fact.  Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th

Cir. 2010). Further, a "motion for summary judgment may not be defeated . . . by evidence that is

'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v.

CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce

evidence sufficient to create a genuine issue of material fact, the moving party is entitled to

summary judgment.  Nissan Fire, 210 F.3d at 1103.

# FACTUAL BACKGROUND[1]

On the evening of November 11, 2012, Elkins led City of Tulare police officers on a high

speed vehicle chase after an officer saw Elkins burglarizing a car in the Tulare County

Fairgrounds parking lot.  DUMF 1.  The vehicle pursuit ended after Elkins crashed his truck into a

walnut orchard, but Elkins successfully fled from the officers on foot.  See id.

On November 12, 2012, at 6:55 a.m., Elkins had an encounter with members of the City of

Tulare Police Department. See Marvin Dec. ¶¶ 1, 7-17.  Elkins ran from Officer Chris Marvin into

a stolen car that was parked in a driveway.  See id. at ¶¶ 7-11, 15.  A Tulare Police patrol vehicle

arrived and parked behind Elkins's stolen car.  See id. at ¶ 11.  Elkins then drove in reverse at a

---

[1] "DUMF" refers to Defendant's Undisputed Material Fact, "PUMF" refers to Plaintiff's Undisputed Material Fact, and "JUMF" refers to Joint Undisputed Material Fact.  Where a fact or evidence to which an objection has been made is cited in this order, the objection is deemed overruled.  The Court notes, however, that Defendant objects that many PUMF's are not supported by the evidence cited by Plaintiff.  An examination of the PUMF's and the evidence cited in support of them shows that, in many instances, Defendant is correct.  When the evidence cited in support of a PUMF does not actually support the PUMF, the PUMF is not cited or considered for purposes of this order.

1   high speed into the occupied patrol vehicle.  See id. at ¶ 12.[2]  Officer Marvin drew his firearm and

2   ordered Elkins to stop.  See id. at ¶¶ 13-14.  Elkins quickly accelerated his vehicle towards Officer

3   Marvin.  See id. at ¶ 14.  Officer Marvin had to jump "a couple of feet" to avoid being hit by

4   Elkins's car.  See id.  Elkins's car came within a foot of hitting Officer Marvin.  See id.  Officer

5   Marvin discharged his firearm nine times at Elkins, as Elkins fled in the stolen car.  See id. at ¶ 15.

6   Two of Officer Marvin's shots appear to have hit Elkins in the arm.  See Romero Dec. ¶ 28; Short

7   Depo 55:10-56:3;[3] see also PUMF 1.  Elkins drove the car through two yards (including fences)

8   before crashing the car into a tree in a residential yard.  See Marvin Dec. ¶ 16 & Ex. A.  Elkins

9   exited the car, ran to another car that was nearby and had been left running, and fled the scene in

10  that car.  See id. at ¶ 17.  This stolen vehicle was later found totally burned-out.  See id.

        The two Tulare police officers eventually identified Elkins as the person involved in the

12  assaults against them, and Officer Marvin was 100% certain of Elkins's identity after he identified

13  Elkins in a photo-lineup.  See DUMF 5; Marvin Dec. ¶ 20.  Due to Elkins's violent behavior

14  towards the two officers and the lateness of the day by the time Elkins had been identified, it was

15  decided to wait until daylight the next day (November 13, 2012) to pursue and apprehend him.

16  See DUMF 6; Kelly Depo. 23:21-24:11.

        On November 13, 2012, Elkins was wanted by the Tulare Police Department for attempted

18  homicide on a Tulare police officer.  JUMF 7.  Tulare Police Sergeant Fred Ynclan ("Ynclan")

19  requested the assistance of the Tulare County Agencies Regional Gang Enforcement Team

20  ("TARGET") in conducting surveillance on Elkins at a location in the town of Pixley, California.

21  See DUMF 9; PUMF 4.  Pelayo was assigned to TARGET, which is a multi-agency law

22  enforcement task force.  See DUMF 8; PUMF 5.

        A briefing took place on November 13, 2012 at 2:00 p.m. at the Tulare County Sheriff's

[2]Plaintiffs object that Officer Marvin's declaration should be disregarded because it improperly ascribes intentions to
Elkins or describes Elkins's state of mind.  It is true that questions involving an individual's state of mind are
generally factual issues that are inappropriate for summary judgment.  See FTC v. Network Servs. Depot., Inc., 617
F.3d 1127, 1139 (9th Cir. 2010).  However, Officer Marvin's declaration does not purport to ascribe a state of mind to
Elkins, rather Marvin's declaration merely factually describes what occurred.   Plaintiffs' objection is overruled.

[3]Plaintiffs object that Short's deposition contains hearsay, apparently statements by Elkins.  However, the statements
are admissible.  The statements they are not hearsay because they are admissions, they describe a then existing
physical condition, or are statements against interest.  See Fed. Rs. Evid. 801(d)(2); 803(3); 804(b)(3).

1    Department substation in Pixley concerning the need for surveillance and apprehension of Elkins

2    that day.  DUMF 10; see also PUMF 6.  The briefing was led by Ynclan, and was attended by

3    inter alia Pelayo, Tulare Police Detective Jesse Guzman ("Guzman"), Special Agent Frank

4    Navarro, and Commander Michael Haroldsen.  See DUMF 11.  All attendees of the briefing were

5    informed:  (1) Elkins was wanted for serious crimes, including ramming a police car two times

6    and attempting to run over another police officer, which caused the officer to fire shots; (2) Elkins

7    might be using methamphetamine; and (3) Elkins would likely do "whatever it takes to get away

8    from law enforcement."  See DUMF's 22, 23.  The attendees were requested to set up surveillance

9    at the home of Elkins's father in Pixley to see if Elkins could be located there.  DUMF 24.  The

10   plan was to use TARGET to conduct surveillance on Elkins and then have SWAT apprehend

11   Elkins if he was confirmed to be at the location.  DUMF 25.  All attendees were given a booking

12   photo of Elkins and a "Be On the Lookout – Officer Safety" bulletin ("BOLO") concerning

13   Elkins.  See DUMF's 12, 13.  The BOLO stated that on November 12, 2012:  (1) Elkins had been

14   identified driving a stolen vehicle, had fled on foot, and then fled away from Officer Marvin in a

15   stolen car; (2) Elkins had attempted to ram an occupied marked police car by driving it in reverse

16   into the police car; (3) Elkins then drove his vehicle forward towards Officer Marvin; (4) Officer

17   Marvin fired several shots at Elkins; and (5) Elkins fled in an additional stolen vehicle that was

18   later found burned-out near Pixley.  See Pelayo Dec. Ex. F; DUMF's 14-17.  The BOLO also

19   stated that Elkins had been involved in a police pursuit on November 11, 2012, when he drove his

20   truck into an orchard and collided with a tree.  DUMF 18.  The BOLO stated that if Elkins is

21   located, officers should "use caution."  See DUMF 19.  The officers at the briefing concluded that

22   Elkins was potentially violent, especially to law enforcement.  See DUMF 21.  Pelayo was not told

23   that Elkins was possibly armed with a gun.  See PUMF 10.

24        Sometime after the briefing, the TARGET members began their surveillance of the Elkins

25   home in Pixley.  Haroldsen and Navarro were in one car and were set up "on point" near the

26   Elkins home (they could see the front of the house).  See DUMF 28.  Ynclan conducted

27   surveillance from a nearby motel parking lot.  DUMF 29.  Pelayo had the BOLO and mug shot of

28   Elkins, and was set up about one and a half blocks away from the Elkins residence.  See DUMF's

26, 27.  Pelayo remained at this location for about 30 minutes.  See DUMD 26.

Eventually, Haroldsen and Ynclan saw Elkins's father arrive home.  See DUMF 30. Haroldsen saw a second vehicle drive up to the Elkins home.  See DUMF 31.  Ynclan also saw the second car drive up, and saw a male exit the home and then enter the car.  DUMF 32.  Haroldsen ordered someone from TARGET to drive by the home and see who had driven up and who had entered the car.  DUMF 33.

Pelayo drove by the home in his unmarked vehicle.  DUMF 34.  Pelayo identified the male who had exited the house and gotten into the car as Elkins, and noted that the driver of the car was a female (who was later identified as Christie Short).  See DUMF 35.  As Pelayo drove by, Elkins slid down in the passenger seat so only the top of his head was visible.  DUMF 36.  Pelayo radioed that he believed that he had been "made" or identified as an officer.  See DUMF 37.  Short's car then drove off, and was followed by three TARGET vehicles containing five law enforcement agents, including Pelayo.  See DUMF 38.  Short's car eventually stopped at a gas station about two blocks away from the Elkins home.  See DUMF 39.  As soon as Short's car pulled into the gas station, Elkins jumped out of the car and began to run.  See DUMF 40.

While Short's car was being followed, Haroldsen and Ynclan were engaged in radio communication to have a "stop car"/marked vehicle in position to stop and arrest Elkins.  DUMF 41.  Because Short's car stopped at the gas station so soon, the plan changed from finding a marked car to make the arrest of Elkins, to having the surveillance team make the arrest.  DUMF 42.  Haroldsen and Navarro's vehicle pulled in behind Short's car, and Pelayo pulled next to Haroldsen/Navarro.  See DUMF 43.  Pelayo and Navarro exited their vehicles and ran after Elkins. See DUMF's 44, 45; PUMF 17.

Navarro followed Elkins into a tire shop.  See DUMF 46; PUMF 18.  When Elkins entered the tire shop, Guzman and his partner drove their car around the corner.  See DUMF 52.  In the tire shop, Elkins pushed tires, rims, and tools at Navarro and into Navarro's path.  See Navarro Depo. 26:4-27:15; Pelayo Depo. 66:22-67:6.  That is, Elkins used tires and tools as obstacles to keep Navarro from apprehending him.  PUMF 19.  While running after Elkins, Navarro was yelling at Elkins, "Stop.  Police."  DUMF 47.  Pelayo also was yelling commands at Elkins to stop

1   running.  DUMF 48.  Elkins did not obey the commands and continued to run.  DUMF 49.  Based

2   on Elkins throwing or pushing tires and tools, Pelayo believed that Navarro was in danger while

3   Elkins and Navarro were in the tire shop.  See Pelayo Depo. 108:4-21, 112:12-113:4.  Pelayo ran

4   around the tire shop in an attempt to cut-off Elkins.  DUMF 51.

