1

2

3

4

5

6

7                          **UNITED STATES DISTRICT COURT**

8                         **EASTERN DISTRICT OF CALIFORNIA**

9

10   **THE ESTATE OF CECIL ELKINS, JR.,**          **CASE NO. 1:13-CV-1483 AWI SAB**
     **et al.,**

11                                                 **ORDER ON THE PARTIES MOTIONS**
                             **Plaintiffs**        **IN LIMINE**

12

13                    **v.**

                                                   (Doc. Nos. 146, 147, 148, 149, 151, 152,
14   **HIPOLITO PELAYO,**                           153, 154, 155, 156, 157, 158, 159, 248)

                             **Defendant**
15

16

17          This is a civil rights lawsuit that stems from a fatal encounter between decedent Cecil

18   Elkins, Jr. ("Elkins") and Defendant California Highway Patrol Officer Hipolito Pelayo

19   ("Defendant or "Pelayo") that occurred on November 13, 2012.[1]  Plaintiffs, who are the estate of

20   Elkins and Elkins' wife (Creasha Elkins ("Creasha")), mother (Tina Terrell ("Terrell")), step-

21   daughter (Valiecia Perez ("Valiecia")), and two minor sons (Devin Ekins ("Devin") and Dylan

22   Elkins ("Dylan")), seek damages under federal and state law arising out of the death of Elkins.

23   Currently before the Court are Plaintiffs' six motions in limine and Defendant's eight motions in

24   limine.  This order resolves the parties' respective motions.[2]

25

26   _____

27   [1] The parties are familiar with the facts of this case.  A thorough recitation of the underlying facts can be found on the
     Court's order on Defendant's motion for summary judgment, Doc. No. 126.

28   [2] The Court has received and reviewed all motions, oppositions, and replies.  The fact that a reply to a particular
     motion is not described does not mean that the Court did not consider the reply.

1    **DEFENDANT'S MOTIONS IN LIMINE**

2    **I.**    **Motion 1 – Exclude Certain Opinions of Expert Roger Clark**

3    *Defendant's Argument*

4    Pelayo argues that six opinions of Plaintiffs' police practices expert Roger Clark should be

5    excluded.

6    Clark's first opinion is that the use of force was unreasonable, and his second opinion is

7    that Elkins did not pose an imminent threat.  Exclusion of these opinions is appropriate because

8    they are unreliable and purport to resolve factual questions.  Clark does not list the relevant factors

9    that he used to assess reasonableness, or discuss how he applied those factors.  Clark also ignored

10   or mistook key data points and reversed his positions on others, including whether there was

11   information that Elkins was armed, whether Elkins had previously been convicted of a gun crime,

12   and whether Elkins may have made a furtive gesture by reaching into his waistband.  Clark also

13   ignored the guidelines he cited regarding imminent threat and appears to have substituted his own

14   personal standards.  Instead, Clark should be permitted to testify about how law enforcement are

15   trained and answer hypothetical questions regarding such training.

16   Clark also opines that Pelayo's actions reflect deliberate indifference to life and that

17   California Highway Patrol ("CHP") supervisors endorsed Pelayo's conduct.  These opinions are

18   speculative and irrelevant.  No  CHP official is a defendant in this case.  Further, Clark does not

19   identify how he concluded that Pelayo acted with a deliberately indifferent state of mind, and

20   opining that Pelayo acted deliberately indifferent is an impermissible legal conclusion that invades

21   the province of the jury.

22   Clark also opines that Pelayo erred in his tactics and opines that he should have used less

23   lethal means to apprehend Elkins.  Clark fails to identify any specific tactics that Pelayo failed to

24   comply with.  Instead, Clark admitted that the issue was that Agent Navarro should not have

25   decided to chase Elkins, and also appears to have criticized decision to alter the surveillance

26   operation into an apprehension situation.  However, Clark conceded that Pelayo acted

27   appropriately in backing up Navarro, and there is no evidence that Pelayo played any role in

28   changing the operation to apprehension.  Additionally, Clark fails to identify what less lethal

means Pelayo should have used, when officers are taught to use such means, and whether Pelayo even had any of those less lethal options available to him. Although Clark cited to the relevant guideline, he fails to quote it or explain how it supports his opinion.

Finally, although not listed in his report, Clark has opined in other cases that officers should wait to see a gun before firing. This opinion should be excluded under Rule 37(c)(1) if he attempts to offer it at trial. Moreover, such an opinion is unsupported by anything in relevant training guidelines.

*Plaintiffs' Opposition*

Plaintiffs argue that exclusion of Clark's testimony is inappropriate.

Clark is qualified to testify as a police practices expert who has 27 years of law enforcement experience and who has been consistently recognized as a qualified expert by numerous courts. Plaintiffs concede that Clark's testimony should be explored through hypothetical questioning, and he can also testify about whether Pelayo's conduct comported with applicable procedures and policies on the date in question. The reasonableness of Pelayo's conduct can also circumstantially show Pelayo's state of mind and show that his conduct deviated from the norm of what a reasonable officer would have done. To testify as to the generally accepted training and standards, legal principles of necessity may need to be expressed. That alone, however, is not a basis to exclude the testimony. That is, to the extent that the testimony is in the appropriate hypothetical form, the testimony should not be excluded because it touches on an ultimate issue.

With respect to the opinion that Pelayo's conduct reflects deliberate indifference and that CHP supervisors endorsed this conduct, the opinions are relevant to assist the jury in determining whether Pelayo's conduct deviated so far from institutional norms that they could conclude that Pelayo's was reckless or deliberately indifferent to Elkins's rights. The testimony is also relevant to the Fourteenth Amendment familial association claim, which requires a finding of "deliberate indifference" when actual deliberation is practical. Therefore, the opinion that Pelayo acted in reckless disregard of his training is admissible.

With respect to the opinion that Pelayo erred in his tactics or should have used less lethal

means, exclusion is improper.  Ninth Circuit Model Instruction 9.25 expressly includes as a consideration of the reasonableness of force used the consideration of whether alternative methods of taking Elkins into custody was available.  Therefore, Clark's opinion is admissible.

Finally, Plaintiffs argue that exclusion under Rule 37(c)(1) depends on the circumstances of the case.  The purpose of the expert report is to convey the substance expert report so that an adversary can rebut, cross-examine, or offer competing expert testimony.  So long as the expert's testimony does not substantially differ from the opinions offered in the expert report, they are not subject to exclusion under Rule 37.  Here, Pelayo has not pointed to any opinion that is outside the scope of Clark's report that Defendant has not anticipated.  Defense counsel anticipates Clark's opinion based on counsel's prior experience with Clark.  Therefore, Pelayo cannot claim to be prejudiced because they could have explored this theory in deposition.  Exclusion is improper.

*Discussion*

The Court will address each opinion separately.

1.    Use of Force Was Unreasonable

Initially, the parties agree that Clark should generally testify through hypothetical questions.  This is an accepted method for expert witness testimony.  See Stevenson v. Holland, 504 F.Supp.3d 1107, 1119 (E.D. Cal. 2020).  Also, there is nothing that precludes Clark from considering disputed facts and basing opinions on disputed facts, so long as either the disputed fact is part of a hypothetical question or is specifically identified as a disputed fact.

There is also no real dispute that Clark, who worked in law enforcement with the L.A. Count Sheriff's Department for 27 years, is a qualified police practices expert.  Clark has provided expert testimony in numerous federal courts, including this Court.  E.g. Lucas v. City of Visalia, 2013 U.S. Dist. LEXIS 65855, *31-*32 (E.D. Cal. May 7, 2013).  As a qualified police practices expert, Clark may testify about when it is appropriate to use certain weapons or tactics, what other force options or strategies for apprehending Elkins were available to Pelayo (but not other officers because it is Pelayo's conduct that is at issue), and comment on the significance of actions and events from a law enforcement perspective in terms of Pelayo's use of force.  Clark may also offer opinions about whether Pelayo's use of force and actions comported with or deviated from

applicable police standards and practices.  See Jimenez v. City of Chicago, 732 F.3d. 710, 721-22 (7th Cir. 2013); Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (upholding admission of expert testimony that a practice violated insurance industry standards and noting that although expert testified that practice violated industry standards, expert did not opine that the defendant acted in legal "bad faith").  However, Clark may not offer opinions about whether Pelayo used "excessive force," violated the Fourth Amendment, or acted "unreasonably," since such opinions are merely legal conclusions.  See Jimenez, 732 F.3d at 721. Further, Clark's opinions should be grounded in the facts that were known to Pelayo at the time force was used, and Clark cannot offer speculative opinions, make credibility determinations, resolve factual disputes, or utilize indisputably false facts to support an opinion.

Within the above limitations, Clark can offer opinions regarding Pelayo's use of force against Elkins.  Questions as to the correctness of Clark's opinions, or the relative weaknesses or strengths of the factual underpinnings of Clark's opinions, are questions that go the weight of the opinions, not their admissibility.  See Pyramid Techs., Inc. v. Hartford Ins. Co., 752 F.3d 807, 813-14 (9th Cir. 2014); Bergen v. F/V St. Patrick, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987).   A "shaky" opinion may be attacked through cross-examination and contrary evidence.  See Pyramid Techs., 752 F.3d at 813-14.

        2.      Elkins Did Not Pose an Imminent Threat

Whether Elkins posed an imminent threat is a consideration that is part of the bedrock of excessive force jurisprudence.  See Graham v. Connor, 490 U.S. 386, 396 (1989); Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).  As a law enforcement officer with 27 years of experience, Clark is qualified to opine on the threat posed by Elkins.  However, it is not enough for Clark to simply state that Elkins did not pose an imminent threat.  Clark must have a basis in fact and a basis in either common law enforcement understanding or law enforcement practices and standards to give any opinion regarding the threat, or lack thereof, posed by Elkins. Therefore, before opining about the threat, if any, posed by Elkins, Clark must be able to describe the basis for the opinion, including how the practice is consistent with relevant standard police practices or common law enforcement knowledge.

1      3.      Deliberate Indifference by Pelayo

2      Clark is capable of providing testimony that relates to deliberate indifference, whether in

3  relation to punitive damages or Plaintiffs' Fourteenth Amendment claim.  See Mellen v. Winn,

4  900 F.3d 1085, 1104 (9th Cir. 2018).  For example, Clark as a police practices expert can explain

5  how or why Pelayo's conduct deviated or violated applicable standards or norms from what would

6  be expected of a reasonable police officer.  The Court detects no reason why Clark could not

7  characterize such deviations as "significant," "major," or even "extreme."  However, expressly

8  opining that Pelayo's conduct demonstrates recklessness or deliberate indifference goes too far.

9  Whether Pelayo acted with "deliberate indifference" or "reckless disregard" is an ultimate issue of

10 law and a legal conclusion.  See Doe v. Robertson, 751 F.3d 383, 388 (5th Cir. 2014) ("An

11 allegation of 'deliberate indifference' is merely a legal conclusion."); Christiansen v. City of

12 Tulsa, 332 F.3d 1270, 1283 (10th Cir. 2003) (affirming the district court for striking from an

13 expert affidavit the opinion that a defendant acted "recklessly" because such an opinion was an

14 impermissible legal conclusion); cf. Andrews v. Metro N. C. R. Co., 882 F.2d 705, 709 (2d Cir.

15 1989) (holding that an expert may not testify that a defendant was negligent).  Thus, while Clark

16 may not tell the jury that Pelayo was reckless or deliberately indifferent, he can provide testimony

17 regarding applicable standards that would support a jury's finding of deliberate indifference or

18 recklessness.  See Mellen, 900 F.3d at 1104; Jimenez, 732 F.3d at 722.

19     4.      CHP Endorsement of Pelayo's Actions

20     Plaintiffs do not expressly defend this opinion.  Neither CHP itself nor any CHP

21 supervisorial employee is a defendant in this case.  Because the sole defendant in this case is

22 Pelayo, whether CHP supervisors endorsed Pelayo's actions is not relevant to any claims that

23 remain in this case.  Therefore, exclusion of Clark's opinion that CHP endorsed Pelayo's actions is

24 appropriate.  See Fed. R. Evid. 401.

25     5.      Negligent Tactics

26     As part of the Court's order on summary judgment, the Court held that a claim for

27 negligent tactics was not fairly reflected in the operative complaint and that, even if such a claim

28 was properly alleged, the evidence submitted by Plaintiffs was insufficient to withstand summary

judgment.  See Doc. No. 126 at 30-33.  Following remand, the Court reaffirmed its decision that a negligent tactics claim was not plausibly pled and that the evidence submitted in support of such a claim (notwithstanding the pleading problem) was insufficient to withstand summary judgment.  See Doc. No. 190.  Thus, there is no negligent tactics cause of action in this case.  See id.

The Court recognizes that the Ninth Circuit has held that Fourth Amendment liability "cannot be established based merely on bad tactics that result in a deadly confrontation that could have been avoided," but "the events leading up to the shooting, including the officer's tactics, are encompassed in the facts and circumstances of the reasonableness analysis."  Vos, 892 F.3d at 1034 (quotations omitted).  Here, Pelayo's motion identified criticisms by Clark against the negligent tactics performed by other law enforcement officers on scene, e.g. Navarro's attempted apprehension of Elkins and changing the nature of the mission from surveillance to apprehension.  Plaintiffs do not address these instances of negligent tactics, explain how any negligent tactics or decisions by other law enforcement officers can be imputed to Pelayo, or, importantly, identify negligent tactics performed by Pelayo himself.  In fact, Plaintiffs do not challenge Pelayo's assertion that Clark opined that Pelayo properly backed up Navarro, even though Clark disagreed with Navarro's decisions/tactics to chase after Elkins.  Given Plaintiffs' failure to address these arguments, the Court can only conclude that any opinions finding negligent tactics are insufficiently tied or attributable to Pelayo to be admissible.

In sum, because there are no negligent tactics causes of action, and because there is an insufficient link between negligent tactics and the conduct of Pelayo himself, Clark's opinions that certain tactics were negligent will be excluded as irrelevant and unhelpful.

6.     Less Lethal Means of Apprehension

The mere availability of less lethal or less severe methods of apprehension will not alone make a use of force unreasonable.  See Wilkinson v. Torres, 610 F.3d 546, 551 (9th Cir. 2010).  Nevertheless, the availability of less lethal or alternative means of apprehending a suspect is a relevant part of the totality of the circumstances in assessing the use of force.  Vos, 892 F.3d at 1033.  Again, Clark as 27 year law enforcement veteran is qualified to discuss various force options or alternative methods of apprehension.  However, before opining about the efficacy of a

particular alternative force option or method of apprehension, Clark must demonstrate or have a sound basis for believing that the alternative was actually available to Pelayo and was a viable option. Cf. Vos, 892 F.3d at 1033 (finding that pepper spray was not a viable option but finding that a less-lethal weapon, a taser, and a canine were available and may have been effective); Lal v. California, 746 F.3d 1112, 1117 (9th Cir. 2014) (finding that no alternative methods to lethal force could have been used because a canine unit had not yet arrived and pepper spray would not have been effective given the distance between the officers and the suspect).

In their reply, Defendants contend that Clark opined that Pelayo should have waited for the SWAT team. The Court is not convinced that Plaintiffs have had an adequate opportunity to address the argument. Nevertheless, in applying the above rule to such an opinion, before Clark can opine that Pelayo should have waited for the SWAT team, Clark needs to explain why he thinks that the SWAT team was available, had been summoned (and that Pelayo knew that they had been summoned), could have been successfully summoned by Pelayo, and/or could have arrived in a timely fashion. Without such a foundation, identification of SWAT team reinforcements as an alternative method of apprehending Elkins is unduly speculative and thus, an unhelpful and unreliable opinion.

## 7. Anticipated Opinion

Plaintiffs do not cite to any portion of Clark's report in which Clark states that Pelayo should have or must have waited to see a gun before using deadly force. The Court has reviewed Clark's report and no such opinion is evident. Because the opinion is not reasonably contained within the Rule 26 expert report, there is a significant problem.[3]

The Rule 26(a)(2) report required of a retained expert must include *inter alia* "a complete statement of all opinions the witness will express and the basis and reasons for them," and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i), (ii); Merchant v. Corizon Health, Inc., 993 F.3d 733, 739 (9th Cir. 2021). "If a party fails to provide

---

[3] This is the only opinion identified by Pelayo. To the extent that he intends to capture other "undisclosed opinions" by Clark, the Court will not make any rulings at this time. The Court will state only that it will enforce Rule 37(c)(1) and exclude any undisclosed opinion by any expert (Plaintiffs' or Defendant's) unless the non-disclosing party can show either harmlessness or substantial justification for non-disclosure. See Fed. R. Civ. P. 37(c)(1); Merchant v. Corizon Health, Inc., 993 F.3d 733, 739 (9th Cir. 2021).

information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); Merchant, 993 F.3d at 739.  This aspect of Rule 37(c) is "automatic" in that a district court may properly impose an exclusion sanction where a noncompliant party has failed to show that the discovery violation was either substantially justified or harmless.  Merchant, 993 F.3d at 739.  "[T]he burden is on the party facing the sanction to demonstrate that the failure to comply with Rule 26(a) is substantially justified or harmless."  Torres v. City of L.A., 548 F.3d 1197, 1213 (9th Cir. 2008).