5         Elkins ran out of the north side of the tire shop.  See DUMF 54.  As Elkins exited the tire

6   shop, Pelayo yelled, "Police.  Stop."  DUMF 55.  Elkins did not obey the commands and

7   continued to run in a full sprint, jumping over tires and an eight foot high fence.  See DUMF 56;

8   PUMF 26.  Pelayo observed Elkins use both of his hands to climb the fence.  See PUMF 26.

9   Pelayo saw Elkins land on the other side of the fence.  DUMF 57.

10         When Elkins landed on the other side of the fence, Pelayo immediately identified himself

11   as "police" and gave Elkins commands to stop and for Elkins to show his hands.  See DUMF 58.

12   Guzman had arrived at the fence on foot.  See DUMF 61.  Guzman was 10 to 12 feet away from

13   Pelayo.  See Guzman Depo. 41:9-13.  Guzman had his gun drawn, and also gave Elkins

14   commands to show his hands.  See id. at 41:17-20; DUMF 61.

15         Elkins landed in a crouched position facing north towards an open field, and then turned

16   west.  See DUMF 59.  Guzman had a view of Elkins's back, and Pelayo had more of a side angle

17   and a better view of Elkins's front.  See Guzman Depo. 41:14-17, 42:11-12.  Pelayo could not see

18   Elkins's right hand when Elkins landed.  DUMF 60.   Upon landing and turning west, Elkins

19   started running, and turned his torso counterclockwise to look back at Pelayo (who was northeast

20   of Elkins).  See DUMF 63[4]; Pelayo Depo. 87:3-16.  When Elkins turned his torso

---

[4] Plaintiffs state that DUMF's 63, 64, 65, 66, 67, 68, and 70 are disputed, but do not explain the dispute.  They simply
cite deposition excerpts from Guzman, Ynclan, and Pelayo, and the declaration of Leonard Romero.  See Doc. No.
104-1.  The cited excerpts from Guzman's testimony discuss how Elkins landed from the fence, the positioning of
Guzman, Pelayo, and Elkins, Guzman's commands, when Guzman heard shots fired, Elkins's conduct just before and
after Pelayo fired, and how quickly Pelayo fired the shots.  See Guzman Depo. 39:3-10, 41:9-20, 43:5-15; 44:19-45-7,
64:3-4.  The cited excerpts from Ynclan's testimony discuss Elkins's conduct and positioning after Elkins landed from
the fence, and that Ynclan did not see the entire series of events because he was in the process of parking/driving.  See
Ynclan Depo. 36:9-37:4, 57:18-22.  The cited portion of Pelayo's deposition deals with the position of Elkins's body
at the time Pelayo fired and whether Pelayo could see Elkins's face.  See Pelayo Depo. 91:25-92:6.  Finally, Leonard
Romero (a forensics expert) discusses in a technical manner the location of Elkins's gunshot wounds and the possible
positioning of Pelayo at the time of each shot.  See Romero Dec. ¶¶ 15-30.  Despite the absence of an express
explanation of why Plaintiffs contend that a dispute exists, the Court has examined the cited evidence.  While the
precise wording of the various DUMF's is not necessarily supported by the evidence cited by Defendant, it is not
apparent that the evidence cited by Plaintiffs undermines the substance of the DUMF's.  Without more from Plaintiffs
that clearly demonstrates a genuine material dispute, the Court does not find that the relevant DUMF's are disputed.

1   counterclockwise, Pelayo could see the left side of Elkins's face and Elkins's right hand.  See

2   DUMF 64.  Elkins then reached with his right hand down into his left side waistband, under his

3   shirttail.  See DUMF 65; Guzman Depo. 62:7-21, 68:7-24; Pelayo Depo. 82:2-6; Ynclan Depo.

4   54:12-55:12.  Pelayo testified that it looked like Elkins was reaching for a gun, and not trying to

5   just pull up his pants (Elkins had been wearing loose fitting jeans).  See Pelayo Depo. 82:5-16;

6   PUMF 46.  Guzman believed that Elkins was carrying a firearm because, as soon as Elkins landed

7   over the fence, Elkins moved his hands to his midsection.  See Guzman Depo. 62:7-13.  Pelayo

8   testified that, upon seeing Elkins reach for his waistband, Pelayo immediately fired his gun

9   because he feared for his life.  See Pelayo Depo. 82:22-83:1.  Pelayo was facing Elkins's back at

10  an angle when he fired his gun.  See id. at 92:17-24.  Pelayo did not give a warning before he

11  fired, did not consider lesser means of force before firing, and was not concerned about the safety

12  of others when he fired.  See id. at 96:16-19; PUMF's 29, 41.  Pelayo fired multiple shots in rapid

13  succession.  See Guzman Depo. 43:3-4, 45:4-7, 64:6-15; Pelayo Depo. 83:17-25.  Pelayo

14  continued to move as he fired so as to avoid being a target to Elkins.  See DUMF 68.  After Pelayo

15  fired, Elkins took a couple of steps in a southwest direction, fell and attempted to crawl away.  See

16  Guzman Depo. 43:5-15, 44:18-45:3.  Pelayo testified that he stopped shooting when he perceived

17  that Elkins was no longer a threat.  See Pelayo Depo. 125:13-15.  Guzman did not fire because he

18  did not see a weapon, but he did feel threatened by Elkins based on Elkins's running, ignoring

19  commands, and tucking his hands to his midsection.  See Guzman Depo. 62:22-63:1, 68:7-24.

20  Pelayo testified that Elkins kept his hand at his waist throughout the shooting.  See Pelayo Depo.

21  122:23-123:4; see also Guzman Depo. 68:7-24.  From the time that Elkins landed on the ground

22  from jumping the fence, to the time when Pelayo fired the first shot, "it was just fast . . . maybe

23  two seconds."[5]  Id. at 42:15-19.

24       After Pelayo stopped firing, Elkins continued to try and pull himself forward/crawl.  See

_____

25  [5] Plaintiffs contend that Pelayo fired immediately when Elkins landed on the ground from jumping the fence.  See

26  PUMF 32.  Plaintiffs cite page 41, lines 9 through 20 of Guzman's deposition.  However, that portion of deposition
    testimony describes Guzman's position, his view of Elkins, Pelayo's view of Elkins, orders given by Guzman to

27  Elkins, and Guzman hearing gunshots.  See Guzman Depo. 41:9-20.  At no point in this portion of deposition
    testimony does Guzman give a time estimate.  See id.  In contrast, page 42, lines 15 through 19 expressly give an

28  estimate of "maybe two seconds."  See id. at 42:15-19.  Although two seconds is a short amount of time, it is not
    "immediately."    PUMF 32 is not established.

1   Guzman Depo. 44:24-45:3; Pelayo Depo. 95:24-96:5.  Pelayo and Guzman approached Elkins and

2   ordered Elkins to show his hands.  See Pelayo Depo. 87:25-88:13.  Haroldsen then appeared and

3   handcuffed Elkins for officer safety.  See Haroldsen Depo. 28:8-11.  Elkins was checked for

4   weapons, however no weapons were found.  See JUMF 74.  Only a methamphetamine pipe and a

5   prescription pill were found in the area in which Elkins had reached.  See id.  Pelayo and other

6   officers administered first response to Elkins until medical personnel arrived at the scene.  DUMF

7   75.  However, Elkins died as a result of the gunshots wounds from Pelayo.  See JUMF 76.

8          Prior to the incident with Elkins, on the night of November 23, 2010, Pelayo was involved

9   in an arrest of an individual who was wanted for *inter alia* automobile theft and assault with a

10  deadly weapon (a vehicle).  See Pelayo Depo. 26:5-25; Jones Dec. Ex. A.[6]  Pelayo understood that

11  the suspect had a violent history.  See Pelayo Depo. 37:9-13.  Pelayo was ordered to assist in

12  arresting the suspect.  See Pelayo Depo. 27:9-28:6.  Pelayo arrived at a muddy, plowed,

13  agricultural field.  See id. at 32:8-11.  The suspect was on his knees in the field, his back was

14  arched as he was trying to get up, and Pelayo could not see the suspect's hands.  See id. at 31:15-

15  25.  A single Tulare police officer was standing in front of the suspect.  See id. at 32:24-33:1.  The

16  last transmission from the Tulare police officer was screaming to "get down, get down," which

17  Pelayo took to mean that the officer needed assistance.  See id. at 35:3-11.  Pelayo testified that he

18  did not know that the suspect was handcuffed and had been "tased."  See id. at 40:17-21.  Pelayo

19  testified that he ran towards the suspect to tackle him, but changed his mind because he did not

20  want to be in a situation in which two officers were down in a muddy field with a dangerous

21  suspect; instead, Pelayo moved to the side and hit the suspect on the cheek area.  See id. at 34:3-8,

22  39:2-18.  Pelayo testified that he recalled then saying, "What the fuck did you make me run for?",

23  but that the statement was spontaneous and not directed at anyone.  Id. at 39:19-24, 41:4-10.  The

24  suspect appears to have then been taken into custody without further incident.

25          Pelayo reported his actions to his supervisors, and the Tulare police officer also reported

26  ────────────────

27  [6] Defendant objects that Jones Declaration Exhibit A is inadmissible because *inter alia* it is hearsay under Rule of
    Evidence 802.  Exhibit A is two memoranda from the Highway Patrol regarding the November 2010 incident.  It
    appears that they may be admissible under Rules of Evidence 803(6) or 803(8).  Further, the statements in Exhibit A

28  that are attributed to Pelayo are admissions of a party opponent and thus, not hearsay, under Rule of Evidence
    801(d)(2)(A).  At this time, Defendant's hearsay objection is overruled.