Plaintiffs do not argue that they were substantially justified in failing to disclose the opinion that Pelayo should have or must have waited to see a gun before using deadly force.  Instead, they argue that there is no prejudice because one of Pelayo's counsel admittedly was aware of this opinion from another case.  However, that Clark may have offered an undisclosed opinion in another case (the procedural posture or rulings from that prior case being unknown) that Pelayo's counsel witnessed does not mean that Pelayo is unharmed by the failure to disclose the opinion.  The purpose of the disclosure requirement is to ensure that the opposing party is expressly aware and put on notice of the opinions to be presented so that they may prepare their own rebuttal, conduct appropriate discovery, and obtain a contrary expert.  Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 748, 762 (7th Cir. 2010).  That purpose is not served simply because one counsel in another case is apparently aware that Clark sometimes offers a particular opinion that is not otherwise disclosed in an expert report.  Parties rely on the disclosures in the expert report, not on what an expert may have done previously in a prior unrelated case.  The Court is aware of no authority that would require Pelayo to pursue discovery on or be prepared to rebut at trial opinions that are not actually disclosed or a part of the expert report.  To require otherwise would lead to uncertainty during discovery and at trial, disputes about what counsel may or may not know about the tendencies of an expert witnesses, and significant erosion of the purposes served by the expert report requirement.  Accordingly, the mere fact that one of Pelayo's counsel was aware of Clark's opinion in a prior case does not make the failure to disclose that opinion in this case harmless.  Without a showing of substantial justification or harmlessness,

1  pursuant to Rule 37(c)(1), Clark is precluded from offering the opinion that Pelayo could not use

2  deadly force until he saw a gun.[4]  Although Clark may consider the fact that no gun was ever seen

3  or found, pursuant to Rule 37(c)(1),[5] he may not opine that Pelayo could not have utilized deadly

4  force until he saw Elkins produce a gun.[6]

5      *Ruling*

6          As described above, this motion is granted in part and denied in part.

7

8  **II.    Motion No. 2 – Exclude Evidence that Elkins Provided Financial Support**

9      *Defendant's Argument*

10         Pelayo argues that the evidence indicates that Elkins did not financially support any

11  Plaintiff and relied on others for financial support.  Pelayo contends that evidence of any

12  Plaintiff's financial support or dependence on Elkins should be excluded as a discovery sanction

13  because Plaintiffs failed to comply with Rule of Civil Procedure 26(a)(1)(A), which requires a

14  computation of each category of damages claimed, failed to respond to interrogatories, and failed

15  to produce supporting documents.  The failure is not harmless because several Plaintiffs must

16  prove financial dependence on Elkins in order to have standing to pursue state law wrongful death

17  claims.  Alternatively, an adverse instruction is important.

18      *Plaintiffs' Opposition*

19         Plaintiffs argue that Pelayo seeks to exclude evidence of Elkins's financial support even

20  though Plaintiffs have chosen to forgo economic damages, the issue of support goes solely to the

21  issue of damages, there is evidence that substantiates Elkins's earnings, and no motions relating to

22  discovery violations were filed.  Motions in limine cannot be used to determine factual disputes or

23

24  [4] This is not to say that Clark cannot consider the fact that no gun was found or seen.  The presence or absence of a firearm, along with the presence or absence of a furtive gesture towards a waistband, are part of the totality of the circumstances.  See Cruz v. City of Anaheim, 765 F.3d 1076, 1078, 1079 n.3 (9th Cir. 2014).

25
26  [5] The Court notes that, apart from Rule 37(c)(1), Clark's testimony does not necessarily appear consistent with the law.  Deadly force can be used in some circumstance even if the suspect is not armed or does not threaten the officer with a weapon.  Tennessee v. Garner, 471 U.S. 1, 11-12 (1985); Forrett v. Richardson, 112 F.3d 416, 419 (9th Cir. 1997).

27
28  [6] The Court notes that Plaintiffs do not identify any POST standards or case law (binding or persuasive) that requires an officer to wait to use deadly force until the officer actually sees a firearm.

how much weight evidence should be given.  It is the jury's job to determine whether the support

Elkins provided is sufficient for liability and damages.  Plaintiffs also argue that this motion is an

improper attempt to exclude evidence of tax records, even though Plaintiffs attempted to

unsuccessfully obtain information from the IRS.

*Discussion*

The extent of any financial support provided by Elkins to any Plaintiff could have

relevance to two issues:  damages and the standing of Plaintiffs Terrell, Valiecia, and Dylan under

Cal. Civ. Code § 377.60.  The Court will discuss the two issues separately.[7]

1.   Damages

Plaintiffs have conceded, and through two pre-trial orders the Court has recognized, that no

Plaintiff seeks to recover economic damages for Elkins's death.  If Plaintiffs are not seeking

economic damages, then they would not submit evidence of financial support/dependence from

Elkins as part of any claimed damages.  Therefore, given Plaintiffs' concession, granting this

motion in limine with respect to damages is a formality.

2.   Standing

With respect to Terrell, in separate briefing, Terrell has conceded that she does not have

standing to pursue a state law wrongful death claim.  See Doc. No. 144 at 5:8-9.  The Court has

accepted Terrell's concession and ruled that she may not pursue a state law wrongful death claim.

See Doc. No. 281 (dismissing Terrell's state long wrongful death claims).   Therefore, any

evidence of financial support by Elkins to Terrell is irrelevant for purposes of § 377.60.

With respect to Valiecia (who is Elkins's step-daughter), in separate briefing, the Court has

held that there is insufficient evidence that Elkins gave material financial support to Valiecia and

that there was insufficient evidence that Valiecia was part of Elkins's household for the 180 days

preceding Elkins's death.  See id.  Because of those findings, Valiecia does not have standing to

pursue a state law wrongful death claim.  See Cal. Code Civ. P. § 377.60(b), (c); Soto v.

---

[7] The Court recognizes Pelayo's motion is based largely on Rule of Civil Procedure 37(c)(1), which provides for
discovery sanctions.  However, given other arguments made in the briefing and the Court's separate order regarding
the standing of Plaintiffs Terrell, Valiecia, and Dylan to bring state law wrongful death claims, the Court finds that
Pelayo's motion is readily resolved through a relevance analysis.  At this time, the Court makes no determination
regarding the Rule 37(c)(1) arguments.

1 BorgWarner Morse TEC, Inc., 239 Cal.App.4th 165, 188-90 (2015).  Therefore, any evidence of

2 financial support by Elkins to Valiecia is irrelevant for purposes of § 377.60.

3     With respect to Dylan, in separate briefing, the parties addressed his standing under §§

4 377.30(a), (b), and (c).  With respect to § 377.60(b) and § 377.60(c), the Court reached the same

5 conclusions regarding Dylan as it did with Valiecia.  See Doc. Nos. 281.  There was an

6 insufficient indication that Dylan was financially dependent on Elkins or that Dylan was a member

7 of Elkins's household for the 180 days preceding Elkins's death.  See id.  With respect to §

8 377.60(a), due to deposition testimony from Creasha, there is a question of whether Dylan is the

9 biological son of Elkins.  As a result, the Court held that whether Dylan had standing under §

10 377.60(a) was a question of fact for the jury.  See id.  Unlike § 377.60(b) and § 377.60(c),

11 standing under § 377.60(a) does not require that a child be financially dependent on the decedent.

12 See Cal. Code Civ. P. § 377.60(a).  Therefore, because the Court has determined that Dylan does

13 not have standing under the two provisions of § 377.60 that require financial dependence, and

14 because § 377.60(a) does not have a financial dependence component, evidence of financial

15 support by Elkins to Dylan is irrelevant for purposes of § 377.60.

16     *Ruling*

17     Because Plaintiffs have conceded that they do not seek economic damages in this case, and

18 because financial dependence is no longer relevant for the standing of Plaintiffs Terrell, Valiecia,

19 and Dylan, evidence of financial support/dependence by Elkins to any Plaintiff is irrelevant.

20 Defendant's motion is granted.

21

22 **III.    Motion No. 3 – Exclude Evidence of Emotional Impact of Elkins's Death**

23     *Defendant's Argument*

24     Pelayo argues that Plaintiffs' state law wrongful death claims are limited to loss of

25 financial support and loss of companionship; damages for grief or sorrow are not available.  As to

26 Plaintiffs' Fourteenth Amendment claim for violation of the right to familial association, the

27 relationship, i.e. companionship and society among family members, is what is protected.  In

28 holding that a Fourteenth Amendment claim is not duplicative of a wrongful death claim, the

1   Ninth Circuit identified the availability of attorneys' fees as the difference between the two laws;

2   no other discussion of any differences was made.  Further, the Ninth Circuit held that an adopted

3   child could not bring a Fourteenth Amendment claim based on the death of a biological parent,

4   which demonstrates that the compensable injury is one to the relationship, not the emotional

5   impact of a loss.  Finally, federal maritime law does not permit a wrongful death plaintiff to

6   recover for mental anguish or grief.  With respect to the survival claims under state law and the

7   Fourth Amendment, the damages that are recoverable are those suffered by Elkins and do not

8   include how the loss of Elkins changed Plaintiffs' lives.  Therefore, testimony about Plaintiffs'

9   grief or how the loss of Elkins affected them is irrelevant.

10          *Plaintiffs' Opposition*

11          Plaintiffs argue that the emotional impact of the loss of Elkins is directly relevant to the

12   wrongful death and Fourteenth Amendment claims.  With respect to the wrongful death claim,

13   California permits recovery for the loss of society and comfort of the deceased, but does not

14   permit damages based only on grief and sorrow from that loss.  With respect to the Fourteenth

15   Amendment, close and intimate family relationship are protected.  The Ninth Circuit's decision in

16   *Wheeler* was expressly limited to the facts of that case.  *Wheeler* is not applicable to this case.

17          *Discussion*

18          There are three groups of claims that are relevant to this motion in limine.

19          First, under California law, the damages available in a survival action are limited to the

20   "loss or damage that the decedent sustained or incurred before death . . . ."  Cal. Code Civ. P.

21   377.34;[8] People v. Runyan, 54 Cal.4th 849, 862 (2012).  Similarly, Fourth Amendment rights are

22   personal and cannot be vicariously asserted, although a decedent's accrued Fourth Amendment

23   claim can still be pursued through operation of the California survival statutes.  Johnson v. Bay

24   Area Rapid Transit Dist., 724 F.3d 1159, 1170 n.5 (9th Cir. 2013); Tatum v. City & Cnty of San

25   Francisco, 441 F.3d 1090, 1093 n.2 (9th Cir. 2006).  Therefore, the sorrow or mental anguish

26   suffered by the individual Plaintiffs, as opposed to Elkins himself, is irrelevant to the Fourth

27   Amendment and state law survival claims.

28
―――――――――――――
[8] The citation to § 377.34 is to the pre-2022 version of the statute.

1    Second, California's wrongful death statute (Cal. Code Civ. P. § 377.60) "creates a new

2 cause of action in favor of the heirs as beneficiaries, based upon their own independent pecuniary

3 injury suffered by loss or a relative, and distinct from any the deceased might have maintained had

4 he survived." Ruiz v. Podolsky, 50 Cal.4th 838, 844 (2010).  Wrongful death damages can

5 include the pecuniary value of decedent's society, comfort, care, and protection, as well as the

6 value of the benefits, including personal services, advice, and training, that the heirs could have

7 expected to receive from the decedent.  See Corder v. Corder, 41 Cal.4th 644, 661 (2007); Krouse

8 v. Graham, 19 Cal.3d 59, 67-70 (1977); Bouley v. Long Beach Memorial Med. Ctr., 127

9 Cal.App.4th 501, 610 (2005).  Thus, loss of consortium damages are available in wrongful death

10 case.  Boeken v. Phillip Morris USA, Inc., 48 Cal.4th 788, 796 (2010).  In assessing a claimed loss

11 of society, comfort, and affection, factors that may be considered include the closeness of the

12 family unit, the depth of their love and affection, and the character of the decedent as kind,

13 attentive, and loving.  See Corder, 41 Cal.4th at 662; Mendoza v. City of West Covina, 206

14 Cal.App.4th 701, 721 (2012).  However, "damages for mental and emotional distress, including

15 grief and sorrow, are not recoverable in a wrongful death action."  Krouse, 19 Cal.3d 59, 72

16 (1977); Bouley, 127 Cal.App.4th at 610; see Boeken, 48 Cal.4th at 796.  Therefore, the grief,

17 sorrow, and mental anguish suffered by Plaintiffs are not considered in determining loss of

18 Elkins's comfort, society, and affection and are irrelevant to their state law wrongful death claims.

19 See Boeken, 48 Cal.4th at 796; Krouse, 19 Cal.3d 59, 72 (1977); Bouley, 127 Cal.App.4th at 610.

20    Finally, Plaintiffs' Fourteenth Amendment familial relationship claim is not the same as

21 the decedent's Fourth Amendment claim.  Instead, the familial relationship claim is "based on the

22 related deprivation of [the Plaintiffs' own] liberty interest arising out of [their] relationship with

23 [the decedent]."  Moreland v. Las Vegas Metro. Police Dept., 159 F.3d 365, 371 (9th Cir. 1998).

24 In other words, the Fourteenth Amendment claim belongs to each individual Plaintiff and is based

25 on a violation of each individual Plaintiff's unique rights.  See id.  As long as a Plaintiff can

26 demonstrate that his or her harm was directly caused by the violation of a constitutional right,

27 "harm due to mental and emotional distress is clearly compensable under [§ 1983]."  Alexander v.

28 City of Menlo Park, 787 F.2d 1371, 1376 (9th Cir. 1986); see Ramirez v. City of Oxnard, 2013

14

1    U.S. Dist. LEXIS 198848, *9 (C.D. Cal. Aug. 13, 2013); McMurray v. County of Sacramento,

2    2012 U.S. Dist. LEXIS 6187, *11 (E.D. Cal. Jan. 19, 2012); Cotton v. City of Eureka, 2010 U.S.

3    Dist. LEXIS 136270, *45 (N.D. Cal. Dec. 14, 2010).  Stated differently, the "victim of the

4    constitutional deprivation is entitled to compensation for economic harm, pain, and suffering, and

5    mental and emotional distress that results from the violations."  Borunda v. Richmond, 885 F.2d

6    1384, 1389 (9th Cir. 1988); Borges v. County of Humboldt, 2017 U.S. Dist. LEXIS 129966, *7

7    (N.D. Cal. Aug. 15, 2017).  Therefore, Plaintiffs are entitled to present evidence of the grief,

8    sorrow, and mental anguish that resulted from Pelayo's alleged violation of their Fourteenth

9    Amendment rights to familial association.  See Borges, 2017 U.S. Dist. LEXIS 129966 at *7;

10   McMurray, 2012 U.S. Dist. LEXIS 6187 at *11; Cotton, 2010 U.S. Dist. LEXIS 136270 at *44-

11   *45; see also Borunda, 885 F.2d at 1389; Alexander, 787 F.2d at 1376.

12         Pelayo relies on Chaudhary v. City of L.A., 751 F.3d 1096 (9th Cir. 2014), Wheeler v. City

13   of Santa Clara, 894 F.3d 1046 (9th Cir. 2018), and federal maritime law to argue that emotional

14   distress damages for the loss of Elkins are unavailable.  The Court is not convinced.  First, this

15   case is not one that is governed by federal maritime law.  Pelayo cites no § 1983 Fourteenth

16   Amendment cases that have looked to federal maritime law for any legal propositions, let alone to

17   determine available damages.  Second, Chaudhary did hold, as Pelayo argues, that a Fourteenth

18   Amendment familial relationship was not duplicative of a California law wrongful death claim.

19   See Chaudhary, 751 F.3d at 1106.  The Ninth Circuit noted that attorneys' fees were available

20   under the § 1983 claim, but not under the wrongful death claim.  See id.  However, Chaudhary did

21   not purport to explain every potential difference between a § 1983 Fourteenth Amendment claim

22   and a wrongful death claim, nor did Chaudhary actually address what damages were available

23   under a Fourteenth Amendment familial relationship claim.  See id.  It was enough to identify at

24   least one aspect of the § 1983 Fourteenth Amendment claim that distinguished it from a state law

25   wrongful death claim.  Third, and finally, Wheeler addressed whether a biological child who had

26   been adopted by another family as an infant could pursue a Fourteenth Amendment familial

27   relationship claim based on the death of a biological parent.  See Wheeler, 894 F.3d at  1050,

28   1057.  The Ninth Circuit held that, under the facts of this particular case, "the relationship between

15

[the decedent and the adopted-out plaintiff] did not have the structure of parental relationships protected by the Fourteenth Amendment." Id. at 1059. *Wheeler* simply addressed what types of familial relationships are protected by the Fourteenth Amendment, it says absolutely nothing about what damages are available for an interference with that right. See id. at 1057-59.

*Ruling*

Defendant's motion is denied in that Plaintiffs may present evidence of their own grief, sorrow, and mental anguish for the loss of Elkins as part of the recoverable damages under their Fourteenth Amendment claims. Defendants' motion is otherwise granted.

## IV.   **Motion No. 4 – Prior Incident**

*Defendant's Argument*

Pelayo argues that evidence of an incident in November 2010 in which he used force to subdue a wanted felon, as well as several related internal CHP investigatory memorandum, should be excluded. The 2010 incident is barred by Rule 404(b) as improper character evidence. Evidence of intent and motive are irrelevant under the Fourth Amendment and related state law claims. The primary factual issue in this case is whether Elkins reached into his waistband, which does not depend on Pelayo's intent. While the Fourteenth Amendment does include intent as an element, if Elkins reached for his waistband, then Pelayo could not have acted with a purpose to harm without regard to legitimate law enforcement objectives. Also, the 2010 incident is not sufficiently similar for purposes of Rule 404(b)(2). In the 2010 incident, Pelayo struck a dangerous felon that he did not yet know was in custody, who had fled in a dark field, and who was alone with another officer whose last transmission was that the dangerous suspect was not cooperating. Pelayo made a split second decision to strike the suspect, thinking the suspect was unrestrained. In this case, Pelayo was faced with a violent felon who had crashed multiple cars, tried to run over another officer, was actively fleeing, and Pelayo fired a gun because he believed Elkins had reached for a weapon.