1    the incident.  See id. at 41:24-42:7; Jones Dec. Ex. A at Memo of 2-15-11.  The Tulare police

2    officer told investigators that Pelayo ran up to the suspect, said "This is what you get for making

3    me run bitch!," and then punched the suspect in the face.  See Jones Dec. Ex. A at Memo of 12-7-

4    10.  As the suspect, the Tulare police officer, and Pelayo were all walking out of the field, the

5    Tulare officer reported that Pelayo told the suspect, "You're lucky I didn't shoot your ass."  Id.

6    Investigators deemed the suspect's account of the event to be different from the Tulare police

7    officer's account and "not as egregious."  Id. at Memo of 2-15-11.  It is unclear whether Pelayo

8    was disciplined for the November 2010 incident.  See Pelayo Depo. 42:11-25.

9

10                                   **DEFENDANTS' MOTION**

11   **I.      Fourth Amendment -- Excessive Force**

12            *Defendant's Argument*

13            Pelayo argues that his use of force was objectively reasonable.  Elkins was wanted for

14   attempted homicide and was actively evading arrest.  This was a quickly evolving situation, and

15   Elkins's actions caused the surveillance team to change their plans.  Elkins ran from the tire store,

16   was ordered to show his hands, and was shot shortly thereafter when he reached his hand to his

17   waistband.  Pelayo was aware of the information in the BOLO about Elkins.  Elkins ignored

18   commands and instead reached to his waistband, which Pelayo and other officers saw.  Pelayo was

19   in fear of his life and fired the shots.  Pelayo kept moving and kept shooting.  Pelayo had to make

20   a split-second determination, and the fact that no weapon was recovered does not mean that the

21   use of force was unreasonable.

22            Alternatively, even if there is a Fourth Amendment violation, qualified immunity should

23   be granted.  Case law recognizes that even if a suspect is unarmed, deadly force may be

24   appropriate under the circumstances if the suspect moves as though he is attempting to draw a gun.

25   Given the facts and existing case law, qualified immunity should be granted.

26            *Plaintiffs' Opposition*

27            Plaintiffs argue that Pelayo's use of force was unreasonable.  First, pursuant to CHP

28   policy, the crime that Elkins allegedly committed did not justify Pelayo's use of force.  CHP

1    authorizes deadly force to apprehend a person whom the officer reasonably believed committed a

2    felony involving the use or threatened use of deadly force, except for an assault with a deadly

3    weapon with a vehicle.  This policy applies even more to Elkins because Elkins was running away

4    from officers and was not in a vehicle.

5         Second, Elkins was not an immediate threat to the safety of anyone.  The incident

6    involving Officer Marvin had long since passed, and there was no indication that Elkins was

7    armed with a weapon.  Moreover, the circumstantial evidence undercuts Pelayo's version of

8    events.  Elkins did not have a gun.  This raises the question of why Elkins would reach for his

9    waistband since he knew there were officers around him with their guns drawn?  Under *Cruz v.*

10   *City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014), one answer is that Pelayo is lying.  Further,

11   Elkins was trying to run away from officers, not towards them.  This is confirmed because Elkins

12   was shot in the back by Pelayo, not in the front.  Additionally, the November 2010 incident

13   discredits Pelayo's version of events.  In 2010, Pelayo threatened a suspect that the suspect was

14   lucky Pelayo did not shoot because the suspect made him run.  A jury could view this incident as

15   evidence that Pelayo carried out this thought/threat against Elkins, who also made him run.

16   Finally, Guzman did not see Elkins make furtive movements, and Guzman did not fire despite

17   being in the same line of sight as Pelayo.  As Elkins was shot and wounded the day before by law

18   enforcement, it is highly likely Elkins was simply trying to run away from the officers.

19        Third, although Elkins was fleeing, this consideration is given less weight since flight by a

20   felon alone does not justify deadly force.

21        Fourth, Pelayo did not consider any alternative uses of force.  Pelayo knew that other

22   officers were in the area, and they could have assisted in taking Elkins into custody.  Pelayo's

23   conduct in pursuing Elkins was unreasonable and reckless, and unnecessarily escalated the

24   situation.  Similarly, even though it was feasible to give Elkins a warning that shots would be

25   fired, Pelayo failed to do so.

26        With respect to qualified immunity, it was established well before November 2012 that

27   police officers cannot use deadly force unless the suspect poses an immediate threat of harm to the

28   officers or others, or the suspect is fleeing and the nature of the attempted escape will result in a

serious threat of injury to others.  There are genuine issues of disputed material fact with respect to the facts surrounding the shooting.  Taking the disputed facts in the light most favorable to Plaintiffs, a reasonable officer in Pelayo's position would have known not to use deadly force.

*Legal Standard*

1.      Excessive Force

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under the Fourth Amendment and its standard of objective reasonableness.  See Scott v. Harris, 550 U.S. 372, 381-83 (2007); Graham v. Connor, 490 U.S. 386, 395 (1989).  Cases that involve deadly force do not fit into their own separate category with their own set of "rigid pre-conditions" that must be met, rather the key is whether the officer's actions were reasonable.  See Scott, 550 U.S. at 382-83; Hooper v. County of San Diego, 629 F.3d 1127, 1133 (9th Cir. 2011).  The pertinent question in excessive force cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation."  Graham, 490 U.S. at 397; Hooper, 629 F.3d at 1133.  The objective inquiry into reasonableness is highly fact specific.  See Scott, 550 U.S. at 383; Wilkinson v. Torres, 610 F.3d 546, 551 (9th Cir. 2010).  "We first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors."  Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007).  Factors that are considered in assessing the government interests at stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396; Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010); Davis, 478 F.3d at 1054.  Where it is or should be apparent that an individual is emotionally or mentally unstable, that is a factor that must be considered in determining the reasonableness of the force employed.  See Luchtel, 623 F.3d at 980; Drummund v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003).  Courts also are to consider whether it was feasible to give a warning before using force, and whether a warning was actually given.  See Bryan v. MacPherson, 630 F.3d 805, 831 (9th Cir. 2010).  "In some cases . . .

the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005); see Luchtel, 623 F.3d at 980. However, police officers "are not required to use the least intrusive degree of force possible" as long as the force actually used was reasonable. Forrester v. City of San Diego, 25 F.3d 804, 807 (9th Cir. 1994); see Gregory v. County of Maui, 523 F.3d 1103, 1107 (9th Cir. 2008). That is, a reasonable use of force "encompasses a range of conduct, and the availability of a less-intrusive alternative will not render conduct unreasonable." Wilkinson, 610 F.3d at 551. It may also be appropriate to consider the parties' "'relative culpability,' i.e. which party created the dangerous situation and which party is more innocent, may also be considered." Espinosa v. City & County of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010); see Scott, 550 U.S. at 384. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; Wilkinson, 610 F.3d at 550. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97; Wilkinson, 610 F.3d at 550. "Force is excessive when it is greater than is reasonable under the circumstances." Santos v. Gates, 287 F.3d 846, 854 (9th Cir. 2002).

    2.    Qualified Immunity

       A court employs a tiered analysis for determining qualified immunity. See Saucier v. Katz, 533 U.S. 194, 200-02 (2001); CarePartners LLC v. Lashway, 545 F.3d 867, 876 n.6 (9th Cir. 2008). However, lower courts need not strictly follow the tiered sequence in analyzing qualified immunity, but instead have the discretion to dispose of the issue at step two without addressing step one. Pearson v. Callahan, 555 U.S. 223, 236 (2009); Glenn v. Washington County, 673 F.3d 864, 870 (9th Cir. 2011). Under the first step, the court determines whether, "taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 201; Bingue v. Prunchak, 512 F.3d 1169, 1173 (9th Cir. 2008). All factual disputes are resolved in favor of the party asserting the injury. See Saucier, 533 U.S. at 201; Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir. 2013). If the

answer to the question is "no," then the inquiry ends and the plaintiff cannot prevail; if the answer is "yes," the court continues the analysis.  See Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173. Under the second step, the court determines "whether the right was clearly established," and applies an "objective but fact-specific inquiry."  Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see Saucier, 533 U.S. at 202.  The critical question is whether "the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates the right."  Saucier, 533 U.S. at 202; Inouye, 504 F.3d at 712.  Whether a right is clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 201; Bingue, 512 F.3d at 1173.  If the officer could have reasonably, but mistakenly, believed that his conduct did not violate a clearly established constitutional right, then the officer will receive qualified immunity.  See Saucier, 533 U.S. at 205-06; Ellins, 710 F.3d at 1066.

*Discussion*

1.    Constitutional Violation

The Court must examine not only certain enumerated factors, but "must examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in the *Graham* decision."  Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011).  Further, the Ninth Circuit has cautioned that summary judgment is to be granted sparingly in excessive force cases in which a death occurs, and that the evidence is to be carefully examined because often times the only surviving witnesses to the use of force are the defendants.  See Gonzalez v. City of Anaheim, 747 F.3d 789, 794-95 (9th Cir. 2014).  With this admonition in mind, the Court will carefully examine each relevant consideration separately.

a.    Quantum of Force

Pistol fire is the only quantum of force at issue.  The discharge of a police officer's service pistol represents a very high quantum of force, it is deadly force.  See Adams v. Speers, 473 F.3d 989, 992-93 (9th Cir. 2007).  In order to use "deadly force," an officer must have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  Gonzalez, 747 F.3d at 793.