Pelayo also argues that the 2010 incident should be excluded as unduly prejudicial under Rule 403. The 2010 incident can be used to argue that Pelayo once used force unreasonably or

punished an arrestee improperly.  However, there is no expert testimony that is critical of Pelayo's conduct during the 2010 incident.  Further, Pelayo's admitted statement about being made to run is unclear and sheds little light on Pelayo's intent.  The 2010 incident also sheds little light on Elkins's actions and whether he reached into his waistband.

Finally, Pelayo argues that the internal investigatory memorandum identified by Plaintiffs should be excluded as they contain imbedded hearsay to which no exception applies.

### *Plaintiffs' Opposition*

Plaintiffs argue that evidence of the 2010 incident should not be excluded.  On November 23, 2010, a Suspect led law enforcement on a pursuit while driving a stolen vehicle.  The Suspect allegedly intentionally accelerated a stolen vehicle and collided with an undercover police vehicle. The Suspect fled on foot and was taken into custody in a field by a Tulare Police Department Officer.  As the Tulare Officer was placing the Suspect into custody, Pelayo ran past the Tulare Officer and struck the handcuffed Suspect in the face.  Pelayo then said, "That's what you get for making me run, bitch!"  Pelayo said that he struck the Suspect because he could not see the Suspect's hands, and then feigned ignorance about what he meant by his statement.  As Pelayo and the Tulare Officer where walking the suspect away from the field, Pelayo told the Suspect, "You're lucky I didn't shoot your ass."  Although Pelayo contends that he self-reported this conduct to his supervisor, that is inconsistent with the statement of the Tulare Officer, who initiated a complaint against Pelayo for Pelayo's conduct towards the suspect.

Plaintiffs argue that the 2010 prior incident calls Pelayo's credibility and integrity into question, which weighs on whether the jury should believe Pelayo's testimony that Elkins was reaching towards his waistband just before Pelayo fired his gun.  The jury may discredit Pelayo's recount of the facts regarding Elkins because Pelayo also claimed that he could not see the 2010 unarmed Suspect's hands.  Finally, Pelayo threatened the 2010 Suspect that he was lucky that Pelayo did not shoot him.  It is highly likely that the jury in this case could find that Pelayo's threat to the other Suspect supports his motive or intent for killing Elkins for making him run. Thus, the prior incident is admissible to show motive, intent, and lack of accident under Rule 404(b)(2) and is admissible on the claim for punitive damages.

1    Finally, Plaintiffs argue that certain CHP investigatory memorandum of the 2010 incident

2  are admissible.  During summary judgment, the Court held that the memorandum was admissible

3  under Rule 803(6) (record of regularly conducted activity) or Rule 803(8) (public record).  That

4  ruling should apply at this stage in the proceedings as well.

5    *Defendant's Reply*

6    Pelayo argues *inter alia* that Plaintiffs are attempting to introduce evidence surrounding

7  the 2010 incident for an improper Rule 404(b) propensity purpose.  However, the 2010 incident is

8  not similar to the incident with Elkins, and the CHP investigation of the 2010 incident upheld

9  Pelayo's use of force.  Introduction of evidence relating to the 2010 incident would create a mini-

10 trial, confuse the jury, and have an unduly prejudicial effect against Pelayo, particularly in light of

11 any marginal relevancy that may exist.  Therefore, evidence relating to the 2010 incident should

12 be excluded under Rule 403.

13    *Judicial Analyses of the Prior Incident*

14    This is not the first time that 2010 incident involving Pelayo has been judicially addressed.

15 The Ninth Circuit in relevant part explained:

16      Plaintiffs present evidence of a separate incident in 2010 involving Officer Pelayo.
        During that incident, Officer Pelayo was assisting another officer chasing a suspect
17      at night through a muddy field. When Officer Pelayo arrived, the suspect was
        already in handcuffs and sitting on the ground. Officer Pelayo ran up and punched
18      the suspect in the face. Officer Pelayo later explained that he was trying to
        apprehend the suspect and did not know that the suspect was handcuffed. Another
19      officer on the scene, however, stated that Officer Pelayo said to the suspect, "That's
        what you get for making me run, bitch." The other officer added that Officer Pelayo
20      also told the suspect as they were leaving the muddy field, "You're lucky I didn't
        shoot your ass." Officer Pelayo denied making that statement and asserted that
21      what he actually said was, "Why the fuck did you make me run?" Whether the
        evidence of Officer Pelayo's actions and statements during the 2010 separate
22      incident would be admissible under Rule 404(b)(2) of the Federal Rules of
        Evidence as evidence of motive, intent, or lack of accident, or whether this
23      evidence should be excluded under Rule 403, *are questions that we need not
        resolve at this time*.
24
   Estate of Elkins v. Pelayo, 737 F. App'x 830, 833 (9th Cir. 2018) (emphasis added).
25
      The dissenting judge also addressed the 2010 incident and the majority's analysis:
26
      The majority insinuates that the evidence of Officer Pelayo's prior conduct might
27    be admissible as substantive evidence under Rule 404(b)(2). However, the majority
      fails to present any theory for how this evidence could possibly fall within the
28    requirements of Rule 404(b)(2). Instead, the majority avoids the issue by stating the

question of admissibility need not be decided at this point. The majority is wrong; admissibility must be decided now, because "[a] trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). Indeed, the district court ruled on the admissibility of the evidence regarding Officer Pelayo's prior acts and held that it was admissible only for impeachment purposes and not as substantive evidence.

Id. at 837 n.5 (Smith, J. dissenting).

Finally, in the Court's summary judgment order, the Court found in relevant part:

Pelayo was involved in an incident two years prior to the encounter with Elkins. As discussed above, Pelayo was directed to assist in the arrest, and believed that a Tulare police officer needed help. See Pelayo Depo. 27:9-28:6, 35:3-11. Pelayo saw the suspect getting up, he ran to tackle the suspect, changed his mind, and punched the suspect in the face. See id. at 33:5-34:8; Jones Dec. Ex. A. Pelayo told the suspect, "this is what you get for making me run, bitch," and may have also said, "what the fuck did you make me run for?" See Pelayo Depo. 39:19-24; Jones Dec. Ex. A. Pelayo also reportedly told the suspect as they were walking away, "you're lucky I didn't shoot your ass."[9] See Jones Dec. Ex. A. Pelayo did not have his gun drawn, had not observed the situation from its inception, and did not testify that he believed his or the other officer's life was in danger. Although Pelayo perceived a threat, Pelayo only hit the suspect in the face and did not say that the suspect was reaching for anything. See Pelayo Depo. 33:5-34:8. Pelayo self-reported his conduct to his superiors. See id. at 41:24-42:7.

Unlike the situation in Cruz, Pelayo has not given two separate accounts of similar conduct by unarmed suspects in order to justify deadly force. In these two incidents, materially different quanta of force by Pelayo were involved, different actions by the subjects occurred, different observations by Pelayo were made, and different justifications were offered by Pelayo for his different uses of force. In other words, Pelayo has not tried to use what amounts to the same defense in two cases with unarmed suspects. Cf. Cruz, 765 F.3d at 1080. Pelayo's credibility is not sufficiently affected by the materially different November 2010 incident. Cf. id.

Estate of Cecil Elkins v. California Highway Patrol, 2016 U.S. Dist. LEXIS 88249, *45-*47 (E.D. Cal. July 6, 2016) (footnote in original).

### Internal Investigation of the 2010 Incident

The 2010 incident was investigated internally by CHP. It appears that the investigation

---

[9] The Footnote read: "Character evidence is inadmissible to prove conformity with a character trait. See Fed. R. Civ. Pro. 404(b); see also Gates v. Rivera, 993 F.2d 697, 700 (9th Cir. 1993). It is for this prohibited Rule 404(b) purpose that the November 2010 incident is potentially most impactful. In fact, Plaintiffs expressly make this improper argument as part of their opposition. See Doc. No. 104 at 14:27-15:2 ("It is highly likely that the jury in this case could find that Pelayo was certain to carry out this threat [that suspect was lucky Pelayo did not shoot him] against Elkins for making him run."). The Court will not consider the November 10 incident or statements by Pelayo for such a purpose. See Fed. R. Evid. 404(b). However, Cruz recognizes that prior incidents can be used to evaluate credibility. See Cruz, 765 F.3d at 1080. The Court only considers the November 2010 incident and Pelayo's statements in order to determine whether they sufficiently call Pelayo's credibility into question."

1  began after the Tulare Officer complained about Pelayo's conduct. However, the investigation

2  was changed to a citizen's complaint after the Suspect decided to file a complaint because Pelayo

3  had struck him in the face. The primary investigating officer for the 2010 incident was Sgt.

4  Tweed. Sgt. Tweed interviewed *inter alia* the Suspect, the Tulare Officer, and Pelayo in

5  preparation for issuing a final report.

6        In relevant part, Sgt. Tweed reported in a separate memorandum that the Tulare Officer

7  said: (1) he chased the Suspect at night through a muddy, freshly plowed, dirt field; (2) the

8  lighting was "pitch black" with little moonlight, and there was just enough moonlight to follow the

9  suspect in the field; (3) after the Suspect had been tasered, handcuffed, and was raising up from

10 his stomach, Pelayo ran past and struck the Suspect in the mouth with a closed fist; (4) Pelayo told

11 the Suspect, "That's what you get for making me run, bitch."; (5) while walking the Suspect out of

12 the field, Pelayo told the suspect, "You're lucky I didn't shoot your ass."; and (6) a supervisor told

13 the Tulare Officer that Pelayo had gotten in the truck after hitting the suspect and said, "Man I

14 fucked up." Doc. No. 262-3 at ECF pp.3-6.

15        Sgt Tweed issued a final report of his findings. See Doc. No. 273-1 at ECF p.5. The final

16 report summarized the suspect's complaint against Pelayo as follows: "[After utilizing a taser,]

17 the complainant was handcuffed and was either assisted to his knees by [the Tulare Officer] or

18 rose this knees unassisted. Immediately after the complainant was on his knees, and before [the

19 Tulare Officer] could broadcast a 'Code-4, one in-custody' advisement, [Pelayo] struck the

20 complainant with a closed right fist on the left neck, lower jaw area." Id. at ECF p.7. The report

21 concluded that Pelayo striking the Suspect was an "unintentional error." The report stated that the

22 Suspect was known to be armed, mentally unstable, gang affiliated, a parolee, and extremely

23 dangerous. See id. The report noted that the lighting conditions were very poor and that Pelayo

24 was running through a muddy field with furrows after receiving a radio dispatch from the Tulare

25 Officer that was simply the Tulare Officer yelling "get on the ground" three times. See id. at ECF

26 p.8. Pelayo did not hear any further radio traffic from the Tulare Officer and feared for the life of

27 the Tulare Officer. See id. When Pelayo suddenly saw the Suspect on his (the Suspect's) knees

28 and with his back arched in an attempt to stand up, Pelayo was going to tackle the suspect. See id.

Pelayo did not believe that the scene was stabilized and believed the Suspect was a threat.  See id.

As Pelayo approached, he saw the Tulare Officer standing in front of the Suspect.  See id.  Pelayo

knew that if he tackled the Suspect, he would also collide with the Tulare Officer.  See id.  Instead

of tackling the Suspect, Pelayo decided to strike the Suspect in the jaw with a distracting blow to

take the suspect into custody.  See id.  After Pelayo struck the Suspect, Pelayo saw the Tulare

Officer gather taser wires and saw that the suspect was handcuffed behind his back.  See id.  With

respect to hitting the Suspect, the report then explained and concluded as follows:

> [Pelayo] deemed the situation as dangerous and unstable with the information he
> had at the time of the incident.  The conditions surrounding the incident, verifying
> it as dangerous and unstable, were confirmed by numerous witness statements.
> These conditions included:  no radio communication, very limited lighting, difficult
> terrain conditions, the suspect's previous assault on an officer with a deadly
> weapon, the suspect's known violent tendencies, the suspect's unknown state-of-
> mind, and the real possibility the suspect was armed.  [Pelayo] willingly ran into a
> potentially deadly situation to apprehend a violent suspect and protect a fellow
> officer he feared was injured.  [Pelayo] used only the force necessary, by which he
> was trained, to gain control of the situation.  [Pelayo] immediately ceased using
> force once he knew the situation was stable.  [Pelayo] did not know, and was not
> informed, [that the suspect] was handcuffed and in-custody at the time of the
> incident.
>
> . . . .
>
> Upon his contact with [the suspect], [Pelayo] was not advised, and reasonably
> could not have seen, [that the suspect] was in-custody.  With the information
> available to [Pelayo], and by [the suspect's] actions, [Pelayo] believed the situation
> was not stable and [the suspect] was a threat to his safety.
>
> The aforementioned statements and evidence demonstrate the fact that [Pelayo]
> followed departmental policy and training, utilizing only the force reasonable to
> gain control of the situation, in the circumstances perceived by [Pelayo], and with
> the information he had available at the time of the incident.  Although the
> complainant was struck while in handcuffs, it was the result of [Pelayo's] honest
> mistake.  Therefore, this allegation was determined to be an unintentional error.

Id. at ECF pp. 8-9.

In the recommendations section, the report noted that Pelayo made a statement to the

Suspect that was inappropriate and unprofessional, although Pelayo's statement was not alleged in

the Suspect's complaint.  See id. at ECF p.9.  The Tulare Officer stated that Pelayo told the

Suspect, "That's what you get for making me run, bitch."  See id.  Pelayo admitted to saying,

"That's what you get for fucking making me run," after he punched the suspect.  See id.  Pelayo

stated that he made the statement out of frustration, adrenaline, and confusion, and accepted

1   responsibility for making the statement, knowing it was wrong.  See id. at ECF p.10.  "The

2   aforementioned statements and evidence demonstrate that [Pelayo] violated departmental policy

3   by using discourteous language in the course of his duties."  Id.

4        Finally, under the "investigator's notes" section, Sgt. Tweed noted that officers are to

5   report incidents of excessive force immediately to a CHP supervisor.  See id. at ECF p.12.

6   Although Pelayo had attempted to report the matter sooner, he was able to report the incident to

7   his sergeant at approximately 7:30 a.m. the next day.  See id.  "[Pelayo's] delay in reporting the

8   incident was determined to be within a justifiable time frame and in accordance with departmental

9   policy."  Id.[10]

10       *Discussion*

11       Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a

12  person's character in order to show that on a particular occasion the person acted in accordance

13  with the character."  Fed. R. Evid. 404(b)(1); United States v. Lague, 971 F.3d 1032, 1038 (9th

14  Cir. 2020).  However, evidence of the crime, wrong, or other act may be admitted for "another

15  purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity,

16  absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2); United States v. Charley, 1 F.4t

17  h 637, 647 (9th Cir. 2021).  The proponent of another crime, wrong, or other act has the burden to

18  show:  (1) the evidence tends to prove a material point (materiality); (2) the other act is not too

19  remote in time (recency); (3) the evidence is sufficient to support a finding that defendant

20  committed the other act (sufficiency); and (4) the past act is similar to the current conduct at issue

21  (similarity).  See Charley, 1 F.4th at 647; United States v. Berckmann, 917 F.3d 999, 1002 (9th

22  Cir. 2020).  "In the civil rights context, courts are reluctant to admit evidence of prior excessive

23  force complaints against a police officer if the complaints are unsubstantiated."  United States v.

24  Bailey, 696 F.3d 794, 800 n.6 (9th Cir. 2012).  "[T]he relevance of a single unsubstantiated charge

25  is obviously limited," Berkovich v. Hicks, 922 F.2d 1018, 1023 (2d Cir. 1991), and "inconclusive

26  allegations of prior similar behavior is not useful."  Bailey, 696 F.3d at 800 n.6.

27

28  [10] The Court notes that Sgt. Tweed's final report was submitted in connection with this motion in limine, but was not
    submitted during the summary judgment proceedings.

Plaintiffs contend that evidence of the 2010 incident is admissible because it weighs on Pelayo's credibility and integrity.  The Court takes this to mean that the 2010 incident reflects poorly on the professionalism of Pelayo, that he lied about self-reporting his actions because the investigation was prompted by complaints from the Tulare Officer, and that he has a documented intolerance for people who run.  However, as detailed above, the investigation into this matter found that Pelayo did self-report the 2010 incident to his supervising sergeant.  See Doc. No. 258 at ECF p.12.  Although Pelayo did not immediately report the incident, he unsuccessfully attempted to do so shortly after the incident and eventually was able to report the matter early the next morning.  See id.  The investigation found that Pelayo's reporting timeframe was justified and within departmental policy.  See id.  Therefore, this aspect of the 2010 incident does not reflect negatively on Pelayo and does not adversely reflect integrity or credibility.  Further, the investigation exonerated Pelayo of using excessive force when he struck the Suspect.  The report noted that Pelayo acknowledged that he used "discourteous language" and found that statements of either "That's what you get for making me run, bitch," or "That's what you get for fucking making me run," were a violation of the policy against using discourteous language in the course of duties.  See id. at ECF p.10.  That is, the only unprofessional conduct found in the investigation was for the use of discourteous language.  The Court cannot find the fact that Pelayo used discourteous language casts any negative light on Pelayo's credibility, particularly when Pelayo self-reported and acknowledged making at least one of the statements (both of which are extremely similar) that was found to be discourteous.  Finally, and relatedly, the 2010 incident is not a documented instance of intolerance for those that run.  As discussed above, the investigation determined that Pelayo's use of force was reasonable under the circumstances, was done in aid of another officer and to stabilize the situation, and the amount of force used was appropriate and within policy given Pelayo's reasonable perceptions.  See id. at ECF pp.8-9.