1          <u>b.</u>     <u>Governmental Interest</u>

2          <u>i.</u>     <u>Severity of the Crime</u>

3        There are a number of crimes at issue in this case.  Elkins had failed to follow the orders of

4  Navarro, Guzman, and Pelayo, which implicates Penal Code § 148.  Pelayo knew that Elkins had

5  previously stolen two vehicles and totally burned one of them, <u>see</u> Pelayo Dec. Ex. F, which

6  implicates Penal Code §§ 487 and 594.  Pelayo also knew that Elkins rammed a stolen car twice

7  into an occupied police car, <u>see</u> DUMF 22, which implicates Penal Code § 245.  However, the

8  crime expressly identified by Pelayo in this motion is attempted homicide of a police officer,

9  which is unlawful under Penal Code § 664(e).  <u>See</u> Cal. Pen. Code § 664(e); JUMF 7.  In

10  California, the attempted murder of a police officer is a felony that is punished be a term of life

11  imprisonment (with the possibility of parole).  <u>See</u> Cal. Pen. Code § 664(e).  For purposes of

12  *Graham*, Penal Code § 664(e) is a severe and dangerous crime.

13        Relying on a section of the CHP Policy Manual, Plaintiffs argue that the attempted

14  homicide in this case is not particularly severe.   Pursuant to CHP Policy 70.6 ¶ 3(b), deadly force

15  is authorized *inter alia* when "necessary to apprehend a person who the officer reasonably believes

16  has committed a felony involving the use or threatened use of deadly force, except for an assault

17  with a deadly weapon (ADW) with a vehicle."  <u>See</u> Ex. H to Chapman Depo.  Plaintiffs maintain

18  that because a motor vehicle was involved in the incident with Officer Marvin, deadly force was

19  not authorized by CHP Policy 70.6 ¶ 3(b).  The Court is not persuaded by Plaintiffs' argument.

20        First, by its express terms, CHP Policy 70.6 ¶ 3(b) does not apply to this case.  The crime

21  against Officer Marvin, and the crime for which Elkins was wanted, was attempted murder of a

22  police officer; it was not assault with a deadly weapon.  Assault with a deadly weapon and

23  attempted homicide of a police officer are found in separate sections of the Penal Code, <u>see</u> Cal.

24  Pen. Code §§ 245, 664, have separate elements, <u>see</u> Cal. Jury Instructions – Criminal (Spr. 2015)

25  §§ 8.68, 9.02, have significantly different sentencing provisions, <u>see</u> Cal Pen. Code § 245(a)

26  (sentence range of 2 to 4 years in prison); Cal. Pen. Code § 664(e) (sentence is life with the

27  possibility of parole), and protect different segments of society.  <u>See</u> Cal Pen. Code § 245(a) (any

28  person can be a victim); Cal. Pen. Code § 664(e) (only peace officers, firefighters, custodial

1   officers, or custody assistants can be victims).  In other words, assault with a deadly weapon and

2   attempted murder of a police officer are separate and distinct crimes that are supported by separate

3   and distinct policy considerations.  That Elkins used a motor vehicle in the attempted murder of

4   Officer Marvin does not transform his crime from one under § 664(e) to one under § 245(a).

5         Second, to the extent that Plaintiffs may contend that CHP Policy 70.6 § 3(b) sets the

6   applicable standard for deadly force in this case, they are mistaken.  A violation of a police

7   department's internal policies or practices will ordinarily not establish a constitutional violation or

8   a basis for 42 U.S.C. § 1983 liability.  See Carlson v. Fewins, 801 F.3d 668, 677-78 (6th Cir.

9   2015); Case v. Kitsap Cnty. Sheriff's Dept., 249 F.3d 921, 929-30 (9th Cir. 2001); Devereaux v.

10  Perez, 218 F.3d 1045, 1056 (9th Cir. 2000); Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992).

11  Rather, whether a use of force (deadly or non-deadly) is justified is determined by the Fourth

12  Amendment's standard of reasonableness under the circumstances.  See Scott, 550 U.S. at 381-83.

13  In some cases, CHP Policy 70.6 § 3(b) arguably may not comport with the Constitution.  See, e.g.,

14  Cass v. City of Dayton, 770 F.3d 368, 375 (6th Cir. 2015); McCullogh v. Antolini, 559 F.3d 1201,

15  1207-08 (11th Cir. 2009).  Therefore, whether Pelayo's use of deadly force complied with CHP

16  Policy 70.6 ¶ 3(b) is not determinative.

17        Because CHP Policy 70.6 ¶ 3(b) neither facially applies to Elkins nor supplies the

18  applicable standard for using force, the crime at issue (Penal Code § 664(e)) remains a dangerous

19  and severe offense.

20              ii.      Active Resistance or Evasion

21        Elkins was not actively resisting Pelayo at the time force was used.  However, Elkins was

22  clearly in the process of active evasion.  Elkins had run into a tire store, threw tools and tires into

23  Navarro's path, ran out of the store, jumped a fence, and was in constant motion.  It is safe to say

24  that Elkins was engaged in "headlong flight," which "is the consummate act of evasion." Illinois

25  v. Wardlow, 528 U.S. 119, 124 (2000).

26              ii.      Threat Posed

27        The threat posed to the safety of an officer or others is the most important factor in

28  evaluating excessive force.  See Gonzalez, 747 F.3d at 793.  Here, the evidence shows that Elkins

posed a significant threat to both the officers and to others.

Three officers (including Pelayo) have testified that Elkins reached for his midsection or waistband after he landed from the fence and began to run.  See Guzman Depo. 62:7-21, 68:7-24; Pelayo Depo. 82:2-6; Ynclan Depo. 54:12-55:12.[7]  This movement caused both Pelayo and Guzman to be placed in fear of their safety because they believed Elkins was reaching for a gun. See Guzman Depo. 62:7-13, 68:7-24; Pelayo Depo. Pelayo Depo. 82:5-83:1.  It is true that Elkins did not have a weapon on him.  See JUMF 74.  However, it is not necessary that an officer's suspicion that a suspect has a gun be correct, as long as the officer reasonably perceived a sufficient threat.  See George v. Morris, 736 F.3d 829, 838 (9th Cir. 2014); see also Cruz v. City of Anaheim, 765 F.3d 1076, 1078, 1079 n.3 (9th Cir. 2014).  Pelayo knew that Elkins had assaulted a Tulare police officer, was wanted for attempting to kill a second Tulare police officer, had flung tires and tools at or in the path of Navarro, was ignoring commands, and was expected to "do whatever it takes to get away from law enforcement."  See DUMF's 14-19; Pelayo Dec. Ex. F; Pelayo Depo. 66:22-67:6.  Elkins's furtive movement, especially when combined with Pelayo's knowledge and observations of Elkins, was sufficient to constitute an immediate threat to Pelayo and Guzman.  See Cruz, 765 F.3d at 1078 (". . . it would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason."); George, 736 F.3d at 838 ("This is not to say that the Fourth Amendment always requires officers to delay their fire until a suspect turns his weapon on them.

---

[7] Citing portions of pages 36, 37, and 54 of Ynclan's deposition, Plaintiffs aver that Ynclan first testified that he could not see Elkins's hands because of his vantage point and being preoccupied with other tasks, it was only after a recess during the deposition that Ynclan tesitfied that Elkins reached for his waistband.  See Doc. No. 104 at 15:7-9.  The Court finds Plaintiff's characterization of Ynclan's testimony to be misleading.  Ynclan testified that Elkins ran along the fence for a few steps before going down, Ynclan did not see everything in sequence because he was driving and had to park, and he did not know Elkins went down.  See Ynclan Depo. 36:9-37:4.  Nowhere in these pages did Ynclan testify either that his vantage point limited his ability to see what was occurring or that he could not see Elkins's hands or Elkins reaching for his waistband.  See id.  As for Ynclan's testimony following a recess, this appears to be an argument that Ynclan either colluded with defense counsel or fabricated his testimony.  However, there is no evidence regarding the nature or extent of the recess, that Ynclan conferred with anyone during the recess, or that Ynclan reviewed anything during the recess.  Moreover, the recess was requested by Plaintiffs' counsel so that she could flip through her notes.  See id. at 54:5-7.  Once the recess ended, the second question asked by Plaintiffs' counsel was whether Ynclan had seen Elkins reach for his waistband.  See id. at 54:5-16.  Given that Pages 36 and 37 do not address Elkins's hands or reaching, and that the recess was for Plaintiffs' counsel to flip through her notes, the obvious conclusion is that counsel recognized that she had not asked a relevant question and then remedied the situation.  The evidence does not support a legitimate argument of collusion or fabrication by Ynclan.

If the person is armed – or reasonably suspected of being armed – a furtive movement, harrowing gesture or serious verbal threat might create an immediate threat.").

Additionally, in order to prevent the escape of a felony suspect, a police officer may use deadly force when:  (1) it is necessary to prevent the escape, and (2) the officer has probable cause to believe that the suspect poses a threat of serious harm either to the officer or others.  Tennessee v. Garner, 471 U.S.  1, 3 (1985); Forrett v. Richardson, 112 F.3d 416, 419 (9th Cir. 1997).  In some circumstances, a "suspect need not be armed or pose an immediate threat to the officers or others at the time of the shooting."  Forrett, 112 F.3d at 420.  "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  Garner, 471 U.S. at 11; Forrett, 112 F.3d at 420.  "Whenever there is probable cause to believe that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, if some warning has been given, where feasible."  Garner, 471 U.S. at 11-12; Forrett, 112 F.3d at 420.  "Under this test, it is not necessary that the suspect be armed or threaten the officer with a weapon."  Garner, 471 U.S. at 11; Forrett, 112 F.3d at 420.

Here, under Garner and Forrett, Elkins posed a threat to the officers and others.  First, as discussed above, Elkins had engaged in two severe felonies on November 12, 2012, assault with a deadly weapon and attempted murder.  Elkins assaulted a Tulare Police officer when Elkins twice rammed his stolen vehicle into the occupied police car.  See DUMF 22; Marvin Dec. ¶ 12.  Elkins then attempted to murder Officer Marvin by running him down with the stolen car.  See Pelayo Dec. Ex. F; JUMF 7; Marvin Dec. ¶ 14.  It is well known that the damage that can be done to a person from a moving automobile can be profound.  Officer Marvin had to take evasive action in order to avoid being run-down by Elkins, and only missed being struck by Elkins's car by about 12-inches.  See Marvin Dec. ¶ 14.  The threat was serious enough for Officer Marvin to discharge his firearm in self-defense.  See id. at ¶ 15.  Therefore, there was probable cause to believe that Elkins had committed felonies involving a threatened infliction of serious physical harm.  See Garner, 471 U.S. at 11-12; Forrett, 112 F.3d at 420.