Plaintiffs also argue that a jury could view the 2010 incident and discredit Pelayo's recount of fatally shooting Elkins because he also claimed that he could not see the unarmed Suspect's hands.  The Ninth Circuit has held that an officer's use of the same explanation to justify deadly force in very similar cases could be viewed as a dishonest "song and dance" that discredits the

explanation.  <u>Cruz v. City of Anaheim</u>, 765 F.3d 1076, 1080 (9th Cir. 2014).  However, Pelayo is not using the same story to justify deadly force in two very similar cases.  The 2010 incident involved Pelayo running to the aid of an officer whose last known communication indicated distress, Pelayo saw the Suspect getting up, and he hit the Suspect with his fist.  Pelayo did not have his firearm drawn, did not utilize deadly force, and did not say that the Suspect made a furtive movement or reached towards his waistband.  Rather, Pelayo utilized a distracting blow because he could not determine that the situation was stable and did not know that the Suspect had been handcuffed.  Moreover, the final report indicated that the conditions were difficult – the field was muddy and it was very dark with minimal ambient light.  Even the Tulare Officer described the lighting condition as nearly "pitch black," which makes it likely that the running Pelayo did not see that the Suspect was handcuffed.  That is, the 2010 incident is not very similar to this case because dramatically different levels of force are involved, different environmental conditions existed, different observations by Pelayo were made, a different policing situation was involved, and different justifications by Pelayo were made to justify different types of force.  Therefore, the 2010 incident and the justifications used by Pelayo are not sufficiently similar to the incident with Elkins to materially call Pelayo's credibility into question.  <u>Cf.</u> <u>Cruz</u>, 765 F.3d at 1080.

Finally, Plaintiffs argue that the purported statement, "You're lucky I didn't shoot your ass," is a threat that is admissible to show intent for purposes of punitive damages.  The Court takes Plaintiffs' argument to be that, because the Suspect made Pelayo run, Pelayo was mad and made the statement, and since Elkins made Pelayo run, this time Pelayo followed through and intend to shoot Elkins largely because Elkins made him run and did not actually pose a threat.

The statement is technically not an act.  In and of itself it is a statement by Pelayo and thus, an admission of a party opponent.  <u>See</u> Fed. R. Evid. 801(d)(2)(A).  However, the alleged statement was made two years prior to the incident with Elkins.  In order for the statement to be probative of intent or motive, it must have been made in a context that is similar to the circumstances involving Elkins and that reflects Pelayo's intent.  <u>Cf.</u> <u>Charley</u>, 1 F.4th at 647 (noting similarity requirement under Rule 404(b)(2)); <u>United States v. Ayers</u>, 924 F.2d 1468, 1473 (9th Cir. 1991) (expressly recognizing that other acts must be similar in order to prove intent).

As just discussed, there are significant differences between the 2010 incident and the incident with Elkins.  While Pelayo did have to run in connection with the apprehension of a dangerous suspect, different types of force were used, Pelayo did not have his gun drawn, the different types of force were used for different reasons, the Suspect did not attempt to reach for his waistband, the environmental conditions made movement (muddy field) and vision (nearly pitch black) very difficult, Pelayo only saw the Suspect once the Suspect had been tasered and handcuffed, and it appears that a primary purpose of Pelayo running was to get to the aid of a fellow officer (as opposed to simply trying to apprehend the Suspect) whose status was unknown after the officer's last transmission indicated danger/distress.  Further, the statement is not actually a threat because it did not inform the Suspect of any consequence if the Suspect would do or say a particular thing.  Rather, the statement seems to reflect frustration.  Pelayo allegedly made the statement after the Suspect was completely subdued and as Pelayo, the Suspect, and the Tulare Officer were together walking out of the field.  The statement was not made while Pelayo was using any force, and the statement does not explain any action taken by Pelayo toward or against the Suspect.  Therefore, the statement does not appear to fairly reflect any aspect of Pelayo's intent during the 2010 incident.  In sum, the Court is not convinced that the context of the statement reflects Pelayo's intent or motive or is sufficiently similar to the circumstances involving Elkins to be admissible under Rule 404(b)(2).[11]

To the extent that the 2010 incident or Pelayo's alleged "shoot your ass" statement is probative of Pelayo's intent when he shot Elkins, the probative value is low.  The CHP's investigation of the 2010 incident found that Pelayo's use of force was reasonable and appropriate. The only violation of departmental policy was for discourteous language, and the discourteous language was not the "shoot your ass" statement.  In fact, that alleged statement does not appear anywhere in the final report, even though Sgt. Tweed took and recorded the Tulare Officer's statement and authored the final report.  Thus, Sgt. Tweed was aware of the alleged statement.  To

---

[11] Plaintiffs also indicate that the statement is relevant to show lack of accident.  However, to the Court's knowledge, Pelayo has never contended that any accident occurred.  Because the presence or absence of an accident is not a part of this case, the absence of an accident is not a viable Rule 404(b)(2) purpose.

the Court's knowledge, Pelayo has always denied that he made the "shoot your ass" statement.
The fact that this statement was not found to be a violation of departmental policy, or even
addressed in the final report, indicates that there was insufficient substantiation. This lessens the
probative value of the statement. See Bailey, 696 F.3d at 800 n.6; Sibrian v. City of L.A., 288 F.
App'x 385, 387 (9th 2008); Berkovich, 922 F.2d at 1023.

Finally, considering the evidence and testimony that would be necessary to address the
2010 incident, the investigation, and Pelayo's various statements, significant court time would be
taken and there is a real danger of creating a mini-trial. The greater the evidence involved and the
trial time consumed, the greater the danger jury confusion. When combined with the natural
prejudicial effect that can arise from the fact that complaints were made about Pelayo and
investigated by the CHP, the Court finds that the probative value of the 2010 incident (including
the "shoot your ass" statement) is substantially outweighed by the danger of unfair prejudice,
confusion, and the creation of a mini-trial. See Fed. R. Evid. 403; Bailey, 696 F.3d at 800 n.6;
Duran v. City of Maywood, 221 F.3d 1127, 1133 (9th Cir. 2000); Sibrian, 288 F. App'x at 387;
Berkovich, 922 F.2d at 1023.

*Ruling*

Defendant's motion is granted and evidence of the 2010 incident and associated statements
will be excluded under Rules 403 and 404.[12]

**V.     Motion No. 5 – Exclude Characterization of Elkins as "a Runner" and Related
        Character Evidence**

*Defendant's Argument*

Pelayo argues that Plaintiffs' summary judgment opposition classified Elkins as a runner
and not a violent criminal who threatened and assaulted law enforcement officers. Rule of Civil

---

[12] Because the Court finds that the evidence at issue is excludable under Rules 403 and 404, the Court does not
address the hearsay objections made by the parties. However, the Court notes that during summary judgment, the
Court considered the CHP investigatory memorandum submitted by Plaintiffs. The Court held that it *appeared* that
the reports may be admissible under Rules 803(6) and 803(8) and overruled the hearsay objection *at that time*. See
Estate of Elkins, 2016 U.S. Dist. LEXIS 88249 at *18 n.6. The Court did not hold that the reports were admissible for
all purposes or that the issue of admissibility was fully settled. See id.

1 | Procedure 404(a)(1) prohibits the use of a character trait to prove that on a particular occasion the
2 | person acted in conformity with that trait.  Any characterization of Elkins as having a "runner"
3 | personality, or being fearful of law enforcement, or being non-violent falls under Rule 404(b).
4 | Characterizing Elkins as a "runner" indicates that he was fleeing from police without engaging in
5 | violent or threatening behavior.  Further, characterization of Elkins as a "runner" is comparable to
6 | the use of colorful language to describe a witness, such as describing Elkins as a "junkie" or
7 | Pelayo as an "assassin" or a "knight in shining armor."  Like these terms, describing Elkins as a
8 | "runner" to contradict assertions that he was a violent criminal is improperly prejudicial under
9 | Rule 403.  Finally, characterizing Elkins as a "runner" in contrast to a violent criminal is a type of
10 | criminal profiling.  The Ninth Circuit has held that such criminal profiling is admissible only as
11 | background evidence, as an investigative tool, or as rebuttal evidence.  The first two avenues of
12 | admissibility are not applicable in this case, and this motion in limine seeks to keep the rebuttal
13 | door shut.  Moreover, when profile evidence is admissible, it is an area uniquely within ken of
14 | forensic psychologists, yet Plaintiffs have not disclosed any such expert.

15 |       *Plaintiffs' Opposition*

16 |       Plaintiffs argue that Pelayo concedes that evidence that Elkins was fleeing apprehension on
17 | the day in question and on prior occasions is admissible.  In light of this concession, Pelayo fails
18 | to support how he will be prejudiced by characterizing Elkins as a "runner," let alone how the
19 | characterization is substantially more prejudicial than probative.  Police practices expert Roger
20 | Clark is a 27 year law enforcement veteran, and it is well within his purview to characterize Elkins
21 | as a "runner" based on Clark's experience in apprehending and chasing fleeing felons.  Finally,
22 | characterizing Elkins as a runner is no different than characterizing him as a "violent criminal."  If
23 | the Court prohibits characterizing Elkins as a runner, it should also prohibit characterizing him as
24 | a violent criminal.

25 |       *Defendant's Reply*

26 |       Pelayo argues that Plaintiffs' opposition misstates the evidence.  Pelayo will introduce
27 | evidence that he heard at the briefing that Elkins was involved in serious crimes and tried to run
28 | over another officer.  This evidence is relevant to assessing the reasonableness of Pelayo's use of

1   force.  Further, while Plaintiffs argue that evidence that Elkins was a runner is not criminal profile

2   evidence, they then contend that their expert Clark can characterize Elkins as a "runner" based on

3   his experience with fleeing felons.  The effect is still that Elkins is being profiled.  However, Clark

4   is not a forensic pathologist, and Pelayo argues that he has not had a fair opportunity to obtain his

5   own expert pathologist to rebut Clark's opinions.  Therefore, this motion should be granted.

6          *Discussion*

7          Both sides use the term "runner" as if it has some sort of established meaning in the

8   context of either criminal psychology or Fourth Amendment jurisprudence.  However, the Court is

9   aware of no particular meaning to the term "runner" in these contexts and neither side has actually

10  provided a definition or a precise understanding of how that term is intended to be used by the

11  Plaintiffs.  Similarly, the parties cite no evidence or authority that indicates that the term "runner"

12  is an unduly prejudicial term or has an accepted meaning.  Cf. C.B. v. City of Sonora, 769 F.3d

13  1005, 1024 (9th Cir. 2014) (noting that officers were told that a minor was "a 'runner' – *whatever*

14  *that may mean . . . .*") (emphasis added); cf. also K.W.P. v. City Pub. Sch., 931 F.3d 813, 825 (8th

15  Cir. 2019) (discussing C.B. and noting that the term "runner" was unexplained).  Plaintiffs'

16  briefing suggests that the term "runner" is simply another way of describing a fleeing suspect or

17  someone who is likely to flee from the police.  If that is the case, the evidence supports use of that

18  term.  Elkins was indeed running from police on the date of the incident, and had successfully

19  evaded police two days prior in part by physically running away, which would fit the common

20  understanding of the worder "runner."  Moreover, there is nothing about the term "runner" that

21  identifies any character trait whatsoever, except perhaps athleticism.  Without more, the fact that

22  someone is described as a "runner" simply means that the person runs or flees on foot; it says

23  nothing about a propensity for peace or violence or anything else.  Therefore, using the non-

24  forensic/non-technical term "runner" to describe Elkins's flight or someone who runs or flees is

25  not unduly prejudicial under Rule 403 and does not implicate Rule 404.

26         To the extent that some technical or specific forensic definition of the term "runner" is

27  intended, the Court agrees with Pelayo that expert testimony is needed.  Plaintiffs' opposition

28  indicates that Clark can use the term "runner."  However, Clark's expert report does not use the

term "runner," and Plaintiffs do not cite any portion of Clark's deposition in which he uses the term "runner." The Court believes that Clark can use the term "runner" with respect to Elkins to the extent that Clark is either using a term that law enforcement officers commonly give to a fleeing suspect or to the extent Clark is personally describing Elkins as someone who is fleeing from the police on foot. Any more than this use, particularly a use of the term in a forensic sense to profile Elkins, appears to be outside the scope of Clark's expertise and is not an opinion that was properly disclosed through either the expert report or at Clark's deposition (given the absence of citation to Clark's deposition in Plaintiffs' opposition). At this time, consistent with Rule 37(c)(1), Clark cannot utilize the term "runner" in any kind of technical, forensic profiling sense.

   *Ruling*

   Defendant's fifth motion in limine is denied to the extent that Plaintiffs or their witnesses may describe Elkins as a "runner," either because that is a reasonable lay description of Elkins's flight from police on foot or because that is a term that police commonly use to describe someone who is fleeing to evade arrest (assuming Clark can verify this second meaning). Defendant's fifth motion in limine is granted to the extent that the term "runner" cannot be used in a technical forensic profiling sense.

## VI.   Motion No. 6 – Exclude Certain Opinions of Expert Leonard Romero

   *Defendant's Argument*

   Pelayo argues that Plaintiffs' expert Leonard Romero should be precluded from offering speculative opinions that are based on either concededly mistaken facts or facts not disclosed in his expert report, as well as opinions that were disclaimed during deposition. First, in his report, Romero opined that two gunshot wounds to the left and right back indicated that the shots were fired while Elkins was attempting to crawl away, as described in Officer Guzman's deposition. However, at his deposition, Romero reread Guzman's deposition and admitted that Guzman testified that Elkins was attempting to crawl away after Elkins was shot. Therefore, the sole predicate for the opinion that two gunshot wounds to the back indicate that Elkins was crawling is false. Under Rule 702, the opinion is unreliable, and under Rule 403 is misleading.

Second, Fed. R. Civ. P. 26(a)(2) requires that an expert's report contain the facts or data considered by the witness in forming his opinions.  In his report, Romero opines that a possible explanation for two gunshot wounds is that Pelayo was positioned on the left side of Elkins and fired as his torso was significantly downward.  However, no factual basis in the report is stated for the conclusion that Pelayo was positioned to Elkins's left side at any relevant time.  The record in this case is bereft of such evidence, which makes this opinion sheer speculation.  The opinion is not the product of reasonable scientific methods and is likely to confuse the jury.

Finally, Romero disclaimed having formed opinions on certain subjects during his deposition.  As a result, Plaintiffs should be precluded from asking Romero questions about the following subjects:  (1) Romero has no opinion about whether Pelayo's testimony or Guzman's testimony is more accurate; (2) Romero had no opinions regarding distance determinations, including Pelayo's distance and position relative to Elkins; (3) Romero could only opine that Elkins's arm could have been across Elkins's body, but cannot otherwise opine as to the specific position of Elkins's arm; and (4) Romero has no opinion as to whether the shots were fired rapidly or whether there was a pause in the shots fired.  Pelayo also requests that Romero's trial testimony should not be permitted to expand beyond the four corners of his report.

### *Plaintiffs' Opposition*

Plaintiffs argue that none of Romero's opinions should be excluded.  Pelayo fails to explain what sort of methodology a ballistics expert is required to apply.  To the extent that Pelayo takes issue with Romero's deposition testimony, the solution is cross-examination and not exclusion.  The characterization that Guzman's description of events is the sole basis for Romero's conclusions is inaccurate and not grounds to grant the motion in limine.  Further, Romero's opinion that Pelayo was positioned to the left side of Elkins as his torso was significantly downward is not speculation.  It is based on training, experience, photos, and an autopsy.  Finally, Romero should not be prohibited from testifying about matters that he testified to at his deposition.  Pelayo has not pointed to any opinions that is outside the scope of his report.

### *Discussion*

Pelayo's motion relates to four aspects of Romero's opinions or expert report.

1           1.      "Disclaimed" Opinions

2          Plaintiffs do not address the four areas about which Romero stated that he had no opinions.

3   In the absence of an opposition, the Court detects no reason why Romero should not be held to his

4   deposition testimony that he has no opinions on certain subjects.  Therefore, Romero will be

5   precluded from opining about:  (1) whether Pelayo's testimony or Guzman's testimony is more

6   accurate; (2) distance determinations; (3) whether the shots were fired rapidly or whether there

7   was a pause in the shots fired, and (4) the specific position of Elkins's arm (but can opine that

8   Elkins's arm *could have been* across his body).

9          However, part of the arguments made by Pelayo with respect to distance determinations is

10  that Romero had no opinions about distances, including Pelayo's distance and position relative to

11  Elkins.  Two of the three deposition excerpts cited by Pelayo clearly show that Romero had made

12  no distance determinations, which would have required a gunshot residue analysis of Elkins's

13  clothes.  See Romero Depo. 31:7-21, 36:23-37:3.  Pelayo then cites page 78 line 22 to page 79 line

14  4 to argue that Romero had no opinions of Pelayo's position relative to decedent.  Those excerpts

15  deal with questioning about the position of Elkins's arm in relation to gunshot wounds to that arm.