Second, Pelayo's gunshots were necessary to prevent Elkins from escaping.  Over the course of three days, Elkins evaded police while he was in motor vehicles or on foot.  Elkins first crashed his truck into a walnut orchard while being pursued by the police, yet somehow managed to successfully escape on foot.  See DUMF 1.  Next, Elkins used a stolen vehicle to twice ram a patrol vehicle and then almost run down Officer Marvin.  See DUMF 22; Pelayo Dec. Ex. F; Marvin Dec. ¶¶ 12, 14, 15.  Once that stolen vehicle was disabled, Elkins miraculously stole a second vehicle and again successfully evaded the police.  After this incident occurred, the TARGET officers were informed of Elkins's actions.  Pelayo and other TARGET officers were also told to use caution in apprehending Elkins, and that Elkins would likely do "whatever it takes to get away from law enforcement."  See DUMF's 19, 22; Pelayo Dec. Ex. F.  Consistent with this warning, Elkins jumped out of a car, ran through a tire shop, threw tires and tools at or in the path of Navarro, jumped an eight-foot high fence, began to run again, and reached to his waistband/mid-section.  During the entire encounter on November 13, Elkins ignored multiple commands to stop by at least three different law enforcement officers.  Elkins's conduct demonstrated desperation, violence, and a recklessness or disregard for the life and property of others.  Elkins was willing to use drastic measures to avoid arrest, and his actions reflect a real danger to both law enforcement and anyone else who might be in the area.  Therefore, there was probable cause to believe that Elkins posed a threat of serious physical harm, either to the officers or to others.  See Garner, 471 U.S. at 11; Forrett, 112 F.3d at 420.

Plaintiffs make several arguments that Elkins did not pose a threat, and rely heavily on Cruz v. City of Anaheim.  In Cruz, officers received a tip that Cruz (a discharged parolee) was a gang member who sold methamphetamine.  See Cruz, 765 F.3d at 1077.  The informant said that Cruz had a gun in his waistband and had made it clear that he (Cruz) was not going back to prison.  See id. at 1078.  Officers initiated a traffic stop against Cruz.  See id.  In a parking lot, police cars surrounded Cruz's vehicle.  See id.  Cruz attempted to escape by backing his SUV into one of the police cars.  See id.  Cruz eventually stopped, and five officers got out of their vehicles with their weapons drawn on Cruz (four in front and one behind Cruz's vehicle).  See id. & 1079 n.2.  Cruz opened the door, and the officers shouted at him to get on the ground as he was emerging.  See id.

at 1078. Four of the officers said that Cruz ignored their commands and instead reached for his

waistband. See id. The officers feared that Cruz was reaching for a gun and they opened fire. See

id. After firing, the officers approached and found Cruz's dead body tangled in and hanging from

the seat belt. See id. No weapon was found on Cruz, but a handgun was found in the passenger's

seat. See id. The district court granted summary judgment in favor of the officers. See id. On

appeal, the Ninth Circuit reversed as to four of the officers because there was a constellation of

circumstantial evidence that could cause a reasonable jury to disbelieve the officers. See id. at

1080. The Ninth Circuit commented on that evidence:

> In this case, there's circumstantial evidence that could give a reasonable jury pause. Most obvious is the fact that Cruz didn't have a gun on him, so why would he have reached for his waistband? [Footnote omitted] Cruz probably saw that he was surrounded by officers with guns drawn. In that circumstance, it would have been foolish -- but not wholly implausible -- for him to have tried to fast-draw his weapon in an attempt to shoot his way out. *But for him to make such a gesture when no gun is there makes no sense whatsoever.* A jury may doubt that Cruz did this. Of course, a jury could reach the opposite conclusion. It might believe that Cruz thought he had the gun there, or maybe he had a death wish, or perhaps his pants were falling down at the worst possible moment. But the jury could also reasonably conclude that the officers lied.
>
> In reaching that conclusion, the jury might find relevant the uncontroverted evidence that Officer Linn, one of Cruz's shooters, recited the exact same explanation when he shot and killed another unarmed man, David Raya, two years later under very similar circumstances. Like Cruz, Raya was tracked down after a confidential informant told police that he had a gun and that he "wasn't going back to prison," and, as with Cruz, the tip led to an altercation with Anaheim police that ended with an unarmed Raya biting the dust. Perhaps the most curious similarity: According to the officers who shot the two unarmed men, both reached for their waistbands while the police had their guns trained on them. (One noteworthy difference: Raya was shot in the back because he was running away from Officer Linn when Linn saw him reach for his waistband.) "They both reached for the gun" might be a plausible defense from officers in the line of duty. *"They both reached for no gun" sounds more like a song-and-dance.*
>
> A jury might find implausible other aspects of the officers' story. For starters, four of the officers said they saw Cruz reach for his waistband. A jury might be skeptical that four pairs of eyes had a line of sight to Cruz's hand as he stood between the open car door and the SUV. There is also the fact that Cruz was left-handed, yet two officers attested that they saw Cruz reach for his waistband with his right hand. A reasonable jury could doubt that Cruz would have reached for a non-existent weapon with his off hand. Then there is the officers' claim that Cruz had "exited" the Suburban, and "stood in the doorway," but after he was killed they had to cut him free from his seat belt because he was "suspended" by it. How does a man who has "emerged fully" from a vehicle, and "turn[ed] to face forward," end up hanging from his seat belt after he's shot? Maybe it's possible. But it's also possible that the officers didn't wait for Cruz to exit his car—or reach for his waistband—and simply opened fire on a man who was trying to comply with their

instructions to "[g]et down on the ground."

> The testimony of the only non-police eyewitness, Norman Harms, indicates that Cruz's feet indeed made it out of the car, but that Cruz was "slipping on the ground, like kind of falling down," as if he were "tripping." This paints a different picture than the officers' testimony that Cruz had fully emerged from his SUV and was poised to attack. Based on Harms's testimony, a jury might find that Cruz was trying to get out of the car (as he was ordered to do multiple times after he opened his door) but got caught in his seat belt. Were a jury to believe this version of events—which seems no less likely than a man shot while standing next to a vehicle becoming suspended by a seat belt—this would certainly cast doubt on the officers' credibility and lead the jury to find for plaintiffs.

Id. at 1079-80 (emphasis added). Here, Plaintiffs argue that two aspects of *Cruz* are particularly relevant: no weapon was found on Elkins and Pelayo had a prior experience with a fleeing suspect in which he told the suspect he was lucky not to have been shot. Plaintiffs argue that, as in *Cruz*, this evidence casts enough doubt on Pelayo's credibility that summary judgment should be denied.

After considering the evidence and arguments, the Court finds *Cruz* to be distinguishable. First, the *Cruz* court found the absence of a firearm to be a significant consideration. However, the Court does not read *Cruz* to mean that any time that there is testimony by an officer that a suspect was reaching for his waistband, but the suspect did not actually have a gun, that there is a *per se* genuine disputed issue of material fact. The absence of a firearm was so significant in *Cruz* because of the totality of the circumstances. Cruz was no longer resisting or evading arrest. Cruz was in front of four officers with their guns drawn. Cruz was either exiting or had just exited his vehicle, and he had no weapons on his person. Under those circumstances, a normal person looking down the barrels of four guns and at four tense police officers would be careful not to provoke a further response from those officers. It is counterintuitive that a normal person would reach for his waistband in that situation. See Cruz, 765 F.3d at 1079.

In this case, although Elkins did not have a gun, the circumstances are otherwise different from those in *Cruz*. Elkins had not just stopped his car, and he was not looking directly at four officers with their guns drawn. In fact, it is unknown whether Elkins actually saw any firearms. Elkins was in the process of running and trying to get away from two officers. He had just landed from jumping an eight foot high fence, was in a crouched position, and was beginning to run again. There was nothing to suggest that Elkins was done evading. Also, unlike *Cruz* where

1   nothing was found on Cruz's body, a methamphetamine pipe was found on the left side of Elkins's

2   waistband, which is where Elkins had reached.  See JUMF 74.  Suspects have been known to

3   discard contraband when fleeing from the police.  E.g. California v. Hodari D., 499 U.S. 621, 623

4   (1991); Michigan v. Chesternut, 486 U.S. 567, 569 (1988); People v. Asghedom, 243 Cal.App.4th

5   718, 721-22 (2015); People v. Atlas, 64 Cal.App.4th 523, 525 (1998).  Furthermore, given that

6   Elkins landed from a significant height in a crouching position, it is possible that Elkins reached

7   towards the methamphetamine pipe because it was digging into his abdomen or had caused him

8   pain.  In other words, unlike *Cruz*, there was something for Elkins to reach for in his waistband, as

9   well as a readily conceivable reason to reach for it.  The fact that something, and in particular

10  contraband, was on Elkins where the officers said that Elkins had reached supports Pelayo's (and

11  Guzman's and Ynclan's) account that Elkins reached for his waistband with his right hand.  Under

12  the circumstances of this case, the absence of a firearm on Elkins's person does not undermine

13  Pelayo's credibility.

14        Second, the *Cruz* Court held that a subsequent shooting by one of the defendant officers

15  buttressed the significance of the absence of a gun, and cast further doubt on the officers'

16  credibility.  Two years after the incident with Cruz, one of the officers was involved in another

17  shooting.  As the Ninth Circuit explained, the circumstances were very similar to the

18  circumstances in *Cruz*.  The same type of offenses, with the same type of tips from a confidential

19  informant, led to the shooting of a suspect who allegedly was also reaching to his waistband for a

20  non-existent weapon.  The Ninth Circuit found that under those circumstances, the defense of

21  "they both reached for no gun" sounded "more like a song-and-dance."  Cruz, 765 F.3d at 1080.