16  See Romero Depo. 74:3-19, 78:2-18.  When asked by defense counsel if Elkins's arm could have

17  been across the body shoulder to shoulder or been instead in a lower position, Romero responded,

18  "Again, I don't know where Pelayo is.  I don't know his position.  I don't know his distance."  Id.

19  at 78:25-79:1.  Romero then stated that he did not know the position of the arm (shoulder to

20  shoulder or lower), but that it could have been across the body.  See id. at 79:2-4.  In the very next

21  sequence of questions, Romero is asked:  "And as to gunshot wounds nine and ten, the

22  conclusions there are that *the officer was behind Elkins and to the right firing*; correct?", to which

23  Romero replied, "Correct."  Id. at 79:5-8 (emphasis added).

24         This sequence shows that Romero, relative to certain gunshot wounds to Elkins's arm,

25  could only give scenarios that would explain the wounds and/or trajectory, but that he did not

26  know Pelayo's positioning for those wounds, because in the very next questioning sequence,

27  Romero opined about Pelayo's position relative to Elkins.  Thus, contrary to Pelayo's arguments,

28  Romero certainly does have opinions about Pelayo's positioning relative to at least some of the

wounds.  It appears to the Court that Elkins is taking Romero's testimony with respect to a specific gunshot wound/sequence out of context, and then taking that out of context statement to try to prevent Romero from offering any opinions about Pelayo's positioning.  The Court should hardly need to say that this is improper.  While Romero may not offer distance opinions, he will not be prohibited from offering opinions about Pelayo's positioning relative to Elkins.[13]

2.     Crawling Away

In his declaration in support of Plaintiffs' opposition to summary judgment, Romero declared that one of three possible explanations for the bullet trajectories of two gunshots wounds was that that the gunshots were fired as Elkins "was attempting to crawl away after going down, as described by Officer Guzman."  See Doc. No. 104-9 at ¶ 23.  At his deposition, however, Romero reread portions of pages 44 and 45 of Guzman's testimony.  See Romero Depo. 73:12-74:2.  Romero quoted Guzman's testimony as, "Yes, even when he fell to the ground, he yelled stop, and he was still crawling, trying to get away."  Id. at 73:24-74:1.  Romero then stated, "I take that to mean after [Elkins] was shot, [Elkins] was attempting to crawl."  Id. at 74:1-2.  Prior to this section, Romero was asked, "But – but this – this scenario, the crawling *is based solely* on that statement by Guzman?"  Romero Depo. 73:5-7 (emphasis added).  Romero responded, "By Officer Guzman."  Id. at 73:8.  Romero did not state that there were other bases, nor did he state that Guzman's testimony was not the sole basis for the crawling opinion.  Instead, Romero simply stated "By Officer Guzman," which appears to be the equivalent of answering, "yes."

Plaintiffs contend that Romero's opinion that shots were fired as Elkins was crawling away is based on evidence in addition to the testimony of Officer Guzman.  However, Plaintiffs do not disclose what those additional bases are.  Moreover, this position appears contrary to Romero's deposition testimony, as quoted above.  See id.

The only evidence that has been specifically cited and provided to the Court indicates that Romero's "crawling opinion," i.e. that Pelayo fired two gunshots and hit Elkins while Elkins was crawling away, is based solely on an interpretation of Guzman's testimony that Romero

---

[13] Indeed, considering the nature of trajectories and discussions of entry angles in general, possible or definite firing positions would necessarily be revealed relative to the wounded individual.

1  disclaimed during his deposition.  That is, the only acknowledged basis for the opinion is infirm

2  because it was disclaimed by Romero.  Without an adequate basis for the crawling opinion, that

3  opinion is unreliable and unhelpful and therefore excludable under Rule 702.  Thus, Romero will

4  be precluded from offering his "crawling opinion."

5          3.      Pelayo Positioned to the Left of Elkins

6          Romero's report identifies the trajectories of the two gunshot wounds as reported by the

7  coroner.  Romero then explains that one of the possible explanations for those trajectories is that

8  Pelayo was positioned to the left of Elkins and fired at a downward angle.  Plaintiffs contend that

9  Romero's opinion is based on his training and experience, review of the autopsy and photos, and

10 review of the law enforcement officers' depositions.  This is a fair reading of the report.  Romero

11 is clearly utilizing his experience with bullet trajectories and attempting to explain firing positions

12 that would account for the bullets' trajectories as identified by the coroner.  That another witness

13 or officer may not have testified that Pelayo was to the left or may have been to the left of Elkins

14 when at least two shots were fired does not mean that there is no factual basis for Romero's

15 opinion.  The Court will not exclude the "left positioning" opinion of Romero on the basis that an

16 insufficient factual basis was identified in Romero's expert report.

17         4.      Four Corners of the Report

18         Federal Rule of Civil Procedure 26(a)(2)'s expert report requirement "does not limit an

19 expert's testimony simply to reading his report," rather, Rule 26(a)(2) "contemplates that the

20 expert will supplement, elaborate upon, and explain his report in his oral testimony."  Muldrow v.

21 Re-Direct, Inc., 493 F.3d 160, 167 (D.C. Cir. 2007); see Thompson v. Doane Pet Care Co., 470

22 F.3d 1201, 1203 (6th Cir. 2006); see also Gay v. Stonebridge Life Ins. Co., 660 F.3d 58, 64 (1st

23 Cir. 2011).  Nevertheless, Rule 26(a)(2) requires that all an expert's opinions, as well as the bases

24 and factual support for those opinions, be disclosed.  See Fed. R. Civ. P. 26(a)(2)(B)(i).  The

25 failure to include all opinions, or the bases or reasons for the disclosed opinions, is a violation of

26 Rule 26(a)(2)(B) and will trigger sanctions under Rule 37(c)(1).  However, Rule 37(c)(1) itself

27 provides that if the party who violated Rule 26 demonstrates either harmlessness or substantial

28 justification for non-disclosure, then exclusion will not occur.  See Fed. R. Civ. P. 37(c)(1);

1  Merchant, 993 F.3d at 739.  One example of harmlessness may be when an opinion and the bases

2  therefor are disclosed through other discovery tools.

3         If the Court were to grant Pelayo's motion and exclude any opinion that was not properly

4  disclosed within the four corners of a Rule 26(a)(2) report, the Court in effect would be reading

5  out the safe harbor language of Rule 37(c)(1) and prevent Plaintiffs from demonstrating

6  harmlessness or substantial justification.  The Court will not do so.  Instead, the Court will follow

7  Rule 37(c) for all expert witnesses.  If an objection is made that an opinion or basis for an opinion

8  was not disclosed in a Rule 26(a)(2) expert report, the responding party must be prepared to either

9  show that the opinion and bases therefor were actually disclosed in an expert report, demonstrate

10 that the expert is merely elaborating on a disclosed opinion, or show either harmlessness or

11 substantial justification for the non-disclosure.

12        *Ruling*

13        Defendant's motion to exclude Romero's "crawling opinion" and to preclude Romero from

14 testifying about the four areas about which Romero admitted that he had no opinion is granted as

15 discussed above.  The remainder of this motion is denied.

16

17 **VII.**     **Motion No. 7 – Exclude Family Photographs Not Disclosed During Discovery**

18        *Parties' Arguments*

19        Pelayo argues that in October 2018, Plaintiffs disclosed 27 photos of Elkins with family

20 members and other unknown individuals.  Prior to October 2018, the photos had not been

21 disclosed and were responsive to requests for production.  Because the photos were not timely

22 disclosed, they should be excluded under Rule 37(c)(1).

23        Plaintiffs did not respond in any way to this motion in limine.

24        *Discussion*

25        The Court takes Plaintiffs failure to file a response as a non-opposition to the motion.  In

26 the absence of an opposition, the Court can only conclude that the photos were not timely

27 disclosed and that exclusion of the 27 photographs is appropriate pursuant to Rule 37(c)(1).  See

28 Fed. R. Civ. P. 37(c)(1); Merchant, 993 F.3d at 739-42.

1    *Ruling*

2         Defendant's seventh motion in limine is granted.

3

4    **VIII.   Motion No. 8 – Exclude Irrelevant and Misleading Topics Tending to Evoke Jury**

5         **Bias Under Rules of Evidence 401 and 403**

6         *Parties' Arguments*

7         Pelayo contends that the following arguments, terms, or evidence should be excluded:  (1)

8    references to wrongful conduct of law enforcement officers and agencies other than Pelayo; (2)

9    references to Pelayo as a "shooter" or "murderer," referring to Elkins as the "victim," or arguing

10   that Elkins was "gunned down" or "murdered"; (3) arguments related to "social effects" and

11   "political effects"; (4) references to settlement negotiations; (5) arguments relating to stress,

12   emotional distress, or mental anguish suffered by Plaintiffs as a result of this litigation; and (6) all

13   references to the potential indemnification of Pelayo by any governmental entity.

14        Plaintiffs did not respond in any way to this motion in limine.

15        *Discussion*

16        The Court takes Plaintiffs' failure to file a response as a non-opposition to the motion.

17   Particularly in the absence of an opposition, the Court agrees that the first and fifth areas identified

18   by Pelayo are irrelevant under Rule 401, the fourth area in the absence of an admissible purpose is

19   excluded under Rule of Evidence 408(a), and the second and sixth areas are unduly prejudicial

20   under Rule 403.  Regarding the third area, to the extent that Defendant means that Plaintiffs

21   should not make arguments that the jury should consider the possible political and/or social unrest

22   or praise that their verdict would have, the Court agrees that such arguments are improper.  To the

23   extent that Pelayo means something different, he must inform counsel and the Court of precisely

24   what he means.

25        *Ruling*

26        Defendant's eighth motion in line is granted.

27   //

28   //

**PLAINTIFFS' MOTIONS IN LIMINE**

**I.**      **Motion No. 1 – Exclude Pictures or References to Elkins's Swastika Tattoo**

*Plaintiff's Argument*

Plaintiffs argue that Pelayo did not have any knowledge that Elkins had tattoos or an affiliation with white supremacist groups at the time of the encounter.  The evidence of Elkins's swastika tattoo is not relevant to any issue in the case.  Introduction of evidence regarding the tattoo would be unduly prejudicial, and all evidence relating to Elkins's swastika tattoo should be excluded.

*Defendants' Opposition*

Pelayo argues that the swastika tattoo is relevant for at least five reasons.  First, the tattoo confirms Pelayo's knowledge from the briefing that Elkins was a member of the Peckerwood white supremacist gang.  Second, it shows Elkins's state of mind and racial animus and supports the defense's position that Elkins made a threatening motion towards Pelayo (a Latino officer) and had thrown tools and other objects at another Latino officer while in flight.  Third, it is relevant to the standing of the Plaintiffs to bring Fourteenth Amendment claims.  Fourth, it is relevant to damages as the tattoo caused conflict and confusion within Elkins's family.  Fifth, the tattoo is relevant for the jury to determine the nature and quality of Elkins' life and interactions and possible life in prison for the serious crimes he was wanted for.  Finally, Defendants contend that the evidence is not unduly prejudicial because Elkins's white supremacist identity and gang affiliation are directly at issue.

*Plaintiff's Reply*

Plaintiffs argue that Pelayo is attempting to admit evidence of the tattoo for improper inflammatory purposes.  The swastika tattoo is not relevant to prove Elkins's bias,  motive, or state of mind because those issues are not relevant to the causes of action, particularly since there is no evidence to suggest that Elkins was attempting suicide by cop.  Further, pictures of the tattoo are unnecessary to corroborate Pelayo's purported knowledge of Elkins's gang affiliation.  The triable issue is Pelayo's knowledge of gang affiliation, not knowledge of particular gang affiliation.  The best evidence on this subject would be testimony, not the picture.

36

1        *Discussion*

2        The tattoo at issue is a large dark swastika about the size of a softball on Elkins's

3   abdomen.  Because swastikas are generally associated with some form of nazism or white

4   supremacism, they are symbols condemned by the overwhelming majority of society.  The risk of

5   undue prejudice to Plaintiffs from the tattoo is obvious.  Particularly considering the large size of

6   the swastika tattoo, it is predictable that a jury would be inflamed or biased against Elkins and

7   Plaintiffs.

8        In contrast to the likelihood for unfair prejudice against Plaintiffs, the Court detects little

9   relevance to the tattoo.  Pelayo concedes that he was unaware of the tattoo at the time of the

10  shooting, so the tattoo did not of itself play any role in the decision to use deadly force.  Further,

11  none of the bases for relevance identified by Pelayo is persuasive.

12       Much of Pelayo's arguments about the tattoo are based on speculation. The Court agrees

13  that the swastika tattoo could cause family confusion or some discord, but no evidence has been

14  cited that the tattoo actually affected family closeness to a degree that could be expected to affect

15  the damages suffered by Plaintiffs from Elkins's death.  The same can be said about the effects

16  that the tattoo could have on Elkins's activities and life both inside and outside of prison.  Outside

17  of prison, the tattoo would not be visible if Elkins wore a shirt.  Expert testimony would need to be

18  presented regarding any possible effects that the tattoo could have on Elkins's prison life,

19  particularly given the regrettable number of race based gangs in the prison system.  The Court is

20  aware of no expert who has been disclosed on this topic.

21       More concretely, Pelayo argues that the tattoo confirms his knowledge of Elkins's gang

22  affiliation.  It does not appear that any party disputes that information conveyed to Pelayo during

23  the briefing is admissible as part of the totality of information known and assessed by Pelayo at

24  the time of the shooting.  This would include information about whether Elkins was a known

25  member of a particular gang, i.e. the Peckerwood white supremacists.  The existence of the

26  swastika tattoo does not in and of itself show what Pelayo was told at the briefing.  Moreover, at

27  this time, the Court agrees with Plaintiffs that, if there is a material dispute as to whether Elkins

28  was a member of the Peckerwood white supremacist gang, then testimony from other witnesses

could confirm Elkins's membership without the need for showing the swastika tattoo, particularly since the swastika tattoo does not necessarily show gang membership.[14]

Finally, Pelayo contends that the tattoo shows Elkins's state of mind or racial animus in connection with furtive movements or throwing objects at Latino officers.  Pelayo relies in part on the Ninth Circuit case of *Boyd*, which held in part that "where what the officer perceived just prior to the use of force is in dispute, evidence that may support one version of events over another is relevant and admissible."  Boyd v. City & Cnty of San Francisco, 576 F.3d 938, 944 (9th Cir. 2009).  The Court cannot say that the presence of a swastika makes Pelayo's version of events more likely.  A tattoo can have non-obvious or myriad meanings to the individual, and given the quasi-permanent nature of a tattoo, a person may no longer hold to that meaning as time progresses.  Moreover, the evidence presented to the Court during summary judgment indicated that Elkins was in headlong flight, had engaged in similar conduct the day before, and that he had attempted to run over an officer while fleeing the day before.  Elkins's conduct is indicative of someone who is attempting to evade capture at all costs, it is not conduct directed at a particular officer because the officer is Latino.

In sum, the Court detects very little, if any, relevancy to Elkins's swastika tattoo.  To the extent that there is relevancy, the Court is satisfied at this time that the risk of undue prejudice substantially outweighs the relevancy.  Therefore, pursuant to Rule 403, evidence regarding Elkins's swastika tattoo will be excluded.

*Ruling*

Plaintiffs' motion in limine is granted.

## II. Motion No. 2 – Exclude Testimony of Elkins's Probation Officer Jarod Araujo

*Plaintiff's Argument*

Plaintiffs argue that Pelayo intends to introduce the testimony of Elkins's probation officer

---

[14] To the extent that there is a material dispute about gang affiliation, it would seem that the Elkins's tattoo of "Peckerwood Gangster – TC" would be the most relevant evidence because it names the particular gang at issue, as opposed to the swastika which is associated with nazism and neo-nazism in general and any number of hate groups apart from the Peckerwood gang.

1   Jared Araujo for the sole purpose of setting up the fact that Elkins was currently on parole and

2   thus, was motivated to use flight to avoid capture.  However, none of Araujo's information was

3   known to Pelayo at the time of the shooting.  After acquired information about parole status

4   cannot be used to justify, or considered to assess, the reasonableness of Pelayo's use of force.

5           *Defendant's Opposition*

6           Pelayo argues that Araujo can testify about Elkins's conduct after Elkins's release from

7   prison in early 2012.  Specifically, Araujo will testify about Elkins walking out of a drug treatment

8   plan after a week, revocation of parole that ultimately led to 45 days in jail and five years of

9   probation, an arrest in November 2012 on serious drug charges, and a second petition to revoke

10  parole that was pending in November 2012.  This evidence shows that Elkins faced a significant

11  term of imprisonment, which would strain and injure the family relationship.  Further, being on

12  probation can enhance a prison sentence, and attempted murder of a police officer (a crime for

13  which he was wanted at the time of the shooting) can carry a sentence of 15 years to life.  All told,

14  Elkins could have been facing 30 years to life in prison for his criminal conduct in November

15  2012.  This would affect damages in terms of the estate's loss of enjoyment of life and the

16  Plaintiffs' familial relationship claim.  Finally, Elkins's status as being on parole is not unfairly

17  prejudicial because the jury will hear testimony that Pelayo knew that Elkins was wanted for

18  attempted murder of a police officer, use of methamphetamine, burglary, stealing cars, and

19  reckless driving that resulted in multiple crashes.