22        In this case, Pelayo was involved in an incident two years prior to the encounter with

23  Elkins. As discussed above, Pelayo was directed to assist in the arrest, and believed that a Tulare

24  police officer needed help.  See Pelayo Depo.  27:9-28:6, 35:3-11.  Pelayo saw the suspect getting

25  up, he ran to tackle the suspect, changed his mind, and punched the suspect in the face.  See id. at

26  33:5-34:8; Jones Dec. Ex. A.  Pelayo told the suspect, "this is what you get for making me run,

27  bitch," and may have also said, "what the fuck did you make me run for?"  See Pelayo Depo.

28  39:19-24; Jones Dec. Ex. A.  Pelayo also reportedly told the suspect as they were walking away,

1  "you're lucky I didn't shoot your ass."[8]  See Jones Dec. Ex. A.  Pelayo did not have his gun

2  drawn, had not observed the situation from its inception, and did not testify that he believed his or

3  the other officer's life was in danger.  Although Pelayo perceived a threat, Pelayo only hit the

4  suspect in the face and did not say that the suspect was reaching for anything.  See Pelayo Depo.

5  33:5-34:8.  Pelayo self-reported his conduct to his superiors.  See id. at 41:24-42:7.

6      Unlike the situation in Cruz, Pelayo has not given two separate accounts of similar conduct

7  by unarmed suspects in order to justify deadly force.  In these two incidents, materially different

8  quanta of force by Pelayo were involved, different actions by the subjects occurred, different

9  observations by Pelayo were made, and different justifications were offered by Pelayo for his

10  different uses of force.  In other words, Pelayo has not tried to use what amounts to the same

11  defense in two cases with unarmed suspects.  Cf. Cruz, 765 F.3d at 1080.  Pelayo's credibility is

12  not sufficiently affected by the materially different November 2010 incident.  Cf. id.

13      Plaintiffs also argue that Guzman was only 10 to 12 feet away from Pelayo, but did not

14  discharge his firearm.  This is true.  However, the argument overlooks vital portions of Guzman's

15  testimony.  Guzman testified that he had a view of Elkins's back, while Pelayo had more of a view

16  of Pelayo's side and a better view of Elkins's front.  See Guzman Depo. 41:11-20.  Guzman could

17  see that Elkins was reaching for his waistband, but was unable to see Elkins's hands.  See id. at

18  62:7-:63:1.  Guzman believed that Elkins was reaching for a gun based on Elkins's conduct, but he

19  was waiting to get a view of Elkins's hands before firing.  See id. at 42:6-14, 62:7-31, 68:7-24.

20  Thus, both Guzman and Pelayo reached the same conclusion based on Elkins's conduct – Elkins

21  was reaching in his waistband, likely for a gun.  It is hardly surprising that the officer who had the

22  better view of Elkins's arms/hands (Pelayo) reacted more quickly than the officer who did not

23  have such a view (Guzman).  Under these circumstances, the fact that Guzman did not fire does

24  _____

25  [8] Character evidence is inadmissible to prove conformity with a character trait.  See Fed. R. Civ. Pro. 404(b); see also Gates v. Rivera, 993 F.2d 697, 700 (9th Cir. 1993).  It is for this prohibited Rule 404(b) purpose that the November 2010 incident is potentially most impactful.  In fact, Plaintiffs expressly make this improper argument as part of their

26  opposition.  See Doc. No. 104 at 14:27-15:2 ("It is highly likely that the jury in this case could find that Pelayo was certain to carry out this threat [that suspect was lucky Pelayo did not shoot him] against Elkins for making him run.").

27  The Court will not consider the November 10 incident or statements by Pelayo for such a purpose.  See Fed. R. Evid. 404(b).  However, Cruz recognizes that prior incidents can be used to evaluate credibility.  See Cruz, 765 F.3d at

28  1080.  The Court only considers the November 2010 incident and Pelayo's statements in order to determine whether they sufficiently call Pelayo's credibility into question.

not undermine Pelayo's credibility or show that Elkins was not a threat.

Finally, Plaintiffs argue that Elkins was shot nine times, and many of the bullets had a back to front trajectory, which means that Elkins was shot mostly in the back. See Doc. No. 104 at 4:6-10.[9] However, both Guzman and Pelayo have testified that Elkins was in motion and was starting to run again very soon after landing from the fence. The fact that Elkins was beginning to run again does not negate the threat posed by him. If Elkins had a gun, he could have easily turned his body and shot at Guzman, Pelayo, or others as he was running. Pelayo and Guzman both perceived that Elkins was reaching for a weapon in his waistband. Pelayo reasonably perceived a threat, kept himself moving, and fired until he believed that Elkins was no longer a threat, even though Elkins continued to crawl after Pelayo stopped firing. The number of shots fired does not determine a constitutional violation. "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." Plumhoff v. Rickard, 134 S.Ct. 2012, 2022 (2014); see also Sheehan v. City & Cnty of San Francisco, 135 S.Ct. 1765, 1775 (2015) ("Nothing in the Fourth Amendment barred [the officers] from protecting themselves, even though they fired multiple rounds."). Plaintiffs have cited no cases in support of their argument that the shots entering Elkins's back, or the number of shots fired, is sufficient to demonstrate that Elkins was not a threat under the circumstances.

In conclusion, the totality of the circumstances shows that Elkins had repeatedly and dangerously fled from law enforcement for three consecutive days, Elkins was non-compliant, the officers had been warned to use caution and that Elkins would do whatever it takes to escape, and Elkins reached for his waistband shortly after landing and while beginning to run again. Under these circumstances, Elkins posed a significant threat to the safety of both the officers and the public. The evidence cited by Plaintiffs is insufficient for a jury to find that the officers' account of the danger posed by Elkins is incredible.

---

[9] Plaintiffs do not cite a PUMF that actually discusses the trajectory of any of the bullets. See Doc. No. 104 at p.4. Presumably this assertion is based on the declaration of Leonard Romero. When Plaintiffs cite to the Romero declaration, it is either in support of PUMF 34 or in opposition to various DUMF's, and either the entire declaration or 15 paragraphs of the declaration are identified. See Doc. Nos. 104-1, 104-2. Romero's declaration is technical. Without further explanation of the significance of Romero's declaration, and more precise citations to Romero's declaration, the declaration is of limited value. For purposes of this motion, the Court will accept that Romero declares that "most" of Elkins's nine gunshot wounds had a back to front trajectory.

1                                        **iv.**    <u>Warning</u>

2         If it is feasible to do so, Police officers are to give a warning before using force.  <u>See</u>

3 <u>Garner</u>, 471 U.S. at 11-12; <u>Bryan v. MacPherson</u>, 630 F.3d 805, 831 (9th Cir. 2010); <u>Forrett</u>, 112

4 F.3d at 420.  Whether a warning would have been effective is separate from the question of

5 whether there was time to give a warning.  <u>See</u> <u>Bryan</u>, 630 F.3d at 831.  Here, from the time that

6 Elkins landed from the fence to the time that Pelayo fired, it was "fast . . . maybe two seconds."

7 <u>See</u> Guzman Depo. 42:15-19.  In that two seconds or so, Elkins landed, turned, reached for his

8 waistband, and started moving again.  This was a rapidly developing situation that required Pelayo

9 to make a split second decision.  <u>Cf.</u> <u>Graham</u>, 490 U.S. at 396-97.  Under these circumstances, it

10 was not feasible for Pelayo to give a warning before firing.  <u>See</u> <u>Morales v. United States</u>, 415

11 F.3d 458, 463 (6th Cir. 2005).

12                                         **v.**    <u>Mental State</u>

13         There is no evidence that Elkins was emotionally or mentally unstable.  Therefore, this

14 factor has no bearing on this case.  <u>Cf.</u> <u>Drummond</u>, 343 F.3d at 1058 (noting that suspect's mental

15 state must be considered when it is clear that the suspect is mentally or emotionally unstable).

16                                    **vi.**    <u>Alternate Methods</u>

17         Plaintiffs contend that there was a team of officers in the vicinity.  By implication, the

18 Court takes Plaintiffs to be arguing that, as an alternative to firing, Pelayo should have stayed

19 where he was or waited for other officers to come and then collectively subdued Elkins.  However,

20 this argument overlooks that Elkins was reaching for his waistband/midsection shortly after he

21 landed from the fence.  Elkins's movements created an urgency that is not reasonably compatible

22 with waiting for other officers to arrive.  Moreover, the Court is only aware of the location of four

23 officers (Pelayo, Guzman, Navarro, and Ynclan), and of those four, two do not appear to have

24 been in a position to help stop the actively fleeing Elkins (Navarro was in the store and Ynclan

25 was in a car).  There is also no evidence that the TARGET team or other officers had established a

26 closed perimeter or an escape proof cordon of the area.  This is especially relevant considering

27 Elkins's ability to elude law enforcement while on foot or in a vehicle.  There is simply no

28 evidence that a "wait for other officers" or "wait for an inevitable capture" strategy was a

reasonable alternative to firing a pistol.  Cf. Forrett, 112 F.3d at 420 (rejecting the argument that waiting for an inevitable capture was a reasonable alternative where shooting officers did not know the location of non-shooting officers, there was no evidence of a closed perimeter, and there was no evidence that an established cordon was escape-proof).

Plaintiffs also suggest that Pelayo could have taken cover behind the fence instead of running towards Elkins and shooting him.  However, Plaintiffs cite no evidence that demonstrates moving behind the fence was a reasonable alternative.  There is no evidence regarding the nature of the fence (cinder block, wood, chain link, or metal), what steps Pelayo would have had to take in order to actually take effective cover (assuming that effective cover could be achieved), or how much time would have been needed in order to adequately take cover.  As discussed, this was a rapidly developing situation.  Plaintiffs' bare suggestion of taking cover is little more than unsupported speculation.