20          Araujo can also testify about Elkins's marital life.  Specifically, Araujo will testify that the

21  marriage with Creasha was rocky, Elkins was not living at home with Creasha when he called in

22  November 2012, Elkins called Creasha a bitch and said that he was leaving her because she was

23  mad that he was screwing around on her (which Araujo understood to refer to an affair), and that

24  Elkins said that he was getting a divorce and that he would be living with his parents.  This

25  evidence is relevant to the Fourteenth Amendment claims because Plaintiffs must be able to

26  establish a robust relationship with Elkins, and the sufficiency of the relationship is a question of

27  fact.  It is not enough to rely on labels such as wife, parent, or child.  Araujo's testimony shows

28  that Elkins's relationships fall below the minimum standards of the Fourteenth Amendment.

1  Plaintiffs cannot argue that they have an injury to a family relationship but then exclude evidence

2  that Elkins said that he was getting a divorce because of infidelity.

3       *Plaintiffs' Reply*

4       In terms of liability, Plaintiffs argue that none of the Araujo's facts were known to Pelayo

5  and Elkins's state of mind is not at issue.  As to damages, the inflammatory nature of Elkins's

6  prior criminal history is extremely prejudicial.  Plaintiffs agree that prior incarcerations is relevant

7  to show time away from family as long as the incarcerations were not trivial.  However, Plaintiffs

8  argue that they can be asked about their knowledge of prior incarcerations without the need for

9  Araujo's testimony.  Further, Creasha has acknowledged that Elkins faced nine years of

10  incarceration at the time of his death and also acknowledged marital problems, including Elkins's

11  affair with another woman.  Finally, facts known by Araujo that are consistent with information

12  conveyed to Pelayo during the law enforcement briefing would be unnecessarily cumulative.

13       *Discussion*

14       There are three possible areas of relevance to Araujo's proffered testimony.

15       1.    Fourth Amendment

16        To the Court's knowledge, Pelayo had no contact with Araujo and therefore could have

17  learned no information from Araujo about Elkins.  Furthermore, Araujo was not present at the

18  scene on November 13, 2012.  As Elkins's supervising parole officer, however, Araujo did have

19  knowledge that Elkins performed poorly on parole.  Araujo twice filed petitions to revoke parole

20  and one of the petitions to revoke was based on Elkins committing a drug related crime for which

21  he was being separately prosecuted.  The Court recognizes that a criminal history and a potential

22  lengthy prison sentence in some circumstances can support one version of events over another

23  when what an officer perceived just prior to using force is disputed.  See Boyd, 576 F.3d at 944-

24  45.  However, it is unclear how poor performance on parole by itself would make it more likely

25  that Elkins was reaching towards his waistband just prior to Pelayo using force.[15]  On the other

26  _____

27  [15] Pelayo's opposition identifies prison terms that Elkins was facing for the drug offense and offenses committed by
Elkins in the days leading up to the November 13 shooting.  However, there is no citation to Araujo's deposition
testimony that indicates that Araujo was aware of any potential crimes involved during or leading up to the November

28  13 incident, the sentencing range for those offenses, and the likely sentences for those offenses.  Therefore, the Court
views Araujo's testimony as being limited to Elkins's performance on parole.

1    hand, there is an apparent danger of unfair bias from testimony that describes Elkins's poor

2    conduct on parole.  To the extent that poor performance on parole is relevant under *Boyd*, the

3    danger of undue prejudice substantially outweighs any relevance under Rule 403.  Therefore, in

4    relation to the Fourth Amendment claim, the Court concludes that Araujo has no information that

5    is relevant or that is not otherwise excludable under Rule 403.

6          2.      Fourteenth Amendment Liability

7          A Fourteenth Amendment claim for loss of companionship protects "those relationships,

8    including family relationships, that presuppose 'deep attachments and commitments to the

9    necessarily few other individuals with whom one shares not only a special community of thoughts,

10   experiences, and beliefs but also distinctively personal aspects of one's life.'"  Johnson v. Bay

11   Area Rapid Transit Dist., 724 F.3d 1159, 1169 (9th Cir. 2013) (quoting Lee v. City of L.A., 250

12   F.3d 668, 685 (9th Cir. 2001)).  The Ninth Circuit has recognized that the familial relationship

13   between parents and children, be they minors or adults, is protected by the Fourteenth

14   Amendment.  See Chaudhry v. City of L.A., 751 F.3d 1096, 1106 (9th Cir. 2014) (adult children);

15   Smith v. City of Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987)[16] (minor children).  Although the

16   Ninth Circuit has not expressly so held, a number of district courts within the Ninth Circuit

17   (including this Court) have held that spouses have a Fourteenth Amendment right to familial

18   association.  See Estate of Brown v. Lambert, 478 F.Supp.3d 1006, 1021-22 (S.D. Cal. 2020) (and

19   cases cited therein); Morales v. City of Delano, 852 F.Supp.2d 1253, 1274 (E.D. Cal. 2012).

20   Further, depending on the nature of the relationship with the step-child and the level of

21   involvement in the step-child's life, a step-child can have standing to bring a Fourteenth

22   Amendment familial relationship claim.  See Ramirez v. City of Oxnard, 2013 U.S. Dist. LEXIS

23   202837, *20-*23 (C.D. Cal. July 23, 2013); cf. Nash-Perry v. City of Bakersfield, 2021 U.S. Dist.

24   LEXIS 165273, *36-*39 (E.D. Cal. Aug. 31, 2021) (acknowledging *Ramirez* but distinguishing

25   the nature and duration of the relationship of the plaintiff step-child and decedent from the

26   relationship in *Ramirez*).  While a parent or child will normally be able to pursue a Fourteenth

27   Amendment claim for interference with or loss of the parent-child relationship, simply because

28

---

[16] Reversed on other grounds, Hodgers-Durgin v. De La Vina, 199 F.3d 1037 (9th Cir. 1999).

there is a genetic/biological link between an adult and a child does not *per se* mean that Fourteenth Amendment protections exist.  Wheeler v. City of Santa Clara, 894 F.3d 1046, 1058 (9th Cir. 2018).

> Judicially enforceable Fourteenth Amendment interests require enduring relationships reflecting assumption of parental responsibility and stem from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life through the instruction of children. . . . In sum, even biological parents must maintain consistent involvement in a child's life and participation in child-rearing activities for their relationship to be entitled to the Fourteenth Amendment protections at issue here.

Id. at 1058.  If a parent raises the child, otherwise assumes responsibility for the child's upbringing, or maintains consistent contact with the child, then the parent-child relationship will be protected by the Fourteenth Amendment.  Cf. id. (affirming dismissal of an adult child's Fourteenth Amendment claim for the death of his biological mother when the adult child had been adopted by another family as an infant and where the complaint failed to allege that the biological mother had "raised him, otherwise resumed responsibility for his upbringing, or even maintained consistent contact with him during his childhood").

Pelayo, relying largely on *Wheeler*, contends that the robustness of the relationship that Plaintiffs had with Elkins is a question of fact, that it is improper to simply rely on labels such as "wife" or "child."  Because Araujo's testimony relates to the robustness of Elkins's familial relationships, his testimony is relevant to the issue of standing.

*Wheeler* is a unique case.  Plaintiff Wheeler was the biological son and only known living relative of a deceased woman, but Wheeler had been adopted by other parents as an infant.  See id. at 1050.  As stated above, the Ninth Circuit noted that parents must maintain consistent involvement in a child's life and participate in child-rearing activities in order for the relationship to be entitled to Fourteenth Amendment protection.  See id. at 1058.  Because the complaint did "not allege that [the decedent] raised him, otherwise resumed responsibility for his upbringing, or even maintained consistent contact with him during his childhood," the "relationship . . . did not have the structure of parental relationships protected by the Fourteenth Amendment."  Id. at 1058-59.  Thus, there was no viable Fourteenth Amendment claim.  See id. at 1059.  The Ninth Circuit was careful to limit its holding to the facts of the case.  See id. at 1058.  "Questions concerning all

1  adopted-out children or those raised in non-traditional family arrangements are not before us

2  today.  Nor should this opinion be read to foreclose a case involving a true parent-child

3  relationship in a different context where a constitutionally protected right may exist." Id.

4          The Court reads *Wheeler* as indicating that the relationship in that case was not protected

5  by the Fourteenth Amendment because a parent-child relationship did not really exist.  The

6  biological mother had voluntarily severed her state recognized parental rights with the plaintiff

7  and then did not have contact with Wheeler growing up or participate in his upbring.[17]  In its

8  simplest terms, *Wheeler* requires that a protected parent-child relationship exist through some

9  form of consistent contact with the child and assumption of some kind of parenting role by the

10 parent.  When there is no consistent contact or assumption of some parenting role, no relationship

11 actually exists, and there is nothing for the Fourteenth Amendment to protect.  Although *Wheeler*

12 involved a parent child relationship, the Court sees no reason why its rationale should not be

13 extended to a marital/spousal relationship.  Like the biological link between Wheeler and his

14 deceased mother was alone not enough to create a protected parent-child relationship, it would

15 seem that simply because a divorce has not yet been obtained does not mean that a marriage is

16 protected under the Fourteenth Amendment.  As long as a marriage relationship exists in which

17 both spouses intend to continue to support and be committed to each other as a married couple, the

18 Fourteenth Amendment will protect that relationship.  As suggested by *Wheeler*, however, when

19 the marriage relationship in reality no longer exists, the relationship will not be protected by the

20 Fourteenth Amendment.[18]

21         As applied to this case, Araujo's proffered testimony relates only to the spousal

22 relationship with Creasha.  Araujo's testimony indicates that when he spoke to Elkins in

23 November 2012, Elkins called Creasha a "bitch" and said that he was leaving her and getting a

24 divorce because Creasha was mad that Elkins was having an affair.  Additionally, although not

---

25 [17] The Court emphasizes that it in no way devalues the extremely difficult decision to relinquish a child for adoption.

26 Such decisions are often made out of love and with altruistic motives.  Moreover, as *Wheeler* noted, the fact that an
   adoption has occurred does not necessarily negate a Fourteenth Amendment claim involving a biological parent and

27 an adopted-out child.  See Wheeler, 894 F.3d at 1058.

28 [18] The key is that the marriage/spousal relationship actually exist, not that the relationship be free of tumult, strife, or
   even infidelity.

1   part of Araujo's testimony, Creasha admitted that Elkins had been living with his mistress in the

2   summer of 2012, and, although they were again living together in August 2012, she kicked him

3   out again and he was living in a trailer on his father's property in November 2012.  Further, in a

4   police report dated November 4, 2012, in which Creasha informed the police that Elkins had taken

5   Dylan and Devin away in a vehicle while he was under the influence of meth, Creasha reportedly

6   told the investigating officer:  "[Elkins] was asking [Creasha] if he attempted to 'come up' with

7   some money would she stay at the house.  [Creasha] said she is ending the relationship because

8   [Elkins] is a drug addict and is in and out of prison."  Doc. No. 258 at Ex. I.  Creasha also testified

9   that she threatened Elkins with divorce, but that she never meant it.  See Creasha Depo. 177:9-16.

10      The above recited evidence paints a picture of a marriage that may have been functionally

11   over by November 13, 2012.  Both Creasha and Elkins told third party law enforcement personnel

12   in November 2012 that the relationship was over or that a divorce would be obtained.  This is

13   bolstered in that Elkins had moved away with his mistress for three months in the summer of

14   2012, had been kicked out of the house after he returned from his mistress, and was again not

15   living with Creasha in November 2012.  A reasonable trier of fact could view this evidence and

16   conclude that the marriage relationship in November 2012 had in reality ceased to exist because

17   Creasha and Elkins no longer intended to be committed to each other as spouses.  Under *Wheeler*,

18   Creasha would have no Fourteenth Amendment familial relationship claim.  Cf. Wheeler, 894

19   F.3d at 1058-59.

20      Araujo's testimony is a highly relevant part of this collective evidence.  Given the

21   importance of the testimony to Creasha's ability to pursue a Fourteenth Amendment claim, the

22   testimony's probative value is not substantially outweighed by the danger of unfair prejudice for

23   purposes of Rule 403.  Therefore, Araujo will be permitted to testify as to what Elkins told him

24   about his relationship with Creasha and his stated intention to divorce her.

25      3.   Damages

26      Araujo's testimony relating to what Elkins said about Creasha and getting a divorce is

27   probative of the nature of the marital relationship.  Therefore, in addition to being relevant to

28   establishing a viable Fourteenth Amendment claim, the testimony is also probative of the value of

the comfort, society, and companionship that Creasha could have expected from Elkins had he not been killed on November 13, 2012.

In terms of criminal history, as discussed above, Elkins was not successfully serving the terms of his parole, and Araujo had petitioned twice for Elkins's parole to be revoked. The fact that Elkins was not performing well on probation and faced revocation, which could mean additional jail time and further parole, is relevant to the amount of time that Elkins would be able to spend with Plaintiffs. The less time that Elkins would be able to spend with the Plaintiffs affects the value of Elkins's comfort, society, affection, and companionship. While the Court is unaware of the precise penalty range that Elkins faced, the revocation of parole generally means more incarceration. The Court cannot conclude that the probative value of Araujo's testimony to the issue of damages is substantially outweighed by the danger of unfair prejudice for purposes of Rule 403. Therefore, the fact that Elkins was performing poorly on parole and faced revocation is admissible on the issue of damages.

*Ruling*

Plaintiffs' motion is denied in that Araujo may give evidence for purposes of damages and may provide evidence about Elkins and Creasha's martial relationship for purposes of Creasha's standing to bring a Fourteenth Amendment claim. Plaintiffs' motion is otherwise granted.


**III.** **Motion No. 3 – Exclude All Criminal History of Plaintiff Except What Was Disclosed at the November 13, 2012 Briefing**

*Plaintiff's Argument*

Plaintiffs argue that Pelayo had no information about Elkins's criminal history or prior law enforcement contacts, except for limited information that was disclosed during the law enforcement briefing on November 13, 2012. Because other criminal history was unknown to Pelayo, that information is irrelevant to the reasonableness assessment and Pelayo's use of deadly force. Moreover, admission of the criminal history would unfairly prejudice the jury against Elkins and also compel the Plaintiffs to either explain the circumstances of the prior history or mitigate its prejudicial impact. All of this is distracting to the central issues of the case and would

1  be unduly time consuming.  Finally, admission of the prior criminal history would violate Rule of

2  Evidence 404(a)(1) since it would permit the jury to believe that, since Elkins engaged in criminal

3  conduct in the past, he likely engaged in criminal conduct during the encounter with Pelayo.

4      *Defendants' Opposition*

5       Pelayo argues that Elkins's past criminal convictions and contacts with police are relevant

6  to both liability and damages.  First, the evidence is relevant to the Fourteenth Amendment

7  familial relationship claim because it shows that Elkins was away from his family for considerable

8  periods of time.  Elkins's criminal history also includes physical abuse of his wife Creasha, which

9  reflects on the martial relationship.  Second, the evidence is related to damages.  Periods of

10  incarceration reduce the amount of support and society that a prisoner can provide to his family.

11  Moreover, the considerable amount of time in prison that Elkins faced for the crimes he was

12  wanted in November 2012 would affect Elkins's family relationships.  Third, the evidence is

13  relevant under *Boyd* because it gives credence to the testimony that Elkins reached for his

14  waistband before shots were fired.  Specifically, Elkins's criminal history could support a

15  plausible explanation that Elkins would do anything to avoid capture and a lengthy sentence,

16  including reaching for his waistband.

17      *Plaintiffs' Reply*

18       Plaintiffs reply that only the criminal history of Elkins that Pelayo was aware of before the

19  shooting is relevant to the Fourth Amendment claim.  Elkins's criminal history is not relevant to

20  establishing Elkins's state of mind since that is not part of the Fourth Amendment claim and there

21  is nothing to suggest that Elkins was attempting suicide by cop.  Plaintiffs also argue that only

22  evidence of significant time spent incarcerated may be relevant to damages and the time that

23  Elkins spent away from his family.  Finally, Plaintiffs state that they may be examined about their

24  awareness of Elkins's criminal history to show that they had a close relationship with Elkins.

25      *Discussion*

26      1.      Criminal History Known By Pelayo

27       There is no dispute that the criminal history that was relayed during the briefing on

28  November 13 is admissible as part of the facts known to Pelayo at the time that he used deadly

force. Additionally, if, at the time he used force, Pelayo was somehow aware of an aspect of Elkins's criminal history that was not relayed during the November 13 briefing, that also would be admissible as part of the facts known to Pelayo.[19] In other words, be it from either the November 13 briefing or some other source, if Pelayo was aware of any aspect of Elkins's criminal history at the time he used force against Elkins, then that known criminal history is admissible as part of the totality of the circumstances. See Hunt v. Massi, 773 F.3d 361, 370 (1st Cir. 2014); Valtierra v. City of L.A., 99 F.Supp.3d 1190, 1194 (C.D. Cal. 2015); cf. Ruvalcaba v. City of L.A., 64 F.3d 1323, 1328 (9th Cir. 1995) (noting the officers' knowledge of the plaintiff's criminal history in the context of Fourth Amendment unreasonable search claim).