Plaintiffs have not demonstrated a reasonable alternative to Pelayo using his pistol.

<u>vii.</u>    <u>Relative Culpability</u>

The evidence shows that Elkins was in headlong flight from numerous officers for a third day in a row.  Elkins engaged in conduct that could have come from a movie – he fled in a car and on foot, through a business, threw items in the path of an officer, and jumped a fence.  At any time prior to the shooting, Elkins could have obeyed either Navarro, Guzman, or Pelayo and stopped, but he did not.  Instead, Elkins was in constant motion and disobeyed all commands to stop.  Therefore, Elkins was significantly more culpable than Pelayo.

<u>c.</u>    <u>Conclusion</u>

The evidence demonstrates that Elkins was wanted for a severe felony, he was actively evading arrest by "headlong flight," he posed a danger to the officers and the public, he was significantly more culpable than Pelayo, and no other reasonable alternatives have been identified.  This was a rapidly developing situation that required split second decision-making.  Therefore, Pelayo's use of deadly force against Elkins was reasonable under the totality of circumstances and did not violate the Fourth Amendment.  See Graham, 490 U.S. at 396-97; Garner, 471 U.S. at 11-12; Forrett, 112 F.3d at 420.

1         2.    <u>Qualified Immunity</u>

2        Because there was no Fourth Amendment violation, qualified immunity is unnecessary.

3  <u>See</u> <u>Saucier</u>, 533 U.S. at 201; <u>Bingue</u>, 512 F.3d at 1173.

4        Nevertheless, in the alternative, the Court finds that Pelayo is entitled to qualified

5  immunity.  Pelayo knew that Elkins was wanted for attempted murder of a police officer.  Pelayo

6  knew that Elkins had successfully evaded law enforcement officers the previous two days, and that

7  evasion included the theft of two vehicles, twice ramming an occupied police car, and attempting

8  to run down Officer Marvin.  Pelayo had been instructed to use caution in apprehending Elkins,

9  and was informed that Elkins would do whatever it took to avoid capture.  Pelayo observed Elkins

10  fleeing on foot, fleeing through a tire shop, throwing tires and tools at or in the path of Navarro,

11  and jumping a fence.  All the while Elkins refused to obey commands to stop.  Pelayo, as well as

12  Ynclan and Guzman, saw Elkins reach for his waistband and start to run.  Under these

13  circumstances, a reasonable officer could have reasonably, but mistakenly, believed that using

14  deadly force would not violate Elkins's Fourth Amendment rights.  <u>See</u> <u>Saucier</u>, 533 U.S. at

15  205-06; <u>Ellins</u>, 710 F.3d at 1066.

16

17  **II.**      **Fourteenth Amendment – Denial of Familial Relationship**

18     *Defendant's Argument*

19        Pelayo argues that summary judgment on this claim is appropriate for two reasons.  First,

20  because there was no Fourth Amendment violation, there can be no Fourteenth Amendment

21  violation.  Second, Pelayo argues that this was a rapidly evolving situation, and Elkins's conduct

22  caused him to fear for his life.  The use of force was in self-defense and constituted a legitimate

23  law enforcement objective.  There was no ulterior motive or intent to harm.

24     *Plaintiffs' Opposition*

25        Plaintiffs argue that summary judgment should not be granted.  First, Pelayo has not

26  established the absence of a Fourth Amendment violation.  Second, the evidence indicates that

27  Pelayo had the intent to harm, which is demonstrated by Pelayo's documented animosity towards

28  fleeing felons.  Further, despite the fact that two other officers were on the scene, Pelayo was the

1    only officer who fired.  Finally, Elkins was running away from Pelayo at the time of the shots, and

2    CHP Policy § 70.6(b)(3) mandated that Elkins not use deadly force.  Because the evidence reflects

3    an intent to harm, summary judgment should be denied.

4         *Legal Standard*

5         "Parents and children may assert Fourteenth Amendment substantive due process claims if

6    they are deprived of their liberty interest in the companionship and society of their child or parent

7    through official conduct."  Lemire v. Cal. Dept. of Corr. & Rehab., 726 F.3d 1062, 1075 (9th Cir.

8    2013).  However, such a claim requires the plaintiffs to prove that the official's conduct "shocked

9    the conscience."  Gonzalez v. City of Anaheim, 747 F.3d 789, 797 (9th Cir. 2014).  "In

10   determining whether excessive force shocks the conscience, the court must first ask 'whether the

11   circumstances are such that actual deliberation [by the officer] is practical.'"  Hayes v. County of

12   San Diego, 736 F.3d 1223, 1230 (9t h Cir. 2013); Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir.

13   2010).  The term "deliberation" should not be interpreted in a narrow technical sense.  Wilkinson,

14   610 F.3d at 554.  Where actual deliberation is practical, then an officer's "deliberate indifference"

15   will suffice.  Hayes, 736 F.3d at 1230; Wilkinson, 610 F.3d at 554.  Deliberation may be

16   "impractical" where a suspect's conduct forces the officer to act quickly, or when other fast paced

17   circumstances present competing public safety obligations.  Tatum v. Moody, 768 F.3d 806, 821

18   (9th Cir. 2014).  Where an officer "makes a snap judgment because of an escalating situation, his

19   conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to

20   legitimate law enforcement objectives."  Hayes, 736 F.3d at 1230; Wilkinson, 610 F.3d at 554.

21   An officer "who acts with the purpose to harm a civilian, unrelated to the legitimate law

22   enforcement objectives of arrest, self-defense, or the defense of others," violates the Fourteenth

23   Amendment.  A.D. v. State of Cal. Highway Patrol, 712 F.3d 446, 454 (9th Cir. 2013).

24        *Discussion*

25        Plaintiffs' Fourteenth Amendment claim is predicated on Elkins's death through Pelayo's

26   use of deadly force.  See Doc. No. 72 at ¶¶ 67, 68.  Where a claim for interference with familial

27   relationships is integrally predicated upon, or entwined with, other conduct that is alleged to be

28   unconstitutional, a finding that the other conduct was constitutional generally will preclude

recovery for interference with familial relationship. See Gausvik v. Perez, 392 F.3d 1006, 1008 (9th Cir. 2004); Schaefer v. Goch, 153 F.3d 793, 799 (7th Cir. 1998); J.P. v. City of Porterville, 801 F. Supp. 2d 965, 988-89 (E.D. Cal. 2011); see also Moreland v. Las Vegas Metro. Police Dept., 159 F.3d 365, 371 n.4 (9th Cir. 1998) (if an officer's actions "were objectively reasonable, it follows that his conduct did not offend the more stringent standard applicable to substantive due process claims."). Here, because Pelayo's use of deadly force was objectively reasonable and did not violate the Fourth Amendment, there is no viable Fourteenth Amendment violation of the right to familial association. See Gausvik, 392 F.3d at 1008; Moreland, 159 F.3d at 371 n.4; Schaefer, 153 F.3d at 799; J.P., 801 F.Supp.2d at 988-89.

In the alternative, as discussed above, this was a rapidly developing situation. Elkins was in headlong flight, and had been evading arrest for the third day in a row. Elkins had assaulted one officer with a stolen car and attempted to kill another officer with that stolen car. When Pelayo fired, Elkins had just jumped over the fence and was reaching for his waistband. From the time that Elkins landed to the time that Pelayo fired, it was fast – "maybe two seconds." See Guzman Depo. 42:11-15. Under these circumstances, deliberation was not practical. See Tatum, 768 F.3d at 821; Wilkinson, 610 F.3d at 554. Furthermore, these circumstances do not reflect an improper purpose to harm. Both Pelayo and Guzman perceived that Elkins was a threat and was reaching in his waistband for a firearm. Although Pelayo may have told a suspect in November 2010 that the suspect was lucky not to have been shot, that incident was two years old and under materially different circumstances. The age of the November 2010 incident and the difference in circumstances do not make it sufficiently probative to create a genuine dispute regarding Pelayo's intent. Finally, CHP Policy § 70.6(b)(3) does not set the applicable standard.

Further in the alternative, assuming that there was a constitutional violation, for the same reasons that qualified immunity was appropriate with respect to the Fourth Amendment claim, qualified immunity is appropriate here. A reasonable officer could have reasonably, but mistakenly, believed that using deadly force would not violate Plaintiffs' Fourteenth Amendment rights. See Saucier, 533 U.S. at 205-06; Ellins, 710 F.3d at 1066.

Summary judgment on this claim is appropriate.

**III.** **State Law Claims**

*Defendant's Arguments*

Pelayo argues that, because his use of force was objectively reasonable, Plaintiffs cannot recover on their state law claims of wrongful death, assault, battery, and Civil Code § 52.1. Alternatively, Pelayo argues that he is entitled to immunity under state law.

*Plaintiffs' Opposition*

Plaintiffs argue that they are pursuing three separate theories of wrongful death. First, the assault and battery theories assert that Pelayo's use of unreasonable force constituted an unjustifiable assault and battery, which proximately caused death. For the same reasons that Pelayo's use of force violated the Fourth Amendment, his conduct supports claims for assault and battery.

Second, Plaintiffs argue that Pelayo's negligence caused Elkins's death. The "objective reasonableness" standard of the Fourth Amendment is not the same as the California "reasonableness" standard of negligence. Pelayo's departure from the tactical plan that merely called for surveillance by the TARGET team, Pelayo's failure to attempt "hands on contact" or other less lethal options against Elkins at the rear of the tire shop and prior to Elkins jumping the fence, and Pelayo's continued pursuit of Elkins on the north side of the fence knowing that other law enforcement officers were on the scene setting up a perimeter to capture Elkins, all support a viable negligence claim because they show that Pelayo's use of deadly force was unreasonable under the totality of the circumstances.