    2.    Damages

    The Court agrees that any non-trivial time Elkins spent away from his family is relevant to the issue of damages because the time spent away during incarceration would affect the nature and closeness of Elkins's relationships with the Plaintiffs. See Estate of Casillas v. City of Fresno, 2019 U.S. Dist. LEXIS 23710, *12 (E.D. Cal. Feb. 13, 2019); Castro v. County of L.A., 2015 U.S. Dist. LEXIS 103945, *12 (C.D. Cal. Aug. 3, 2015). Further, Plaintiffs agree that they can be questioned about Elkins's criminal history in order to show the closeness of their relationship with him. See Valtierra, 99 F.Supp.3d at 1194. Awareness of criminal history would demonstrate a close relationship, whereas lack of awareness would demonstrate a relationship that may not be as close as otherwise described. See id. However, identification of the amount of time spent away from the family due to incarceration, as well as any Plaintiff's awareness or lack thereof, can be conveyed to the jury without identifying the specific offenses that caused the incarceration; the relevant information is duration of incarceration, and knowledge of the fact of incarceration, not the reason for incarceration. To identify the specific offenses involved provides little probative value, but offers a great danger of undue prejudice. Therefore, while significant periods of incarceration can be identified, the reasons for the incarcerations/the specific crimes involved will not be admitted pursuant to Rule 403. See Valtierra, 99 F.Supp.3d at 1194.

---

[19] Of course, simply because Pelayo testifies that he knew about some part of Elkins's criminal history even though that part was not disclosed during the briefing does not mean that the fact would be conclusively established or that Plaintiffs could not somehow challenge the testimony.

Additionally, four noteworthy instances of police related contacts that did not result in convictions have been identified by Pelayo.  First, Elkins was investigated for domestic violence in February 2008 following a third party's call to the police.  See Doc. No. 258 at Ex. G.  The investigation indicated that two witnesses saw Elkins yell at Creasha while she was at a party, grab her by the neck while she was standing in a doorway, and then lead her away to his pickup truck.  See id.  Creasha told the investigating officers that this did not happen, that she got into the truck voluntarily, and that Elkins returned her to the party.  See id.  Creasha also did not have any marks on her neck.  See id.  After speaking with Creasha, the investigating officer closed the matter and no further actions were taken.  See id.  The Court agrees that this investigation has some relevance to the issue of damages.  However, the Court finds it significant that the investigation did not lead to any convictions, to any charges being filed, or to any further follow up investigation or actions of any kind, and that Creasha denied what others had reported.  Further, the Court is concerned that admission of this incident and investigation would lead to rebuttal evidence and the creation of a mini-trial on an issue with limited probative value.  Finally, considering the stigma that domestic violence has, there is a significant danger of this information biasing the jury against Elkins.  Given the above, the Court finds that any probative value from the February 2008 report of domestic violence is substantially outweighed by the danger of unfair prejudice and undue consumption of time under Rule 403.

Second, on November 4, 2012, Creasha called the police to report that Elkins had taken minors Dylan and Devin away in his vehicle while he was high on methamphetamine.  See Doc. No. 258 at Ex. I.  The Court finds that this conduct reflects on the nature of Elkins's judgment and actions towards Creasha, Dylan, and Devin.  As such, it is relevant to determining the value of these Plaintiffs' damages for the loss of Elkins's companionship, comfort, society, care, and advice.  Further, unlike the February 2008 police report, this law enforcement contact was initiated by Creasha herself and involves her and her two minor sons.  Therefore, the Court does not find that the probative value of this evidence on Plaintiffs' damages is substantially outweighed by the danger of unfair prejudice.

Third, in May 2012, a Tulare County Sheriff's Deputy investigated the Elkins's home after

a 911 hang-up.  <u>See</u> Doc. No. 258 at Ex. J.  When the deputy arrived, he saw Creasha in the driveway with blood on her hands and broken glass in the driveway.  <u>See id.</u>  Creasha said that she had punched the window of Elkins's truck as he was driving away.  <u>See id.</u>  Creasha had punched the window because she was mad that Elkins had pushed her head into a dresser and hurt her.  <u>See id.</u>  Creasha explained that Elkins would come and go from the house for days at a time, would come back to "come down" off of drugs and alcohol, and would become angry without warning and violently lash out.  <u>See id.</u>  The deputy recommended that the case be sent to review by the District Attorney.  <u>See id.</u>  The Court finds that this evidence is relevant to the issue of damages for the loss of Elkins's companionship, comfort, affection, care, and society.  Unlike the February 2008 incident, Creasha is describing violent behavior by Elkins to law enforcement, she indicated that it was not uncommon, and the deputy recommended that the file be forwarded for further review.  Therefore, the Court does not find that the probative value of this incident is substantially outweighed by the danger of unfair prejudice.

Finally, in July 2012, Creasha filed a request for a restraining order against Elkins based on domestic violence.  <u>See</u> Doc. No. 258 at Ex. K.  As part of the request, Creasha described regular and common physical violence by Elkins against her, declared that Elkins used drugs daily, and that she and her children are terrified of him.  <u>See id.</u>  She requested that Elkins stay 50 feet away from them, pay child support, not engage in violent or destructive conduct, and participate in a batterer intervention program.  <u>See id.</u>  The Court finds that Creasha's application for a restraining order is very relevant to the issue of damages for the loss of Elkins's companionship, comfort, affection, care, and society.  Considering that the application was filed with the Tulare County Superior Court and was supported by a declaration from Creasha herself, the Court does not find that the probative value of the application is outweighed to any degree by the danger of unfair prejudice.

### 3. Fourteenth Amendment Standing

The Court takes Pelayo to argue that Elkins's criminal history is relevant to establishing standing or lack thereof for Plaintiffs to pursue Fourteenth Amendment familial relationship claims.

49

One aspect of the November 4, 2012 incident discussed above is relevant to standing.  As hsa been discussed, Creasha told the responding officer that she was ending the relationship because Elkins was a drug addict who was in and out of prison.  See Doc. No. 258 at Ex. I.  Creasha's statement is evidence that suggests that the marriage relationship had in reality ceased to exist by November 13, 2012, and part of the reason was Elkins's incarceration history and drug habits.[20]  However, in admitting this statement by Creasha, the Court does not suggest that the full details of the November 4 incident are admissible.  Some context is nevertheless necessary for Creasha's statement to have meaning.  At this time, in connection with Creasha's statement that she was leaving Elkins because of his drug use and because he was in and out of prison, the jury may be informed that law enforcement were investigating a 911 hang-up from the Elkins's residence and that in the course of the investigation, Creasha was mad and made the statement.  At this time, the Court finds that further details would be unduly prejudicial.

Additionally, the Court finds that aspects of the July 2012 restraining order application is relevant to the issue of Creasha's standing to bring a Fourteenth Amendment claim.  Combined with the other evidence described above (statements of divorce/ending the relationship, Elkins living with his mistress, Elkins getting kicked out of the house after his return, and Elkins living in a trailer in his father's driveway), the restraining order could further support a finding that Creasha and Elkins no longer had an existent marriage relationship by November 13, 2012.[21]  However, the Court does not find that all aspects of the application are relevant for purposes of standing.  What is relevant is the fact that the request for a restraining order was filed by Creasha in July 2012, it was based generally on domestic violence, and it requested that Elkins stay 50 feet away from Creasha and the children.  The Court finds that the other details contained in Creasha's declaration would be too inflammatory under Rule 403 for liability purposes.

---

[20] Elkins's actions as reflected in the police report do not reflect an intent to abandon Dylan or Devin, nor do they reflect an intent by Elkins to cease being committed to Creasha in a marriage relationship.

[21] The Court notes that the restraining order application does not in and of itself show that the marriage relationship had ceased to exist.  The application was filed in July 2012, which is during the three months in which Elkins was living with his mistress.  Despite the restraining order application, it appears that Creasha took Elkins back in the late summer or early fall of 2012, but then kicked him out again.  Nevertheless, the fact that the restraining order application was submitted based on domestic abuse, and the fact that it requested that Elkins stay 50 feet away is a significant part of several pieces of information that collectively could support a finding that the marriage relationship was essentially non-existent by November 13, 2012.

1    Finally, the Court agrees that the time Elkins spent incarcerated could be expected to have

2    some form of adverse effect on his relationship with the Plaintiffs.  However, with the exception

3    of Creasha's statement during the November 4 incident, there is no evidence that shows Elkins's

4    prior incarcerations led to the essential abandonment or full destruction of any relationship with

5    the Plaintiffs.  That is, there is no evidence that the incarcerations caused a protectable familial

6    relationship to cease to exist by November 13, 2012.  Therefore, to the extent that Pelayo contends

7    that evidence of Elkins's incarcerations are relevant to determining a Plaintiff's standing to pursue

8    a Fourteenth Amendment claim, the Court finds no such relevance.  To the extent that periods of

9    incarceration may have some minimal relevance to the issue of standing, the danger of unfair

10   prejudice substantially outweighs that probative value for purposes of Rule 403.

11   In sum, with the exception of Creasha's statement during the November 4 incident and

12   limited aspects of the July 2012 restraining order application, no other aspects of Elkins's criminal

13   history is admissible on the issue of Plaintiffs' standing to pursue Fourteenth Amendment claims.

14   **4.    Corroborate Pelayo's Version of Events**

15   The Court cannot agree that Elkins's criminal history makes Pelayo's version of events

16   more plausible or shows that Elkins would do anything to avoid further incarceration.  The Court

17   recognizes that *Boyd* found evidence of the decedent's criminal history and the lengthy prison

18   sentence the decedent faced to be probative of the defendant officer's version of events, in

19   particular that the decedent was attempting to provoke a suicide by cop.  See *Boyd*, 576 F.3d at

20   943-45.[22]  The criminal history of the decedent in *Boyd* was part of a constellation of facts,

21   including the decedent's open and vocal support for killing police officers, that supported a suicide

22   by cop defense theory.  See id.  In this case, however, there is no evidence that Elkins ever

23   admitted or said things to the effect that he would do anything to prevent going back to prison, he

24   would rather die than go to prison, that he hated the police, or that he advocated killing the police.

25   ─────────────

26   [22] *Boyd* did not identify any aspects of the decedent's criminal history.  See *Boyd*, 576 F.3d at 944-45.  *Boyd* did find significant that the decedent's conduct that led to his death (the attempted kidnapping of two women at gunpoint), would lead to a lengthy prison sentence.  See id. at 945.  In this case, the jury will hear evidence of the crimes

27   involved at the time Pelayo utilized deadly force because those crimes were either told to Pelayo during the November 13 briefing or because the nature of the crime involved is a factor that must be considered under *Graham v. Connor*.

28   At least one of those crimes, attempted murder of a police officer, is extremely serious and would carry a lengthy jail term.  Under *Boyd* and *Graham*, evidence of lengthy jail time faced by Elkins for the crimes at issue is admissible.

1  Cf. id.  Simply because one has been arrested or spent time in prison on multiple occasions does

2  not mean that one would do anything, particularly when confronted by an officer with his service

3  pistol drawn, to avoid apprehension and further incarceration.  Connecting Elkins's criminal

4  history to a desire to avoid further incarceration and thus, make it more likely that Elkins reached

5  for his waistband just before Pelayo fired, seems very speculative.  To the extent that Elkins's

6  criminal history has some probative value under *Boyd*, the Court finds that it is substantially

7  outweighed by the danger of unfair prejudice and thus, excludable under Rule 403.

8        5.   Dylan's Wrongful Death Standing

9        As discussed above, Creasha's deposition testimony has created a disputed issue of

10  material fact regarding the standing of Dylan to pursue a state law wrongful death claim.  The

11  dispute is based on Elkins's dates of incarceration in 2005, Dylan's birthdate in 2005, and

12  Creasha's testimony that she did not visit Elkins during that incarceration.  To resolve this dispute,

13  the precise dates of the 2005 incarceration, but not the reason for incarceration, may be admitted.

14        *Ruling*

15        Plaintiffs' motion is denied in that: (1) non-trivial periods of incarceration, the three police

16  encounters described above, and the Plaintiffs' awareness of Elkins's criminal history in general

17  (without reference to the specific nature of any arrests or convictions) are admissible on the issue

18  of damages, (2) limited aspects of the July 2012 application for a restraining order and the

19  November 4, 2012 police investigation are admissible regarding Creasha's standing to pursue a

20  Fourteenth Amendment claim; (3) the precise dates of Elkins's incarceration during 2005 is

21  admissible on the issue of Dylan's standing to pursue a wrongful death claim; and (4) the

22  seriousness of the crimes for which Elkins was wanted as of November 13, 2012, is admissible as

23  to the Fourth Amendment claim.  Plaintiffs' motion is otherwise granted.

24

25  **IV.**    **Motion No. 4 – Exclude Evidence Relating to Personal Problems Between Elkins and**

26      **His Wife Creasha**

27      *Plaintiff's Argument*

28      Plaintiffs argue that Defendants seek to introduce evidence of an extra-marital affair,

complaints of domestic violence, and threats of divorce between Elkins and Creasha.  However, this evidence has nothing to do with the loss of love, care, support, and companionship that Creasha has sustained from the death of her husband, as the alleged difficulties did not affect her love for her husband.  Thus, this evidence should be excluded.  Alternatively, any relevance such evidence has is greatly outweighed by the danger of unfair prejudice and will waste the jury's time because the trial will turn into a messy he-said she-said argument.

### Defendants' Opposition

Pelayo argues that evidence of marital problems[23] is relevant to show the nature of the relationships between Elkins and the Plaintiffs.  The jury should be able to hear evidence to evaluate the relationships that were allegedly damaged by Elkins's death.  Evidence of affairs, estrangement, verbal and physical abuse, legal disputes, and time apart because of incarceration all undercut Creasha's representations concerning the nature of her marriage and are relevant to assessing her loss of Elkins's society, comfort, and affection.

### Plaintiff's Reply

Plaintiffs reply that the evidence that Pelayo seeks to introduce concerning marital problems is unduly prejudicial, needlessly cumulative, confusing, and misleading.  Plaintiffs have never held Elkins out to be a saint and have been open about Elkins's criminal history, drug usage, and martial problems, but the evidence Pelayo seeks to introduce is done with a motive to embarrass and is extremely inflammatory.  Moreover, none of the evidence regarding marital problems is relevant to Pelayo's decision to use force.

### Discussion

The Court agrees in part with Plaintiffs in that Pelayo had no information regarding marital problems between Elkins and Creasha.  Further, the marital problems between Creasha and Elkins would not make Pelayo's version of events either more or less credible under *Boyd*.  Therefore, the marital problems have no relevance to the Fourth Amendment excessive force claim.

---

[23] Pelayo's opposition includes evidence that is not limited to marriage problems, such as Elkins's potential prison terms and his nickname for Valiecia.  Evidence that does not actually concern problems in the marriage relationship between Creasha and Elkins will not be addressed in as part of the order on this motion in limine.

1    To the extent that Pelayo contends that evidence of marital problems affects Creasha's

2  standing to bring a Fourteenth Amendment claim, the Court agrees in part.  As discussed above,

3  the Court has found that certain aspects of the marital problems between Creasha and Elkins is

4  admissible to show that Creasha and Elkins did not have a martial relationship that was protected

5  by the Fourteenth Amendment by November 13, 2012.  Specifically, evidence that both Creasha

6  and Elkins told law enforcement personnel that the relationship was ending or that a divorce

7  would be obtained, Elkins's other statements about Creasha or his marriage to Araujo, that Elkins

8  had lived with his mistress for three months in the summer of 2012, that Elkins was living in a

9  trailer in his father's driveway in November 2012 because Creasha had thrown him out, and that

10 Creasha had applied for a restraining order in July 2012 that requested that Elkins stay 50 feet

11 away is admissible.  At this time, the Court is not satisfied that any other identified marital

12 problems are sufficiently relevant or not excludable under Rule 403 as unduly prejudicial, time

13 consuming, and confusing, to be admissible.

14    With respect to damages, the Court agrees with Pelayo that evidence of the marital

15 problems described in this motion is relevant to damages.  For the state law wrongful death

16 claims, the pecuniary value of Elkins's protection, comfort, affection, care, advice, and society is

17 recoverable.  See Corder, 41 Cal.4th at 661-62; Bouley, 127 Cal.App.4th 601, 610.  For the

18 Fourteenth Amendment claim, grief, sorrow, mental anguish, and loss of companionship are

19 recoverable.  See Johnson, 724 F.3d at 1169 (describing "loss of companionship" claim); Borunda,

20 885 F.2d at 1389.  For both the state law and Fourteenth Amendment claims, the nature of the

21 relationship is relevant to and directly reflects on the value of the loss sustained from Elkins's

22 death.  Episodes of abuse, estrangement, and extramarital affairs are relevant to assessing

23 Creasha's relationship with Elkins and thus, the nature and value of her loss.  While this evidence

24 is embarrassing and uncomfortable, it is nonetheless very relevant, and the Court cannot hold that

25 the probative value to damages is substantially outweighed by the danger of unfair prejudice.

26    *Ruling*

27    Plaintiffs' motion is denied in that:  (1) limited evidence (as identified above) may be

28 admitted on the issue of Creasha's standing to pursue a Fourteenth Amendment claim, and (2)

1  evidence of marital problems between Elkins and Creasha may be admitted on the issue of

2  damages for Creasha's individual claims.  Plaintiffs' motion is otherwise granted.

3

4  **V.    Exclude All Evidence of Drug Use or History of Drug Use By Elkins**

5        *Plaintiff's Argument*

6        Plaintiffs argue that Pelayo had no information about current or past drug use by Elkins at

7  the time of the shooting.  Because Pelayo was not aware of any drug use by Elkins, such

8  information would have no bearing on whether Pelayo's use of force was reasonable.  Further,

9  Defendants have no proper evidence that would link Elkins's actions to any drug or alcohol use.

10 There are no expert opinions that explain how any amount of drugs would affect human

11 perception or behavior.  Alternatively, any probative value that Elkins's past or current drug use

12 (including the day of the incident), as well as evidence of the toxicology report following the

13 shooting, are unduly prejudicial and will result in a mini-trial.  Finally, evidence of Elkins's drug

14 consumption constitutes impermissible character evidence under FRE 404 because the jury could

15 infer that Elkins's past bad behavior meant that he engaged in bad behavior during the encounter

16 with Pelayo.