Third, the elements of a Civil Code § 52.1 claim are essentially the same as those of a § 1983 excessive force claim. For the reasons that summary judgment is inappropriate regarding the Fourth Amendment claims, summary judgment is also inappropriate on the § 52.1 claim.

*Discussion*

1.     First Cause of Action – Wrongful Death

Plaintiffs' opposition identifies negligent acts or negligent tactics by Pelayo and clarifies that they are pursuing a negligence theory under the first cause of action. However, a negligence cause of action based wrongful death theory appears to be a new theory that was not fairly

reflected in the active Complaint.  Under the first cause of action for wrongful death (which is the only state law claim where a negligence claim might be found),[10] Plaintiffs allege that Pelayo fatally shot Elkins, Elkins did not pose a threat to Pelayo or anyone else, Elkins died as a result of his injuries, Pelayo was negligently retained by various law enforcement entities, and that Plaintiffs' have experienced various types of economic and non-economic damages.  See Doc. No. 72 at ¶¶ 19-27.  None of these allegations suggest negligence by Pelayo.[11]  In an earlier paragraph that is incorporated by reference, there is an allegation that Elkins died as a direct and proximate result of physical injuries sustained by "the shooting, negligent tactics, and unreasonable and excessive use of force inflicted upon him by Pelayo . . . ."  See id. at ¶¶ 17, 19.  These allegations hint that there were negligent tactics, but there are no factual allegations concerning which tactics were negligent, how those tactics where negligent, or how the tactics caused harm.  The term "negligent tactics" is merely a bare legal conclusion.  See Bennett v. Skyline Corp., 52 F.Supp.2d 796, 806 (N.D. W.Va. 2014); Mt. Club Owner's Assn. v. Graybar Elec. Co., 2014 U.S. Dist. LEXIS 4783, *6 (E.D. Cal. Jan. 14, 2014); Alcay v. City of Visalia, 2013 U.S. Dist. LEXIS 90160, *32 (E.D. Cal. June 26, 2013).  Legal conclusions that are unsupported by factual allegations fail to provide adequate notice under Rule 8; they are implausible and fail to state a claim.  See Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009); Electric Props. East, LLC v. Marcus & Millichap Co., 751 F.3d 990, 995-98 (9th Cir. 2014).  Thus, there is no plausible negligence wrongful death claim that is stated in the active Complaint.  Where a complaint does not include the necessary factual allegations to state a claim, raising such a claim in a summary judgment motion or opposition to summary judgment is improper.  See Navajo Nation v. United States Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008); Pickern v. Pier 1 Imports (U.S.), Inc., 457 F.3d 963, 968-69 (9th Cir. 2006).  Because the active Complaint fails to state a plausible claim for negligent wrongful death, raising that theory (along with the specific "tactical" decisions by Pelayo) is improper.  See id.   On this basis alone, summary judgment is proper.

---

[10] The first cause of action is for wrongful death, the second cause of action is for assault, the third cause of action is for battery, and the fourth cause of action is for violation of California Civil Code § 52.1.  See Doc. No. 72.

[11] Negligent hiring or negligent retention would be a claim against Pelayo's employer, not against Pelayo himself.

31

1    Alternatively, "[n]egligence is the failure to use reasonable care to prevent harm to oneself

2    or to others. . . . A person is negligent if he or she does something that a reasonably careful person

3    would not do in the same situation or fails to do something that a reasonably careful person would

4    do in the same situation." Raven H. v. Gamette, 157 Cal.App.4th 1017, 1025 (2007).  Thus, the

5    elements of actionable negligence are: (1) a legal duty to use due care; (2) a breach of that duty;

6    (3) causation; and (4) damages.  See Ladd v. County of San Mateo, 12 Cal.4th 913, 917 (1996);

7    Brown v. Ransweiler, 171 Cal.App.4th 516, 534 (2009).  In California, the reasonableness of a

8    peace officer's conduct must be determined in light of the totality of circumstances.  See Hayes v.

9    County of San Diego, 57 Cal.4th 622, 631 (2014).  An officer's preshooting conduct is properly

10   "included in the totality of circumstances surrounding [his] use of deadly force, and therefore the

11   officer's duty to act reasonably when using deadly force extends to preshooting conduct." Id. at

12   632.  "[W]here preshooting conduct did not cause . . . any injury independent of the injury

13   resulting from the shooting, the reasonableness of the officers' preshooting conduct should not be

14   considered in isolation.  Rather, it should be considered in relation to the question whether the

15   officers' ultimate use of deadly force was reasonable." Id.

16   Here, the Court has found that Pelayo's use of deadly force was reasonable under the

17   Fourth Amendment.  Plaintiffs contend that certain tactical preshooting actions by Pelayo must

18   also be considered in assessing the "totality of the circumstances" for purposes of negligence.

19   Specifically, Plaintiffs fault Pelayo for:  (1) attempting to arrest Elkins instead of surveilling him;

20   (2) not using alternative means, including "hands on," to subdue Elkins prior to Elkins jumping

21   the fence; and (3) continuing to pursue Elkins knowing that other law enforcement officers were

22   setting up a perimeter.  Because these criticisms are speculative and unsupported by citation to

23   relevant evidence, Pelayo's conduct remains reasonable under the "totality of the circumstances."

24   See Hayes, 57 Cal.4th at 631-32.

25   First, there is no evidence that Pelayo made the decision to arrest Elkins.  The evidence

26   shows that Elkins's conduct caused Ynclan and Commander Haroldsen to decide to arrest Elkins

27   at that time.  See DUMF 42; Haroldsen Depo. 25:5-18, 40:23-41:13.  Plaintiffs cite no evidence or

28   authority that explains how other officers' command decisions can be imputed to Pelayo, or that it

was negligent for Pelayo to follow a change of plans.  Moreover, there is no evidence that suggests the decision to arrest Elkins after Elkins again fled was negligent or improper.  Elkins was wanted for serious crimes, was near a public business, and multiple officers were involved.

Second, there is no evidence that alternative means, including "hands on," were feasible or reasonable prior to Elkins jumping the fence.  Plaintiffs do not discuss or cite evidence that shows that it was proper or advisable to use other specific force methods, especially in light of Elkins's history and the admonition that officers were to "use caution."  Further, other than "hands on," there is no evidence that other force methods were even available to Pelayo.  For example, there is no evidence that Pelayo had a baton, pepper spray, or a Taser.  Finally, Plaintiffs do not explain how Pelayo even had a realistic opportunity to detain Elkins prior to the fence, especially in light of Elkins running from the officers and obstructing pathways in the tire shop.

Third, there is no evidence that a perimeter was being established, or assuming that one was, that Pelayo knew about it.  Forrett, 112 F.3d at 420.   But even if a perimeter was being established, there is no guarantee that the perimeter was "escape proof," especially given Elkins's ability to successfully evade law enforcement.  See id.  Moreover, Elkins had been actively and dangerously evading the police for three straight days and he was wanted for *inter alia* attempted murder of a police officer.  It is counterintuitive that a reasonable officer would have just stopped pursuing a suspect like Elkins.  Without contrary expert opinion, nothing suggests that Pelayo's pursuit of Elkins was negligent.

In sum, because the negligence claim is not fairly reflected in the active Complaint, and because Plaintiffs' arguments are unsupported and speculative, summary judgment on this cause of action is appropriate.

2.      Second Cause of Action (Assault), Third Cause of Action (Battery), Fourth Cause of Action (Civil Code § 52.1)

Plaintiffs' claims for assault, battery, and California Civil Code § 52.1 are based on Pelayo's use of deadly force against Elkins.  These claims are analyzed in essentially the same fashion as Plaintiffs' § 1983 excessive force claim.  For the same reasons that there is no excessive force under the Fourth Amendment, there are no viable claims for Civil Code § 52.1, assault, or

1   battery.  See Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1105-06 (9th Cir. 2014) (Civil

2   Code § 52.1 claim); Cameron v. Craig, 713 F.3d 1012, 1022 (9th Cir. 2013) (same); Johnson v.

3   County of L.A., 340 F.3d 787, 794 (9th Cir. 2003) (assault and battery claims); Arpin v. Santa

4   Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (same).  Summary judgment on

5   this cause of action is appropriate.  See id.

6

7                                    **CONCLUSION**

8          Pelayo moves for summary judgment on all claims alleged against him.

9          With respect to the Fourth Amendment excessive force cause of action, the evidence shows

10  that Pelayo's use of force was objectively reasonable under the totality of the circumstances.

11  Elkins was wanted for a severe crime, was in headlong flight, was more culpable in the creation of

12  the situation, and was a threat to officers and others.  Alternatively, qualified immunity is

13  appropriate because it would not have been clear to a reasonable officer that using deadly force

14  against Elkins was unconstitutional.  Summary judgment on this claim will be granted.

15         With respect to the Fourteenth Amendment claim, because Pelayo's use of force was

16  objectively reasonable, the use of force did not shock the conscience.  Alternatively, the evidence

17  shows that there was no time for Pelayo to deliberate, and no evidence indicates that Pelayo acted

18  with an intent to harm.  Further in the alternative, qualified immunity is appropriate because it

19  would not have been clear to a reasonable officer that using deadly force against Elkins would

20  violate Plaintiffs' Fourteenth Amendment familial rights.  Summary judgment on this claim will

21  be granted.

22         With respect to the negligence wrongful death cause of action, this claim is not plausibly

23  alleged in the Complaint.  Alternatively, the conduct identified by Plaintiffs is unduly speculative

24  and does not show negligence under the totality of the circumstances.  Summary judgment on this

25  claim will be granted.

26         Finally, with respect to the assault, battery, and Civil Code § 52.1 claims, for the same

27  reasons that the Pelayo's use of force was reasonable under the Fourth Amendment, these claims

28  are not viable.  Summary judgment on these claims will be granted.

# **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment is GRANTED;

2. The Clerk shall ENTER judgment in favor of Defendant Pelayo and CLOSE this case.

IT IS SO ORDERED.

Dated:   July 6, 2016

_____

SENIOR  DISTRICT  JUDGE