17        *Defendants' Opposition*

18        Pelayo contends that exclusion of Elkins's drug use and history of drug use is admissible

19 for a number of reasons.  First, Elkins had an extremely high amount of methamphetamine in his

20 system on November 13, and a toxicologist confirmed that the levels are consistent with chronic

21 use and aggressive, erratic, paranoid, and agitated behavior.  The methamphetamine levels would

22 explain Elkins's behavior and make Pelayo's version of events more likely.  These levels also

23 confirm Pelayo's testimony that he was briefed that Elkins was under the influence of meth.

24 Second, a meth pipe was found on Elkins after he was shot.  The presence of the pipe further

25 corroborates Pelayo's version of events that Elkins reached for his waistband.  Third, Elkins's

26 long term drug use is relevant to explain Elkins's behavior in the days and months prior to

27 November 13, 2012.  Creasha was aware that Elkins used drugs on November 13, but also knew

28 that Elkins's drug use over time showed that he would demonstrate poor decision making, harmed

others, and would place others at risk.  Creasha admitted that while Elkins was using meth, they were angry with each other, they would verbally and physically fight, and Elkins's behavior was unpredictable.  Fourth, Elkins's drug use is relevant to Plaintiffs' standing to bring a Fourteenth Amendment claim because Plaintiffs testified that Elkins's drug use harmed their relationship with him.  If the relationship with Elkins was not sufficiently robust, Plaintiffs cannot bring a Fourteenth Amendment claim.  Fifth, Elkins's history of drug abuse and addiction is relevant to Plaintiffs' damages claims.  Elkins's drug abuse would affect Elkins's life expectancy, habits, activities, health, and lifestyle, and affect the Plaintiffs' loss of society and consortium damages.  Finally, while the above evidence prejudicial, it is highly probative and not unfairly prejudicial.

*Plaintiffs' Reply*

Plaintiffs reply that Elkins's drug use history and toxicology reports have no relevance to the reasonableness of Pelayo's use of force.  There is no contention that Elkins was attempting suicide by cop, and Elkins's mental state is not at issue.  Further, while Pelayo may have heard that Elkins was using meth, there is no evidence that Pelayo knew how intoxicated Elkins was at the time of the shooting or that the levels of Elkins's methamphetamine intoxication contributed to the decision to shoot.  Pelayo's expert Dr. Burr Hartman's description of the levels of intoxication, that Elkins "probably thought he was Superman" or "If I were a responding officer, I'd be nervous as hell," are unduly prejudicial and highly inflammatory and thus, should be excluded.  Finally, while drug usage could be relevant to damages, the proper method of introducing such evidence is to question Plaintiffs about their knowledge of Elkins's drug usage and how that usage affected their relationship.

*Discussion*

1.   Methamphetamine Pipe

There is no dispute that a methamphetamine pipe was found on Elkins in the area where Pelayo alleged that Elkins had reached just before Pelayo fired shots.  Plaintiffs do not specifically address the meth pipe as part of the briefing on this motion.  As explained in the summary judgment order, the presence of the meth pipe provides a reason why Elkins may have reached towards his waistband (as alleged by Pelayo), either because the pipe hurt Elkins after he landed

1  from the fence or because he might have been trying to discard the pipe.  Because the presence of

2  the pipe makes Pelayo's version of events more credible in that the pipe provides a reason why

3  Elkins may have reached towards his waistband, evidence that the pipe was found on Elkins is

4  admissible.

5         2.      Corroboration of Pelayo's Version of Events, Explanation of Elkins's Behavior, &

6                 Confirmation that Elkins was Under the Influence

7         "[W]here what the officer perceived just prior to the use of force is in dispute, evidence

8  that may support one version of events over another is relevant and admissible."  Boyd, 576 F.3d

9  at 944.  The supportive evidence need not be known by the officers at the time force was used.

10  See Crawford v. City of Bakersfield, 944 F.3d 1070, 1079 (9th Cir. 2019).  There appears to be no

11  dispute that Elkins had taken a large quantity of methamphetamine on November 13.  A post-

12  mortem toxicology report indicated a level that was seven times greater than what is considered

13  "therapeutic."  It is well known that alcohol and drugs can affect an individual's perceptions and

14  actions.  See Turner v. County of Kern, 2014 U.S. Dist. LEXIS 18573, *5-*7 (E.D. Cal. Feb. 13,

15  2014).  The testimony of toxicologist Hartmann confirms that the large quantity of

16  methamphetamine was consistent with a chronic abuser and could reasonably be expected to alter

17  Elkins's perceptions, beliefs, behavior, and actions.  Hartmann describes the large level of

18  methamphetamine in Elkins's system as causing Elkins to probably believe that he was Superman.

19  Pelayo's version of events has Elkins running from the police, running through a mechanic's

20  shop/garage and throwing tools at and in the path of another officer, jumping a fence, ignoring

21  commands to stop, and reaching for his waistband prior to shots being fired.  This version of

22  events is made more believable when considering that there was a large quantity of

23  methamphetamine in Elkins's system, and that quantity could be expected to alter perceptions and

24  judgment and make one think that they are Superman.  Therefore, under *Boyd*, evidence of the

25  quantity of methamphetamine found in Elkins's system, as well as Hartmann's testimony that

26  describes that quantity and expected behavior from such quantities, are admissible to corroborate

27  Pelayo's version of events, corroborate Pelayo's testimony that he understood that Elkins was on

28

1  meth, see Pelayo Depo. 54:5-20, and explain Elkins's behavior.[24]  See N.G. v. City of L.A., 746 F.

2  App'x 659, 662 (9th Cir. 2018); Boyd,  576 F.3d at 944; Castro, 2015 U.S. Dist. LEXIS 103945 at

3  *17; Turner, 2014 U.S. Dist. LEXIS 18573 at *5-*7.

4        3.    Damages

5        Evidence of Elkins longstanding drug use, and more importantly the effect that Elkins's

6  drug use had on Plaintiffs, is relevant and admissible to show damages, particularly regarding

7  mental anguish and the loss of Elkins's companionship, comfort, advice, and society.  See Estate

8  of Casillas v. City of Fresno, 2019 U.S. Dist. LEXIS 23710, *9 (E.D. Cal. Feb. 13, 2019); Castro,

9  2015 U.S. Dist. LEXIS 103945 at *11.  Any evidence submitted regarding Elkins's drug use must

10  have a strong tendency to demonstrate a negative effect on Elkins's relationship with Plaintiffs.[25]

11  However, to demonstrate Elkins's drug use and its effects on Plaintiffs' relationship with Elkins, it

12  is not necessary to delve into the details of all convictions, all law enforcement contacts involving

13  drugs, or all episodes in which Elkins acted high or came down from a meth high.

14        4.    Fourteenth Amendment Standing

15        Pelayo contends that Elkins's drug use is relevant to the Fourteenth Amendment claims of

16  Terrell and Creasha.  The Court has found that Creasha's statement that she was ending her

17  relationship with Elkins because he was a drug addict and in and out of prison is admissible.  The

18  Court does not find that additional evidence of Elkins's history of drug use is sufficiently

19  probative to show that the marriage relationship had essentially ceased to exist by November 13,

20  2012.  To the extent that there is some probative value, the danger of unfair prejudice and undue

21  consumption of time substantially outweighs that probative value under Rule 403.

22        As to Terrell, there is no evidence that a parent child relationship did not exist or that such

23  a relationship had been abandoned by November 13, 2012.  That Terrell may have denied

24

_____

25  [24] As part of Plaintiffs' reply, they identify two aspects of Hartmann's testimony that they argue is speculative and
    unduly prejudicial.  Pelayo has not had an opportunity to respond to these arguments.  Therefore, the Court reserves

26  ruling on the two statements by Hartmann that are identified in Plaintiffs' reply.

27  [25] Given the proffered testimony of Dr. Hartmann that Elkins was a chronic user, and Creasha's statements to the
    effect that Elkins was using drugs on a daily basis, there is a potentially large body of evidence the demonstrates

28  Elkins's drug use.  While the Court cannot so hold at this point, there may come a point in which evidence becomes
    unduly cumulative under Rule 403.

knowledge of Elkins's drug history is relevant to the issue of damages, see Valtierra, 99 F.Supp.3d at 1194, not to whether Terrell can pursue a Fourteenth Amendment claim.  Therefore, Elkins's history of drug use may not be admitted in connection with Terrell's ability to bring a Fourteenth Amendment claim.

        5.    Drug Use for the Months Prior to November 13, 2012

      The Court does not find that evidence of Elkins's drug use is admissible to explain his actions in the days prior to November 13 when he had encounters with law enforcement.  While Elkins's conduct on November 11 and November 12 has relevance, that relevance deals with Pelayo's knowledge of Elkins's conduct on those days.  Pelayo was made aware of certain aspects of Elkins's conduct on those days as part of the November 13 briefing.  What is important is that information about Elkins's conduct was relayed to Pelayo, it is not necessary to understand why Elkins behaved the way he did on November 11 and 12.

      Creasha has testified that Elkins was using drugs heavily, was abusive, and was unpredictable.  That information is encompassed by the testimony of Dr. Hartmann, who testified that the toxicology report showed an exceptionally high level of methamphetamine in Elkins's system, that the levels would be associated with a chronic user, and that the levels in Elkins's system could be expected to alter Elkins's behavior, perceptions, and actions.  That is, Dr. Hartmann's testimony shows that Elkins was using a large amount of meth recently, had been using meth for quite some time, and the amount of meth could make Elkins's actions unpredictable.  At this time, Creasha's testimony would be unduly cumulative and prejudicial, compared to Dr. Hartmann's testimony.

      *Ruling*

      Plaintiffs' motion is denied in that:  (1) drug use as reflected in the toxicology reports, toxicology opinions, and the meth pipe may be admitted to explain Elkins's behavior, confirm Pelayo's knowledge/information that Elkins was high on meth, and to corroborate Pelayo's version of events; (2) evidence of Elkins's longstanding drug use and its effects on the Plaintiffs' relationship with him may be admitted for purposes of damages; and (3) evidence of Creasha's statement that she was ending her relationship with Elkins because of his drug use and being in

and out of prison may be admitted for purposes of Creasha's standing to pursue a Fourteenth Amendment claim.  Plaintiffs' motion is otherwise granted.

## VI.    Motion No. 6 – Exclude the Criminal History of Any Individual Plaintiff

### *Plaintiff's Argument*

Plaintiffs argue that any of their criminal histories are irrelevant and have nothing to do with the use of force by Pelayo.  Further, to the extent that any criminal history has relevance, such relevance is substantially outweighed by the risk of unfair prejudice.

### *Defendant's Opposition*

Pelayo argues that this MIL is too broad and contrary to FRE 608 and 609.  For example, Tina Terrell had a felony conviction from January 2010.  Terrell failed to disclose at her 2015 deposition that she was convicted of felony fraud, even though she was on active probation and had been found to have violated her probation less than two years prior to her deposition.  The convictions and Terrell's failure to disclose her fraud conviction are admissible to show Terrell's character for truthfulness and honesty.  Additionally, Creasha Elkins has been the subject of several criminal cases in recent years.  Those cases may be admissible under FRE 608 or 609.

### *Plaintiffs' Reply*

Plaintiffs reply that Creasha's and Terrell's criminal histories are irrelevant since they will only testify to their loss of love, support, and companionship from Elkins's death.  There is no evidence that any crimes by Creasha or Terrell were punishable by imprisonment for more than one year.  While Terrell has a fraud conviction, it is more than 10 years old.  The criminal histories are too prejudicial in relation to the testimony that will be offered by Creasha and Terrell.

### *Legal Standard*

"Testimony about a witness's credibility is prohibited unless it is admissible as character evidence."  See United States v. Sanchez-Lima, 161 F.3d 545, 548 (9th Cir. 1998).  Under FRE 608(a), witnesses can give an opinion about a witness's reputation for truthfulness or untruthfulness.  See Fed. R. Civ. P. 608(a).  Also, FRE 608(b) "allows a cross-examiner to impeach a witness by asking him about specific instances of past conduct, other than crimes

1  covered by [FRE] 609, which are probative of his veracity or 'character for truthfulness or

2  untruthfulness.'  The Rule limits the inquiry to cross-examination of the witness, however, and

3  prohibits the cross-examiner from introducing extrinsic evidence of the witness's past conduct."

4  United States v. Abel, 469 U.S. 45, 55 (1984) (discussing FRE 608(b)).  "Rule 608(b) permits

5  impeachment . . . by specific acts that have not resulted in a criminal conviction."  United States v.

6  Osazuwa, 564 F.3d 1169, 1175 (9th Cir. 2009).

7      To attack a witness's character for truthfulness, evidence of felony convictions or

8  convictions for crimes involving dishonesty or false statements are admissible.  See Fed. R. Evid.

9  609(a).  However, evidence of a conviction that is 10 years old (or more) is admissible "only if:

10  (1) its probative value, supported by specific facts and circumstances, substantially outweigh its

11  prejudicial effect."  Fed. R. Evid. 609(b)(1).  "Evidence relating to impeachment by way of

12  criminal conviction is treated exclusively under Rule 609."  Osazuwa, 564 F.3d at 1175.

13      *Discussion*

14      Pelayo has noted that Creasha has been the subject of criminal cases over the last few

15  years.  However, Pelayo has not identified any convictions of Creasha or explained how the

16  "criminal cases," assuming that they did not result in convictions, could be admissible under Rule

17  608(b).  Presumably Pelayo is aware of any convictions that Creasha has, as well as the nature of

18  the criminal cases against her.  The fact that there is no showing of how Rule 608 or Rule 609

19  could apply to Creasha, the Court can only conclude that Creasha has no convictions that fit within

20  Rule 609, and that Creasha's criminal cases do not reflect on Creasha's character for truthfulness.

21      With respect to Terrell, it appears that she was convicted in 2010 of fraud in connection

22  with obtaining government benefits/welfare.  See Doc. No. 254 at Ex. A.  However, that

23  conviction is over 10 years old.  Rule 609(b)(1) creates a presumption against admissibility of

24  convictions that are 10 years old or over, United States v. Portillo, 633 F.2d 1313, 1323 (9th Cir.

25  1980), and its standard for admissibility has been described as "stringent."  United States v.

26  Beahm, 664 F.2d 414, 418 (4th Cir. 1981); United States v. Lane, 2013 U.S. Dist. LEXIS 99078,

27  *2 (D. Ariz. July 16, 2013).  Given the Rule 609(b)(1) standard, stale convictions will be admitted

28  "very rarely and only in exceptional circumstances . . . ."  Simpson v. Thomas, 528 F.3d 685, 690

(9th Cir. 2008).  While the Court agrees that this conviction is probative of truthfulness, the Court cannot hold that Pelayo has pointed to specific facts or circumstances that show the probative value of the conviction substantially outweighs the fraud conviction's prejudicial effect.[26] Therefore, the Court finds that evidence of Terrell's 12 year old fraud conviction is not admissible through Rule 609(b)(1).

That being said, Pelayo has submitted the 2015 deposition testimony of Terrell in which she stated that she had only been convicted of one felony in 1999 or 2000 and that it had been expunged.  See Terrell Depo. 23:4-13.  Terrell did not mention the 2010 fraud conviction, even though she had a probation violation in August 2013 and was still on probation for that fraud conviction at the time of her deposition.  See Doc. No. 254 Ex. B.  Although it is possible that there may be an innocent explanation for her deposition testimony, the fact remains that Terrell's testimony is false.  The Court finds Terrell's failure to identify the 2010 conviction to be significant and probative of her character for truthfulness.  Under Rule 608(b), it is appropriate for Pelayo to cross-examine Terrell about her failure to disclose the 2010 conviction during her 2015 deposition.  In questioning Terrell about her inaccurate deposition testimony, the parties will refer to the fraud conviction at issue as simply the "2010 conviction."

*Ruling*

This motion is granted in that Defendant will be precluded from eliciting testimony or admitting evidence of Creasha's "criminal cases" and Terrell's 2010 conviction for felony fraud. This motion is denied in that Defendant may question Terrell under Rule 608 regarding her failure to disclose the 2010 conviction during her deposition.

//

//

//

//

---

[26] In deciding the admissibility under Rule 609(b)(1), district courts in a criminal case are to consider:  (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the witness's testimony; and (5) the centrality of the witness's testimony.  United States v. Hursh, 217 F.3d 761, 768 (9th Cir. 2000).  The Ninth Circuit has indicated that these factors may also be considered in a civil case.  Simpson, 528 F.3d at 690 n.3.

1

**ORDER**

2       Accordingly, IT IS HEREBY ORDERED that:

3  1.    Plaintiffs' motions in limine (Doc. Nos. 155, 156, 157, 158, 159, and 248) are GRANTED

4       IN PART and DENIED IN PART as set forth above; and

5  2.    Defendant's motions in limine (Doc. Nos. 146, 147, 148, 149, 151, 152, and 153) are

6       GRANTED IN PART and DENIED IN PART as set forth above.

7

8  IT IS SO ORDERED.

9  Dated:   April 14, 2022

                                   SENIOR  DISTRICT  JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28